Samuel P. Norton and Estate of Beatrice Norton, Deceased, Samuel P. Norton, Administrator v. Commissioner.
Norton v. Commissioner
Docket Nos. 67854, 74913, 74914, 77098, 91362, 94829[1]
.
United States Tax Court
T.C. Memo 1970-279; 1970 Tax Ct. Memo LEXIS 82; 29 T.C.M. (CCH) 1257; T.C.M. (RIA) 70279; September 30, 1970. Filed *82 Issue 1: Government Bonds Transactions. (a) Held, upon the facts: That in each one of the four transactions involving $1,000,000 Federal Land Bank bonds, $100,000 U.S. Treasury bonds, $100,000 Treasury bonds, and $500,000 Treasury notes, respectively, the petitioner. Samuel P. Norton, did not enter into a bond fide transaction in each instance, on February 11, 1953, February 26, 1954, March 1, 1954, and December 23, 1955, respectively, for the purchase of the securities which purportedly were involved; that each transaction was without substance and reality and was a sham transaction; that none of the transactions can be recognized for tax purposes; that in reality petitioner did not purchase the securities referred to in each transaction; that petitioner did not borrow and was not indebted for, in the respective transactions, $1,052,000, $105,000, $105,000, $475,000 (note to Gibraltar), and $25,000 (note to CHK); and that the amounts paid by Norton during the 7 taxable years, 1953-1959, pursuant to his several "notes" were not interest paid on indebtedness and, therefore, were not deductible under section 23(b), 1939 Code, and section 163(a), 1954 Code. (b) Held, That as each *83 purported transaction was a sham, there shall be excluded from taxable income, under Rule 50, for the taxable years the respective amounts which petitioner reported and included in income as "interest" on the Government securities, and the so-called "capital gain" from purported sales of the securities. (c) Held, upon the facts: That, with respect to Transaction A, which is the only transaction involved under petitioner's alternative claim for a loss deduction since, inter alia, the years 1960 and 1961 are not before the in Transaction A, $9,322.88, as a loss under either sections 165(c)(2), 212(2) or 1234, 1954 Code. Issue 2: Income in 1953 from BRNM Law Partnership. Held, upon the facts: That petitioner, Norton, did not realize unreported income from the BRNM law partnership in the amount of $9,876.59, and that his share of the partnership income did not exceed $17,989.44; and therefore respondent's determination was not correct. Issue 3: Addition to 1954 Income Tax. Held: That for 1954, in each one of the separate income tax returns of the petitioner, Docket Nos. 74913 and 74914, there was a substantial underestimation of the estimated tax and, therefore, each petitioner *84 is liable for an addition to the 1954 tax under section 294(d)(2), 1939 Code, applicable to the year 1954. DeWitt M. Sherwood, 20 T.C. 733, 734 (1953), followed. *85 Samuel P. Norton, 242 N. Canon Dr., Beverly Hills, Calif., for the petitioners. Eli Blumenfeld and Myron Weiss, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax for the years of 1953 through 1959, and additions to tax for 1954 under section 294(d)(2), 1939 Code, as follows: Year
Docket No.
Deficiency
Sec. 294(d)(2)
1953
67854
$ 30,582.59
1954
74913
10,991.98
$ 701.31
1954
74914
11,159.99
723.63
1955
77098
30,763.42
1956
77098
$21,546.05
1957
91362
16,407.79
1958
94829
5,098.82
1959
94829 1,893.85
$128,444.49
$1,424.94
*86 The issues are: (1) Whether payments in each of the 7 taxable years, in the following amounts, totaling $224,449.11, were payments of interest on indebtedness within section 23(b), 1259 1939 Code, and section 163(a), 1954 Code, so as to be deductible; and if not, whether they are deductible as losses. This issue involves purported loans to make alleged purchases of Federal Land Bank bonds, United States Treasury bonds, and United States Treasury notes. Year
Docket No.
Payments
1953
67854
$ 43,999.89
1954
74913
20,108.78
1954
74914
20,108.78
1955
77098
52,456.31
1956
77098
32,021.82
1957
91362
32,313.61
1958
94829
15,939.92
1959
94829 7,500.00
Total
$224,449.11
The deductions taken as "interest" related to payments made by the petitioner, Samuel P. Norton, pursuant to 4 transactions which purportedly involved Government securities of different types. The following schedule provides explanations of the deductions taken on the tax returns for each of the taxable years with respect to each transaction:
Year
Trans-action
Payments
Per Tax ReturnsTotal Deduction
1953
A $43,999.89 $43,999.89
1954
A
$31,777.71
B
4,222.22
C 4,217.63 $40,217.56
1955
A
$21,999.96
B
4,222.24
C
4,217.64
D
16,867.41
D 5,149.11
* $52,456.36 $52,456.31
1956
A
$17,782.76
B
4,222.24
C
4,217.64
D 5,799.18 $32,021.82
1957
A
$16,373.73
B
4,222.24
C
4,217.64
D 7,500.00 $32,313.61
1958
B
$ 4,222.17
C
4,217.60
D 7,500.00
** $15,939.77 $15,939.92
1959 D
$ 7,500.00
$ 7,500.00
*87 (2) Whether the petitioner, Samuel P. Norton, realized additional income in 1953 from a law partnership in the amount of $9,876.59. (3) Whether each one of the petitioners is liable for the addition to the tax for 1954 for a substantial under-estimation of the estimated income tax for 1954 as provided by section 294(d)(2), 1939 Code, and section 6554(h), 1954 Code. In Docket No. 77098, with respect to the year 1956, the respondent concedes that deductions are allowable, totaling $1,275, for amortization of bond premium on Republic of Cuba bonds due June 30, 1967. Effect will be given under Rule 50 to respondent's agreement. Findings of Fact Samuel P. Norton and his wife, Beatrice Norton, were residents of Beverly Hills, California, at the time the petitions in these cases were filed. Their joint and individual tax returns were filed for calendar years, on the cash basis. Individual returns were filed for 1954; joint returns were filed for each of the other taxable years. All of the returns were filed with the district director of internal revenue *88 at Los Angeles, California. After the trial of these cases, Beatrice Norton died. Since all of the issues relate to Samuel P. Norton, he is referred to hereinafter as the petitioner, or, for convenience, as Norton. The late Beatrice Norton was involved in these cases, for 1954, only because an election was made to file separate returns for that year. Also, because separate returns were filed, certain items of income and claimed deductions on the 1954 return of Beatrice Norton relate to transactions, here in issue, of Samuel P. Norton. Issue 1: Federal Land Bank Bonds; U.S. Treasury Bonds and Notes; Deductions for Payments of Alleged Interest on Purported Loans Norton is a lawyer who is duly licensed to practice law in California. He was engaged in the practice of law at all times material. During the taxable years, he was a partner in the law firm of Brand, Rosenthal, Norton & Miller, which was dissolved on February 23, 1953, and thereafter he was a partner in the law firm of Rosenthal & Norton having its offices at first at 242 North Canon Drive, Beverly Hills, and later at 250 North Canon Drive. At the time of the trial of these cases and before, Norton was not a partner *89 of Rosenthal, and he maintained his own law office. James 1260 B. Rosenthal [2] was Norton's former law partner. Rosenthal and Norton were business advisers to, as well as attorneys for, during 1952-1959, several individuals employed in the motion picture industry, among whom were Martin Melcher and Doris Day Melcher, [3] and Gordon MacRae.[4]
In December 1952 Norton and Rosenthal discussed with certain individuals, their clients, the possibility of entering into a certain type of transaction involving the "purchase", or purported purchase, of substantial amounts of securities issued by the Government or its departments, such as United States Treasury bonds or notes and Federal Land Bank bonds, in which type of transaction the client purportedly would utilize "borrowed" funds and pay "interest" *90 thereon. Gordon MacRae was a client of the Rosenthal and Norton law firm. That kind of transaction could be, and was, handled by Cantor, Fitzgerald Co. (C-F), brokers and dealers in securities in Beverly Hills. Norton was a close friend of B. Gerald Cantor, the president of Cantor, Fitzgerald during the taxable years. During the years 1959-1964, Norton was a vice president of Cantor, Fitzgerald (during which time he may not have engaged in the private practice of law, as he discontinued his private law practice on March 1, 1959). The Gibraltar Financial Corporation, in New York City, was incorporated under the laws of New York on about December 24, 1952, with invested capital of $2,000, and with initial borrowed working capital of $1,500. During the years involved here, no additional working capital was invested in Gibraltar. Gibraltar was not subject to regulations of the Securities and Exchange Commission. Gibraltar was the correspondent in New York City of Cantor, Fitzgerald, and the latter was Gibraltar's correspondent in California. The principal business of Gibraltar during the taxable years was trading in securities, including municipal bonds, U.S. Treasury obligations, *91 and Government bonds, and it engaged in transactions such as are in issue in these cases. Jack Bernstein was an employee of Cantor, Fitzgerald from April 1946 until November 1952. He was the sole shareholder of Gibraltar from January or February 1953 until April 10, 1956, and during that period he was a director, a vice president, and an employee of Gibraltar, except for a few months, November 1952 until January 1953. Bernstein is now employed by C-F, having become an employee, again, on May 1, 1963. The books and records of Gibraltar reflect that during its first week of business, December 24 to 31, 1952, it entered on its books "loans" to customers totaling 17 million dollars; that its first "loan", according to its bookkeeping entries, was $1,220,000 on December 26, 1952; and that entries were made on its books in January, 1953, of more than 17 million dollars of additional "loans". Cantor, Fitzgerald and Gibraltar were involved in the four transactions of Norton which are in issue here. There are in issue in these cases, four transactions which are attributed to the petitioner, Norton. In connection with these transactions, Norton reported income, and he took deductions *92 for payments which purportedly represented "interest". In making the determinations set forth in the statutory deficiency notices, respondent disallowed the claimed deductions for alleged interest. He did not determine, also, that there should be excluded from taxable income in the various years the items of income which Norton reported (in the joint returns, and in the separate returns for 1954), as income received or realized from the transactions in issue. Respondent's disallowance of the claimed deductions for "interest", and his failure to eliminate certain items from taxable income, were seemingly inconsistent, but the seeming inconsistency was a matter of policy, to protect the revenues pending the outcome of these cases; and at the trial of these cases, the respondent took the position that if this Court finds and determines that any or all of the four transactions in issue were sham (unreal) transactions, which were so lacking in substance and reality that they cannot be recognized for tax purposes, then the respondent will agree that no items of taxable income were realized by Norton in the respective years from a transaction held to be an unreal, sham transaction; and *93 such 1261 items of reported "income" will be eliminated from taxable income when recomputations of income tax liabilities and deficiencies are made by the parties under this Court's Rule 50. Respondent stated in the deficiency notices, in general, that deductions taken for payments of alleged "interest" in each of the taxable years were not interest within the applicable Code provision, either section 23(b), 1939 Code, or section 163(a), 1954 Code, whichever applied to a taxable year involved, and also that the claimed deductions were not allowable for tax purposes under any other section of the Internal Revenue Code. Each of the four transactions is, for convenience, designated as Transaction A,B,C, and D. The following list describes the bonds or notes, and the principal amount thereof, involved in each transaction: 1. Transaction A: $1,000,000 Federal Land Bank bonds, bearing 1 3/4 percent interest, due October 1, 1957. This transaction began February 11, 1953, and was concluded on September 6, 1957. 2. Transaction B: $100,000 U.S. Treasury bonds due September 15, 1961. This transaction began on February 25, 1954, and was concluded as of September 14, 1961. 3. Transaction *94 C: $100,000 U.S. Treasury bonds due September 15, 1961. This transaction began on Feb. 26, 1954, and was concluded as of September 14, 1961. 4. Transaction D: $500,000 U.S. Treasury notes due April 1, 1960. This transaction began on December 23, 1955, and was concluded as of March 31, 1960. The facts involved in each of the four transactions were as follows: Transaction A: $1,000,000 Federal Land Bank Bonds 1. On February 11, 1953, C-F purchased $1,000,000 Federal Land Bank bonds, bearing 1 3/4 percent interest, due October 1, 1957, callable October 1, 1955. The interest on the bonds was payable on April 1 and October 1, $8,750 on each date, $17,500 a year. The purchase price of the bonds was at the market price of 95 1/2, $955,000. The broker's statement, made out as a charge to Norton, set forth a total charge of $961,611.11: Purchase price, 95 1/2
$955,000.00
Broker's commission
0
Bond interest accrued to 2/11/53 6,611.11
$961,611.11
Norton did not make any payment on this charge. The bonds were in New York City. There were 100 bonds of $10,000 each. The trading date was February 11, and the settlement date was February 17. 2. Cantor-F (C-F) *95 handled the purchase of these bonds through C.F. Childs & Co., a securities dealer in New York City, who made the purchase, as described above, on February 11, for the account of Cantor-F, and delivered the bonds "against payment", on February 11, to a New York clearance agent of C-F, Loeb, Rhoades & Co. Loeb, Rhoades then delivered the bonds on February 11 to Irving Trust Co.
Irving Trust Co., in New York City, the clearance agent for Gibraltar, received the bonds from Rhoades "against payment", for the account of Gibraltar, and debited Gibraltar's account $961,611.11 pursuant to Gibraltar's instructions dated February 11. 3. Gibraltar instructed Childs to sell the bonds and Irving to "redeliver" them to Childs on February 11, 1953, against payment, which was done. Gibraltar, on February 11, 1953, sold the $1,000,000 of Land Bank bonds through Childs. Childs sold the bonds at the same market price, 95 1/2 for $955,000, plus accrued bond interest, $6,611.11, for a total of $961,611.11. There is no evidence to the contrary; this is indicated by the debit advice of Irving Trust to Gibraltar (Exhibit 67-BO). The purchase was nullified by the sale by Gibraltar on the same day on *96 which the bonds were purchased for the account of Cantor-F. As Childs handled both the purchase and the sale of the bonds, on the same day, at the same price, the bonds probably never left Childs. The mechanics of utilizing the services of Irving Trust, with which Gibraltar had an account, involved a credit to Gibraltar's account on Irving's books of $961,611.11, which offset the debit to the account in the same amount. Except for the temporary use on February 11 of Gibraltar's credit with Irving, no money was borrowed to purchase the bonds, and the sale of them on the same day covered the "purchase". It was a paper transaction. The mechanics employed by Gibraltar and Cantor-F involved a round-trip in one day of the bonds from Childs and back to Childs, if they physically left Childs at all, and the sale of 1262 the bonds provided the funds to pay for the charge made on the books for the bonds. The services of Gibraltar and the clearance agents in New York, Rhoades for Cantor, and Irving for Gibraltar, on February 11 were effective in bringing about, within about one day, a purchase and sale of the identical bonds by Cantor, with respect to its bookkeeping entries. As part of *97 the mechanics, Norton signed two letters dated February 11, one to Cantor and one to Gibraltar, instructing Cantor to deliver the bonds to Gibraltar, "against payment of $961,611.11"; and instructing Gibraltar to receive the bonds from Cantor "against payment" of the above amount. 4. Norton sent Gibraltar, with his letter dated February 11, a note, executed by Norton, dated February 17, 1953, in the amount of $1,052,000, payable to Gibraltar on October 1, 1955. The provisions of the note are set forth later, some of which stated that Norton had pledged with Gibraltar $1,000,000 Federal Land Bank bonds due in 1957, (as described above) and that Gibraltar had "withheld and reserved" $90,388.90 as security for the payment of interest on the note. The principal amount of the note, $1,052,000, represented the total of two figures, $961,611.11 (explained above) plus the so-called "reserve" stated in the note, $90,388.90, less one cent, so that the charge was $961,611.10 for the bonds. No part of the figure, $961,611.10 was paid to Norton on or about February 11, 1953, by Gibraltar or Cantor, and Gibraltar did not pay that amount to any payee, out of its own funds, for Norton. As set *98 forth above, the money to pay for the charge of C.F. Childs for the bonds was derived from funds of C.F. Childs derived from Childs' sale on the market of the same bonds. Childs did not make a loan to Gibraltar of that amount of money, and Gibraltar, in turn, did not make a loan of that amount of money to or for the account of Norton. Facts about the reserve of $90,388.90 are set forth later. 5. Under date of February 17, 1953, Gibraltar opened on its books, in the name of Norton, a "Secured Account" in which a debit entry was made of $1,052,000, described as a "Secured Loan", with the explanation that Gibraltar had "Bought or Received" the $1,000,000 Land Bank bonds due October 1, 1957, which bonds were held "Long". This charge to Norton's account reflected Gibraltar's receipt of Norton's note in the amount of $1,052,000, payable to Gibraltar. 6. Norton executed a printed note of Gibraltar dated February 17, 1953, in the amount of $1,052,000, payable to Gibraltar on October 1, 1955, bearing 3 1/2 percent interest, payable in monthly installments on the dates and in the amounts typed on the note. This note was security for the purported "loan" by Gibraltar to Norton of the above *99 amount, and it was stated on the note that the note was secured by the pledge to Gibraltar of the $1,000,000 Land Bank bonds. The provisions of the note included the following: That Gibraltar had the right to borrow, re-hypothecate, use, or transfer the pledged bonds for any purpose whatsoever, and to use the pledged bonds "to cover delivery of any securities of similar kind which may have been sold to others by the Gibraltar Financial Corporation, as principal and for its own account." The note provides further that at the option of Gibraltar, the pledged bonds or collateral "of like kind" can be turned over to the signer of the note upon the payment of the principal of the note, together with interest due. The note provides that the bond interest due on the pledged bonds shall be applied to the principal amount of the note; and that the signer of the note shall not be entitled to a refund of any interest paid arising from the reduction of the principal. The note was renewable for the unpaid balance of principal on October 1, 1955, and could be extended to October 1, 1957. The renewal note was to bear interest for the additional period of time of 1 3/4 percent, payable on the *100 first day of April and October. It was stated on the original note of February 17, 1953, that the 3 1/2 percent interest was to be paid in installment of specified amounts on the dates and in the amounts typed on the note, namely, $19,555.51 on February 17, 1953, and $9,777.75 on August 17 and October 19, 1953, a total sum of $39,111.01 in 1953; $9,777.75 on January 15, 1954, and $2,444.44 per month beginning on February 15, 1954, through December 15, 1954, a total of $36,666.59 for 1954; and $2,444.44 monthly on January 15, 1955, through August 15, 1955, and on September 15, 1955, $2,444.39, or a total of $21,999.91 for 1955. The sum of all of the periodic payments of "interest" 1263 on the original note, as typed on the note, was $97,777.51. However, the note also provided that Gibraltar would pay $90,388.90, to be paid in equal installments to Norton on the dates when Norton was to pay the stated "interest" to Gibraltar, upon the condition that the interest payments were made by Norton, leaving $7,388.61 as his net payment. The way in which this provision of the note was carried out is set forth hereinafter. The total charge by C-F for the bonds was $961,611.10, but the *101 note of Norton to Gibraltar was for $1,052,000, which was $90,388.90 more than the charge for the bonds. The printed note executed by Norton states that as "security" for the payment of interest on the note Gibraltar had withheld $90,388.90 of the principal amount of the note as a "reserve", and that Gibraltar would release and pay to Norton the "reserve" in equal installments on the interest due dates set forth in the note upon the condition that the interest payments would be paid by Norton. The terms of Norton's note to Gibraltar specifying Norton's periodic payments of interest on the note, and those relating to Gibraltar's periodic payments to Norton out of the so-called "reserve", were carried out by Norton and Gibraltar, respectively. Gibraltar mailed notices to Norton stating that the payment of an installment of "interest" would be due, as provided in the note. Norton wrote checks payable to Gibraltar for each installment of "interest". Gibraltar, in turn, mailed its checks to Norton in amounts representing Gibraltar's "release" of parts of the "reserve". During the period February 17, 1953, to September 14, 1955, Norton's checks to Gibraltar for note "interest" totaled *102 $97,777.56, five cents more than prescribed; and Gibraltar's checks to Norton totaled the amount of the reserve, $90,388.90. In effect, Gibraltar repaid to Norton the above sum, and Norton paid Gibraltar from his own funds the net sum of $7,338.66, the difference. The following schedules set forth for 1953-1955, the respective amounts of Norton's payments to Gibraltar, and Gibraltar's payments to Norton: PAYMENTS OF NORTON (N) TO GIBRALTAR (G); PAYMENTS OF GIBRALTAR TO NORTON; AND NET SUM PAID BY NORTON *10 1953
Check Dates
Net Paid byNorton
2/17/53
N to C-F
$19,555.51
2/17/53
G to N 18,077.78
Net paid by N
$ 1,477.73
8/12/53
N to C-F
$9,777.75
8/12/53
G to N
9,038.89
Net paid by N
$ 738.86
10/ 9/53
N to C-F
9,777.75
10/ 9/53
G to N 9,038.89
Net paid by N
738.86
12/24/53
N to G
4,888.88
12/24/53
G to N 4,519.45
Net paid by N
369.43 *10 Summary - 1953
Total paid Norton to Gibraltar
$43,999.89
Total paid Gibraltar to Norton 40,675.01
Net paid Norton to Gibraltar
$ 3,324.88 *10 1954
1/14/54
N to G
$4,888.87
1/14/54
G to N 4,519.44
Net paid by N
$369.43
2/12/54
N to G
2,444.44
2/12/54
G to N 2,259.72
Net paid by N
184.72
3/12/54
N to G
2,444.44
3/12/54
G to N 2,259.72
Net paid by N
184.72
4/14/54
N to G
2,444.44
4/14/54
G to N 2,259.72
Net paid by N
184.72
5/15/54
N to G
2,444.44
5/15/54
G to N 2,259.72
Net paid by N
184.72
6/15/54
N to G
2,444.44
6/15/54
G to N 2,259.72
Net paid by N
184.72
7/14/54
N to G
2,444.44
7/14/54
G to N 2,259.72
Net paid by N
184.72
8/12/54
N to G
2,444.44
8/12/54
G to N 2,259.72
Net paid by N
184.72
9/15/54
N to G
2,444.44
9/15/54
G to N 2,259.72
Net paid by N
184.72
10/13/54
N to G
2,444.44
10/13/54
G to N 2,259.72
Net paid to N
184.72
11/10/54
N to G
2,444.44
G to N 2,259.72
Net paid by N
184.72
12/15/54
N to G
2,444.44
G to N 2,259.72
Net paid by N
184.72
*103 1264 *10 Summary - 1954
Check Dates
Net Paid by Norton
Total paid Norton to Gibraltar
$31,777.71
Total paid Gibraltar to Norton 29,376.36
Net paid Norton to Gibraltar
$ 2,401.35 *10 1955
1/12/55
N to G
$2,444.44
1/11/55
G to N 2,259.72
Net paid by N
$184.72
2/15/55
N to G
2,444.44
2/15/55
G to N 2,259.72
Net paid by N
184.72
3/16/55
N tod G
2,444.44
3/16/55
G to N 2,259.72
Net paid by N
184.72
4/12/55
N to G
2,444.44
4/14/55
G to N 2,259.72
Net paid by N
184.72
5/11/55
N to G
2,444.44
5/16/55
G to N 2,259.72
Net paid by N
184.72
6/15/55
N to G
2,444.44
6/16/55
G to N 2,259.72
Net paid by N
184.72
7/13/55
N to G
2,444.44
7/15/55
G to N 2,259.72
Net paid by N
184.72
8/10/55
N to G
2,444.44
G to N 2,259.72
Net paid by N
184.72
9/14/55
N to G
2,444.44
9/15/55
G to N 2,259.72
Net paid by N
184.72
Total, G's payments to Norton, $20,337.48, plus credit to N..05, total $20,337.53 *10 Summary - 1955
Total paid Norton to Gibraltar
$21,999.96
Total paid Gibraltar to Norton 20,337.53
Net paid Norton to Gibraltar
$ 1,662.43
Summary - 1953-1955
Total paid Norton
$97,777.56
Total paid Gibraltar to Norton 90,388.90
Net paid by Norton, own funds
$ 7,388.66
*104 7. Norton took deductions for "interest" on his income tax returns for the years 1953-1955 in the sum of his payments to Gibraltar under Transaction A, as set forth above, namely: 1953, $43,999.89; 1954, $31,777.71; 1955, $21,999.96; total deductions $97,777.56. 8. Although the Land Bank bonds had been sold by Gibraltar on February 11, 1953, Gibraltar treated that step as a "borrowing" of the bonds, and Gibraltar credited the accrued bond interest to Norton's account, as the bond interest became due, during the period February 11, 1953, to September 5, 1957. During 1956 and 1957, Gibraltar paid accrued bond interest to Norton at the same time as Norton paid "interest" on his second note to Gibraltar, as is set forth later. Norton reported the accrued interest on the bonds as income on his income tax returns for the years 1953-1957, as is set forth later. As of February 11, 1953, the accrued interest on the bonds was $6,611.11. Since this amount was part of the total charge for the bonds, Norton did not report this amount of bond interest in his 1953 income. The accrued interest on the bonds in 1953 was $17,500, which amount, less $6,611.11, was $10,888.89. 9. Gibraltar credited *105 the principal amount of Norton's note with the annual bond interest, $17,500, for 1953, 1954, and 1955. The sum of the credits was $52,500. They reduced the principal amount of the note from $1,052,000 to $999,500, as of October 1, 1955, when the note became due. The credits to the principal amount of the note were made pursuant to a provision in the note. The note also provided that the note, referred to hereinafter as the first note, could be renewed for a period ending October 1, 1957. 10. Norton executed a second note, dated October 1, 1955, in the principal amount of $999,500, payable to Gibraltar on October 1, 1957, bearing 1 3/4 percent interest (instead of 3 1/2 percent, as on the first note). This note is referred to hereinafter as the second note. The note stated that it was secured by the $1,000,000 Federal Land Bank bonds due October 1, 1957. Some of the provisions of the second note were the same as those of the first note, but there was no provision that part of the principal amount was to be retained by Gibraltar as a "reserve" to secure the payment of interest, and there was no provision for applying any amount, collected by Gibraltar with respect to the pledged *106 collateral, to reduce 1265 the principal amount of the note. The note provided that Gibraltar could borrow, rehypothecate, and use the pledged securities. The second note was a different printed note of Gibraltar than the first note in several respects. The second note limited the "right" of Norton to obtain the return of the "pledged" bonds because of two factors: Norton had a right to the return of the "pledged" bonds but not before the time of the Maturity of the note on October 1, 1957, upon the payment of the principal of the note and interest. Also, if Norton elected to have the "market value" of the "pledged" bonds applied to the payment of the note, he could only make that election 30 days before the maturity of the note, and not sooner, or 10 days before the maturity date, and not later. In Norton's account on Gibraltar's books the amount of the purported "loan" of $1,052,000, a debit, was reduced when the credits for the accrued bond interest were entered, so that as of the date of the second note the purported "loan" had been reduced by the credits to $999,500. The amounts and due dates of the "interest" on the second note, as stated thereon, were April 1 and October 1, 1956, $8,891.38 *107 on each date; April 1, 1957, $8,842.80; and October 1, 1957, $8,891.38; total, $35,516.94. The last installment of interest was subsequently reduced, as of September 5, 1957, to $7,530.93, which reduced the total charge for "interest" to $34,156.49. 11. Norton made payments by check to Gibraltar for the interest on the second note, as prescribed for 1956 and for April 1, 1957. He received a credit for note interest accrued to September 5, 1957, as stated later. He took deductions for "interest" on the second note on his income tax returns, $17,782.76 for 1956, and $16,373.73 for 1957. The total sum of the "interest" charged on the second note was $34,156.49, which was deducted. Gibraltar paid the accrued bond interest to Norton for 1956, $8,750 due April 1 and October 1; and $8,750 due on April 1, 1957; total $26,250. Norton reported the bond interest in his tax returns for 1956 and 1957. For 1956 and April 1, 1957, Norton paid a total sum to Gibraltar, as note "interest", of $26,625.56; and Gibraltar paid Norton $26,250, as bond interest, so that the net amount paid by Norton from his own funds was $375.56. 12. As of September 5, 1957, Gibraltar sold $1,000,000 new Land Bank *108 bonds, for Norton's account, of the same issue of the 1 3/4 percent bonds due October 1, 1957, as set forth hereinafter. The amount of the accrued bond interest to September 5 was $7,534.72. The amount of the "interest" on the second note to September 5, 1957, was $7,530.93. The credit of the accrued "interest" on the bonds was $3.79 more than the debit for the accrued interest on Norton's note. Norton had overpaid Gibraltar's charges for "interest" on his original note by five cents. He paid $21,999.96 whereas the note called for payments totaling $21,999.91. There were, therefore, credits to Norton's account of $3.84 more than Gibraltar's charges for "interest" on Norton's notes. Those credits reduced the principal amount owing on the second note to Gibraltar from $999,500 to $999,496.16. As is shown later, when the account on Gibraltar's books was closed by a purported "sale" of Land Bank bonds for the net amount of $997,937.50 as of September 5, 1957, the credit for the "sale proceeds" left a balance owing by Norton of $1,558.66 which Norton paid to Gibraltar. 13. The following schedule summarizes Norton's cash payments to Gibraltar as "interest" on his second note, and Gibraltar's *109 cash payments and credits to Norton for "interest" on Land Bank bonds: Dates
Cash Pd. by Nortonas Note "Interest"
Cash Pd. byGibraltar as Bond"Interest"
Net Cash Pd. byNorton
3/31/56
$ 8,891.38
$ 8,750
$141.38
10/1/56
8,891.38
8,750
141.38
4/1/57 8,842.80
8,750
92.80
$26,625.56
$26,250
$375.56
9/ 6/57 7,534.72 Credit to Norton of bond "interest"
$34,160.28
Total credits tonote "interest" 34,156.49 Total charged byGibraltar as note"interest"
$ 3.79
Excess credited tonote principal 1266 Gibraltar's charges for "interest" on Norton's two notes were $97,777.56 plus $34,156.49, a total of $131,934.05, which Norton deducted on his returns for 1953-1957 with respect to Transaction A. Norton paid the net sum of only $7,388.66 plus $375.56, or a total of $7,764.22 as "interest" on the two notes, after receiving from Gibraltar cash payments of $116,638.90 plus the credit for bond "interest" of $7,530.93, or a total of $124,169.83. 14. The transaction was concluded by a purported "sale" of $1,000,000 Land Bank bonds as of September 5, 1957. The mechanics employed involved another almost simultaneous purchase and sale on *110 the same day, another "In" and "Out" procedure. Cantor, Fitzgerald made a sale of $1,000,000 bonds to J. S. Strauss & Co., a securities dealer in San Francisco. The Norton transaction was closed about 25 days before the date when the particular issue of Land Bank bonds would become due and would be redeemed at 100, on October 1. The mechanics followed to close the transaction were the same as those followed on February 11, 1953, when bonds were "purchased" for Norton's account. The following steps were taken beginning on September 5 with the closing date of September 6: (a) Cantor-Fitzgerald sold on September 5 a new lot of $1,000,000 of the same issue of Land Bank bonds to J. S. Strauss & Co., a San Francisco dealer. (b) Gibraltar bought on September 5 in New York $1,000,000 of Land Bank bonds from or through a New York dealer, Devine & Co., to cover the sale of Cantor to Strauss. (c) The respective clearance agents of Cantor-Fitzgerald, of Strauss & Co., and of Gibraltar were located in New York City, and the bonds were transferred in New York City, in a series of steps, to the account of Wells Fargo Bank with its clearance agent in New York, Chemical Bank, for the account *111 of Strauss. The clearance agents were Irving Trust for Gibraltar; Chemical Bank for Cantor-Fitzgerald; and Chemical Bank for Wells Fargo Bank. (d) No money was borrowed. The sale of the bonds to Strauss, on the same date as the purchase of bonds to cover the sale, provided the funds to pay Devine & Co. for its charges for the bonds, except for a small difference between "cost" and "sale proceeds", and charges for fees and commissions, which produced a net charge, or debit, to Gibraltar's account with its clearance agent, Irving Trust, of $822.50, which included a commission of $500 charged by Cantor. The net charge to Gibraltar of represented the following:
$822.50
Commission of Cantor-F
$500.00
Clearance fee of Irving Trust
10.00
Charged by Devine
$1,006,284.72
Paid by Strauss 1,005,972.22
Net charge by Devine 312.50
$822.50
(e) The clearance agents took these steps: (1) Irving received the bonds from Devine against payment and debited Gibraltar's account; (2) Irving delivered the bonds to Chemical against payment and credited Gibraltar's account; (3) Chemical first charged the account of Cantor-Fitzgerald, and then charged the account *112 of Wells Fargo Bank for Strauss & Co., and credited the account of Cantor-Fitzgerald. All of the parties concerned issued instructions to their respective clearance agents. Norton signed letters of instruction to Gibraltar to deliver bonds to Chemical against payment of $1,005,472.22, and to Cantor-Fitzgerald to receive bonds at Chemical from Gibraltar against payment of the same amount. Gibraltar bought bonds from or through Devine & Co. for the total charge of $1,006,284.72. Cantor-Fitzgerald sold the same bonds to Strauss & Co. for $1,005,972.22, or $312.50 less than Devine's charge. Cantor-Fitzgerald issued its statement confirming a sale of the bonds for Norton's account for $1,005,472.22, which was $500 less than the proceeds of the sale to Strauss; the $500 represented the commission of Cantor. Norton's account on Gibraltar's books was credited $1,005,472.22, which represented the following: Sold $1,000,000 bonds at 99-27/32
$ 998,437.50
Less commission of C-F 500.00
Net selling price
$ 997,937.50
Plus bond interest to Sept. 5 7,534.72
Total net proceeds
$1,005,472.22
15. In Norton's account on the books of Gibraltar, an adjustment was made of *113 five cents, reducing the amount of Norton's second note from $999,500 to $999,499.95. As of September 6, a debit to his account was made for "interest" accrued on the note to September 6 in the amount of 1267 $7,530.93, so that as of September 6, there was purportedly owing to Gibraltar $1,007,030.88. His account was credited with $1,005,472.22, the sale proceeds, which left a balance due of $1,558.66. Gibraltar sent Norton a letter stating the balance due, which Norton paid by check on October 2, 1957, which closed the account in Norton's name. 16. On his 1957 tax return, Norton reported a long-term capital gain from the sale of the Federal Land Bank bonds of $42,937.50, of which 50 percent was taken in account in reporting income from capital gains: 9/ 6/57
Proceeds from sale
$997,937.50
2/17/53
Cost 955,000.00
Capital gain
$ 42,937.50
17. In fact, the arrangements and the transaction for Norton by Cantor-F and Gibraltar did not yield a real and true gain of $42,937.50. Rather, the whole transaction, apart from the anticipated tax benefits, resulted in a deficit in the account on Gibraltar's books of $1,558.66. The deficit resulted from the fact *114 that the purported "loan" of Gibraltar to Norton included a purported "loan" of $90,388.90, to cover part of the note interest, so that the total purported "loan" of $1,052,000, plus all of the charges for note interest, less all of the credits to principal and note interest, for bond interest, was not fully satisfied by sale of the bonds in 1957, and the account showed an amount still "owing" by Norton of $1,558.66 on the principal amount of the "loan". 18. The schedule set forth later is a summary of the account on Gibraltar's books in the name of Norton which was the bookkeeping record of the purported loan in 1953 of $1,052,000. This schedule reflects Gibraltar's charges on its books, in the total amounts, respectively, for interest on each one of the two notes, and the total sum of the credits to the account for bond interest, and note interest. As of September 6, 1957, the debits exceeded credits by $1,558.66, so that the entire transaction, after the sale on September 5, 1957, of $1,000,000 Land Bank bonds (to close the transaction) showed a loss instead of a gain to Norton of $1,558.66, apart from anticipated tax benefits, which was the balance due to Gibraltar, which was *115 paid by Norton. In his 1957 income tax return, Norton reported a capital gain of $42,937.50 from the sale of the bonds. However, the initial note to Gibraltar was for $1,052,000, and that figure incorporated the "reserve" for note interest of $90,388.89, and bond interest accrued to February 11, 1953, $6,611.11 or $97,000. Thus, the initial debit to Norton's account included $97,000 more than the "cost" of the bonds in 1953, ($955,000), used in computing "gain" upon the sale of a like amount of bonds in 1957. The credits, direct or part of some larger credit figure, in the account which offset the debits of $97,000 were credits to capital (rather than to the charges for interest). They totaled $95,441.34, which was $1,558.66 less than the above-described debits. These credits were the five cents ($0.05) adjustment in reduction of the principal amount of the second note; the credit to the principal of the first note of $52,500 for accrued bond interest for three years, 1953-1955, inclusive; the reported capital gain of $42,937.50; and the credit of $3.79, the excess of accrued bond interest over accrued note interest for the period April 1, 1957, to September 5, 1957. The summary *116 of the debits and credits and to the account is as follows: *10
Debits to Norton's Account
2/11/53
Charge for $1,000,000 bonds
$ 955,000.00
2/11/53
Charge for accrued bond interest 6,611.11
$ 961,611.11
2/17/53
Gibraltar's charge for "reserve"
90,388.90
Reduction in charge, 1 cent (.01)
2/17/53
Total amount of Norton's note
$1,052,000.00
"Interest"
charged by G, note
97,777.51
"Interest"
charged by G, renewal note 34,156.49
Total charges to account
$1,183,934.00 1268 *10
Credits to Norton's Account
1953-1955
Bond "interest" credited to principal
$ 52,500.00
1953-1955
Paid by Gibraltar to Norton
90,388.90
1953-1955
Net "interest" paid by Norton
7,388.66
1955-1957
Bond "interest" paid by Gibraltar to Norton
26,250.00
1955-1957
Net note "interest" paid by Norton
375.56
9/6/67
Bond "interest" credited by Gibraltar 7,534.72
1953-1957
Cash paid and credits
$ 184,437.84
9/6/57
Credit, "sale" of bonds 997,937.50
Total credits to account
$1,182,375.34
Balance owing by Norton, paid 10/2/57 1,558.66
$1,183,934.00
19. Norton reported as income in his returns for the *117 years 1953-1957, interest received on Federal Land Bank bonds in the total amount of $79,673.61. The following shows the amount of the bond interest reported for each year: *10
Bond Interest Reported as Income
1953
Credited by G to note
$10,888.89
1954
Credited by G to note
17,500.00
1955
Credited by G to note
17,500.00
1956
Paid by G to Norton
17,500.00
1957
Paid by G to Norton
$8,750.00
Sales proceeds credit 7,534.72
16,284.72
$79,673.61
As stated above, Norton reported in his 1957 return capital gain of $42,937.50, of which one-half, $21,468.75, was included in income. The respondent conceded at the trial of these cases that if his determinations are sustained by this Court, disallowing the deductions taken as "interest" on the purported "loan" of Gibraltar to Norton, then there shall be excluded from Norton's income for each of the taxable years the amount included in income as bond interest, for each year, and the capital gain reported for 1957 as gain from the sale of Land Bank bonds. 20. The amounts deducted for each year as "interest" on the purported loan of Gibraltar in Transaction A totaled $131,934.05, *118 as shown below: *10 Deductions for Purported "Interest" on Notes to Gibraltar
Year
Method of Payment
Amount
1953
Cash
$ 43,999.89
1954
Cash
31,777.71
1955
Cash
21,999.96
1956
Cash
17,782.76
1957
Cash
$8,842.80
Credit, sale of bonds 7,530.93
16,373.73
Total deductions
$131,934.05
21. The transaction in the Land Bank bonds cost Norton $9,322.88, which was his out-of-pocket expense: Net payment of "interest" on 2 notes
$7,764.22
Balance due on "loan" 1,558.66
$9,322.88
22. The following schedule summarizes and accounts for the purported "interest" charges of Gibraltar on the purported "loan" to Norton; the payments and credits of Gibraltar on account of its charges for "interest"; and Norton's net cash payments from his own funds: Charges and Credits, "Interest" Account
Debit
Credit
"Interest" on Note 1
$97,777.56
"Interest" on Note 2
34,156.49
Cash paid by Gibraltar, Note 1
$ 90,388.90
Cash paid by Gibraltar, bond in- terest
26,250.00
Credit from sale of bonds 7,530.93
Total cash and credit from Gibraltar
$124,169.83
Net cash paid by Norton
7,764.22
$131,934.05
$131,934.05
*119 23. The schedule set forth below shows that apart from expected tax benefits, the transaction arranged by Cantor-F and Gibraltar resulted in an economic loss to Norton of $9,322.94. This amount is by coincidence, except for a difference of six cents, the same as Norton's net out-of-pocket expense. *10 Net Economic Loss
(a) Interest charged on notes
$131,934.05
(b) Capital gain
$42,937.50
(c) Bond interest re- ported in income 79,673.61
122,611.11
Norton's economic loss
$ 9,322.94
The economic loss from the transaction can be stated also in the following way: The charge for the bonds in 1953 was $961,611.11, including accrued bond "interest" of $6,611.11. An additional charge was 1269 made for a so-called "reserve", to be paid by Gibraltar to Norton, of $90,388.90. Those charges totaled $1,052,000.01. After a reduction by Gibraltar of one cent, Norton's note to Gibraltar was in the amount of $1,052,000. Added to those charges, Gibraltar charged Norton $131,934.05 as "interest" on his two notes to Gibraltar, so that the sum of Gibraltar's charges was $1,183,934.05. During the period February 17, 1953, to September 6, 1957, Gibraltar made *120 cash payments to Norton consisting of the "reserve" and purported "interest" on the bonds, $90,388.90, and $26,250, or $116,638.90, and gave him credits for purported bond interest of $52,500 and $7,534.72, or $60,034.72. Gibraltar's payments and credits totaled $176,673.62. Gibraltar credited the account on September 6, 1957, for the "sale" of bonds $997,937.50, and allowed a credit of five cents, also, as an adjustment. The sum of all of Gibraltar's cash payments and book credits was $1,174,611.17. The economic loss to Norton was $9,322.88, which also was his out-of-pocket expense for the net sum which he paid Gibraltar as "interest" on the two notes, $7,764.22, and the balance due to close the account, $1,558.66, $9,322.88. The following schedule shows the details: Charged to Norton
2/11/53
$1,000,000 bonds
$ 961,611.10
2/17/53
"Reserve" to be paid 90,388.90
2/17/53
Note to Gibraltar
$1,052,000.00
1953-1957
Charges for "interest" 131,934.05
Total charges $1,183,934.05
Cash & Credits by Gibraltar
Cash pd. to Norton, "Reserve"
$ 90,388.90
Cash pd. to Norton, bond "inter- est"
26,250.00
Credits to note, bond "interest"
52,500.00
Credit, bond "interest" 7,534.72
$ 176,673.62
Credit, adjustment
.05
Credit, "sale" of bonds 997,937.50
Total
$1,174,611.17
Economic Loss to Norton 9,322.88 $1,183,934.05
*121 The transaction in the Land Bank bonds was one from which a real gain from the purported "purchase" and "sale" could not reasonably have been expected or realized, apart from anticipated tax deductions and benefits, because the total "charge" to Norton included a charge of $90,388.90 (the "reserve") in addition to the "charge" for the bonds, $961,611.11, and the total "charge" for "interest" on Norton's notes to Gibraltar was $131,934.05. Norton's original note to Gibraltar was in the amount of $1,052,000. Gibraltar reduced that principal amount by credits for bond "interest", $52,500, to $999,500. It would have been necessary to "sell" the bonds for $999,500, rather than the net amount of $997,937.50, in order for the proceeds of the "sale" of the bonds to have been equal to the balance due on Norton's second note to Gibraltar. If the bonds could have been "sold" at par, $1,000,000, and the broker's commission had been $500, the net "sale" proceeds, $999,500, would have been the same as the balance "due" on Norton's note. The credits of $52,500 for bond "interest," in reduction of the principal amount of Norton's note, if applied to the "reserve" included in principal of $90,388.90, *122 would still leave $37,888.90 owing by Norton for that charge. The charge for the bonds on February 11, 1953, was $961,611.11. The sum of the two above figures is $999,500.01. The "sale" of the bonds as of September 5, 1957, for $997,937.50 did not yield enough to equal the "charge" of $999,500.01. Moreover, the total "interest" charged by Gibraltar was $131,934.05, and when that is added to the charge for the "reserve," $90,388.90, there were charges totaling $222,322.95 which would have had to be covered and exceeded by proceeds from the "sale" of the bonds and by "interest" received from the bonds, but the rate of bond interest was only 1 3/4 percent, whereas the rate of "interest" charged by Gibraltar was 3 1/2 percent up to October 1, 1955, and 1 3/4 percent thereafter. The Land Bank bonds were to mature and become payable at par on October 1, 1957. In the transaction the second note of Norton to Gibraltar was due on the same date. The bonds purportedly were "held" until September 5, 1957, when they were "sold" at a price below par, 99-27/32. Under all of the circumstances and the arrangements in which the form of the transaction was cast, the transaction was not entered into *123 for profit and no profit could have been reasonably expected apart from anticipated tax deductions and benefits. 24. On the basis of a stipulation of the parties agreeing to the incorporation into the record of these cases of the testimony of Professor John P. Shelton in the cases of Jerome B. Rosenthal, Docket Nos. 67848, 77923, et al., the following list of bid prices for the Land Bank bonds due October 1, 1957, during the period February 2, 1270 1953, to September 3, 1957, is included herein, since it appears to have been so intended by the parties in their stipulation. The fractions in the list of bid prices have the same denominator, 32; thus, 95-12 means 95-12/32. Since the bonds matured October 1, 1957, the market prices tended to approach 100 as the time before the maturity date became shorter: UNITED STATES FEDERAL LAND BANK BONDS 1 3/4% - October 1, 1957/55 LOW BID PRICES Year
Date
Low Bid Price
1953
Feb. 2
95-12
Mar. 2
95-12
Apr. 30
95-8
May 29
94-26
June 8
94-16
July 1
94-26
Aug. 28
94-30
Sept. 9
94-26
Oct. 1
95-18
Nov. 25
96-6
Dec. 1
96-8
1954
Jan. 4
97-4
Feb. 1
98-26
Mar. 1
99-6
Apr. 1
99-12
May 27
99-4
June 1
99-4
July 1
99-16
Aug. 2
99-26
Sept. 24
99-20
Oct. 26
99-16
Nov. 15
99-12
Dec. 29
99-0
1955
Jan. 18
98-18
Feb. 25
98-8
Mar. 1
98-4
Apr. 28
98-0
May 2
98-0
June 27
98-2
July 29
97-28
Aug. 30
96-14
Sept. 6
97-10
Oct. 4
97-16
Nov. 30
97-20
Dec. 23
97-16
1956
Jan. 3
97-16
Feb. 27
98-2
Mar. 29
97-20
Apr. 17
97-16
May 1
97-18
June 1
97-24
July 27
98-10
Aug. 28
98-1
Sept. 6
97-30
Oct. 1
98-4
Nov. 29
98-10
Dec. 17
98-8
1957
Jan. 2
98-10
Feb. 1
98-23
Mar. 1
99-0
Apr. 1
99-1
May 1
99-6
June 3
99-10
July 1
99-14
Aug. 1
99-21
Sept. 3
99-26
*124 Transactions B and C: $200,000 U.S. Treasury Bonds Due September 15, 1961 Two transactions in the same amount, $100,000 of the same Government security, U.S. Treasury 2 3/4 percent bonds due September 15, 1961, were arranged by Gibraltar for the account of Samuel P. Norton. These transactions are referred to herein as Transactions B and C. The facts are substantially the same but are set forth separately. Transaction B was initiated on February 25, 1954. It was concluded on Gibraltar's books on September 14, 1961, closing date September 15, 1961, the maturity date, by a purported purchase of the bonds "from" Norton by Gibraltar at par for $100,000. Transaction C purportedly involved another $100,000 of the same issue of Treasury bonds, which was initiated on February 26, 1954, and was concluded on Gibraltar's books on September 14, 1961, by a purported "purchase from Norton" by Gibraltar at par for $100,000. In both transactions the form of the "purchase" of the Treasury bonds was that the "coupons" were "detached" for the bond "interest" otherwise payable during the years 1956-1961, the dates for the payment of bond interest being March 15 and September 15 of each year. Except *125 for bond "interest" due in 1954 and 1955, the bonds purportedly involved in both transactions were noninterest-bearing bonds during the 6 years 1956-1961. The mechanics were followed in both instances of Gibraltar's placing an order with Faroll & Co. to purchase the bonds, and placing another order almost simultaneously with another broker to sell the bonds on or about the same day, so that it was an almost simultaneous "In" and "Out" transaction in which no funds were borrowed as the sale proceeds covered the purchase charges. The mechanics followed purportedly involved a "borrowing" of the securities to make a "short sale," in form, but in substance there were no real short sales even though the device used was supposed to give the appearance of a short sale. In fact and substance, no U.S. Treasury bonds were bought and held for the account of Norton except of a momentary, one-day purchase which was nullified by the almost immediate and simultaneous sale of the bonds. Each transaction was a paper transaction on the books of Gibraltar in an account in the name of Norton called a "Secured Account." 1271 In each transaction Norton executed a promissory note payable to Gibraltar *126 on September 15, 1961, which also was the maturity date of the Treasury bonds. In each transaction the principal amount of the promissory note was $105,000, "interest" on the note was stated to be 2 5/8 percent; and it was provided that Norton would make payments of installments of the "interest" on the dates and in the amounts typed on the notes, beginning in February or March 1954, and continuing until October 15, 1958, after which date no payments of "interest" on the note were to be made up to the maturity date of the promissory note. Each note was cancelled by Gibraltar on the maturity date and the account of Norton was credited $100,000. The transaction was cast in the form of an involvement of Treasury bonds bearing 2 3/4 percent interest for 2 years, 1954 and 1955, and with the promissory notes payable to Gibraltar bearing 2 5/8 percent interest during the 5 years, 1954-1958, during which "interest" on the note was to be paid to Gibraltar. In each instance the principal amount of the promissory note included a so-called "reserve" of $17,359.46, Transaction B, and $17,211.67, Transaction C, which meant that Gibraltar would pay, and did pay, those sums to Norton, with the result *127 that Norton's net, cash payments of the purported note "interest" was $3,751.65 (rather than $21,111.11) in Transaction B; and $3,876.48 (rather than $21,088.15) in Transaction C. However, in his tax returns for 1954-1958, Norton's deductions for "interest on the notes totaled $21,111.11 and $21,088.15, respectively. Both transactions per books were concluded in 1961. The taxable years in these cases include only the six years 1954-1959, inclusive, and the two years 1960 and 1961 are not before the Court. The details about the entirety of each transaction are set forth, however, so as to show each complete transaction, as follows: Transaction B: $100,000 U.S. Treasury Bonds 1. On February 26, 1954, Irving Trust Co. in New York sent a debit advice to Gibraltar's clearance agent, stating that it had charged Gibraltar's account for $100,000 U.S. Treasury bonds due September 15, 1961, with coupons for September 15, 1954, through September 15, 1955, attached, received from Joseph Faroll & Co. (in New York), account of Samuel P. Norton. The debit advice stated that Irving would "redeliver" the bonds "against payment"; that Irving's charge of $2.50 covered "receipt and delivery of *128 bonds"; and that it had received instructions February 25, 1954. On March 1, 1954, Irving sent Gibraltar a credit advice, according to instructions dated February 26, 1954, stating that Irving had delivered $200,000 U.S. Treasury bonds due September 15, 1961, with coupons September 15, 1954, attached, to C. F. Childs & Co. (New York). This credit advice referred to two orders of Gibraltar, one of which was No. 43593, the same as the number of the debit advice of February 26, 1954, described above, referring to Norton. The other order referred to in the credit advice related to an account of Jerome B. Rosenthal. On February 25, 1954, Jack Bernstein, for Gibraltar, instructed the securities clearance department of Irving Trust to receive from Faroll & Co. $100,000 of the bonds for the account of Norton, and $100,000 of the same bonds for the account of Rosenthal. The order described the bonds as having the interest coupons for March 15, 1956, and the subsequent coupons detached. The mechanics included a sales slip of Faroll to Norton dated February 25, 1954, of a sale to him of $100,000 of the bonds, charging him for the cost; a letter of Norton to Faroll of the same date instructing *129 Faroll to deliver the bonds to Gibraltar against payment; a slip of Gibraltar to Norton dated February 26, 1954, advising him of the receipt of the bonds from Faroll against payment; and a credit slip of Faroll to Norton dated February 26 advising Norton that Faroll had delivered $100,000 Treasury bonds with certain coupons detached to Irving Trust for the account of Gibraltar. The several brokers' statements reflected the following steps: On February 25, 1954, $100,000 Treasury bonds due September 15, 1961, with certain coupons detached, were purchased from Faroll & Co., but they were delivered to Irving Trust for the account of Gibraltar, for the account of Norton, on February 26. Gibraltar instructed Irving, on February 25, 1954, to receive the bonds from Faroll and to redeliver the bonds. On February 26, Gibraltar instructed Irving to deliver them to Childs. Irving delivered the bonds to Childs & Co. Childs bought, or sold, the bonds, and Irving credited Gibraltar's account on March 1, 1954, with the proceeds 1271-3 of the sale, which offset the charge to Gibraltar's account on February 26 for the payment to Faroll. Accordingly, the bonds came "In" by a purchase from Faroll *130 on February 25, 1954, and they went "Out" through a sale to or by Childs on February 26 or March 1, 1954. In 1954, the date, February 25, was Thursday, and March 1 was Monday. February 27 and 28 were Saturday and Sunday. Excluding the weekend dates, the circuit from Faroll to Irving and from Irving to Childs was cleared in either two days, February 25 and 26, or three days, including March 1. The transaction was handled, "In" and "Out", by Irving's securities clearance department for Gibraltar. In the course of the transaction, as it applied to $100,000 of Treasury bonds "for the account of" Norton on Gibraltar's books, the account of Gibraltar on Irving Trust's books was debited and credited as follows: 2/26/54
Debit at 86-26/32
$ 87,640.54
Debit Irving's charge 2.50
Total debit
$ 87,643.04
3/ 1/54
Credit at 103-9/32 104,132.08
Credit balance to G
$ 16,489.04
2. No funds were borrowed in the transaction handled by Irving for Gibraltar. Rather, Gibraltar's credit, represented by its account with Irving, was used for two or three days. There was a charge of $2.50. The sale to or by Childs paid for the purchase from Faroll. The bonds paid for *131 themselves. The sale to Childs nullified the "purchase" as a "purchase" of securities, as an investment, for Norton's account. * Faroll's charge for the bonds took into account the interest coupons which were detached, so that its charge was only $87,640.54. Irving's credit to Gibraltar, upon delivery of the bonds to Childs, in the amount of $104,132.08, may have included a credit for the interest coupons if they had been reattached to the bonds. The evidence does not show this detail. The credit balance in Gibraltar's account with Irving of $16,489.04 may not have represented a "profit" to Gibraltar if it had made an expenditure to repurchase detached coupons. As the purchase slip of Childs is not in evidence, the credit balance of $16,489.04 in Gibraltar's account with Irving on March 1, 1954, has not been explained. In this transaction, no funds were loaned by Gibraltar to Norton, and Norton did not make any payment for or toward the purchase of the bonds. Norton did not receive delivery or possession of the bonds; neither did Gibraltar; *132 and the bonds were not physically held by Gibraltar for Norton. Norton did not pledge the bonds to Gibraltar, except on paper. Gibraltar did not receive the payment of any coupon interest on the bonds. 3. The Treasury bonds were 2 3/4 percent bonds due September 15, 1961. Coupon interest, if paid, was $2,750 a year, payable $1,375 on March 15 and September 15. In the transaction with Faroll, the coupons for 1954 and 1955 were attached to the bonds and that interest would amount to $5,500 for the two years if the bonds were held. In the transaction with Faroll, the bonds were sold with the coupons for 1956 and the subsequent years detached. Faroll's sale slip showed that the $100,000 of bonds had accrued interest of $828.04 to February 25, 1954, and that the cost of the bonds at 86-26/32, exclusive of the accrued interest was $86,812.50, as follows: 2/25/54
$100,000 Treasury bonds, 9/15/61, at 86-26/32
$86,812.50
2/25/54
Accrued interest 828.04
Total charge
$87,640.54
In the transaction with Gibraltar, Norton's cost of the bonds was $86,812.50. 4. With respect to the transaction between Gibraltar and Norton, the following steps were taken: Norton *133 executed a promissory note dated February 26, 1954, payable to Gibraltar on September 15, 1961, which was the maturity date of the bonds, in the principal amount of $105,000, bearing 2 5/8 percent interest, secured by the "pledge" of the $100,000 Treasury bonds. The note was a printed form of Gibraltar. The principal amount of the promissory note, $105,000, was the total sum of a cash "reserve" of $17,359.46, to be paid to Norton by Gibraltar, and $87,640.54, the charge for the bonds according to Faroll's statement. None of the $87,640.54 was paid by Gibraltar to Norton, and Norton did not in fact borrow any amount from Gibraltar. Gibraltar did not pay $87,640.54 from its own funds to anyone. The note stated that Gibraltar withheld $17,359.46, as a "reserve", as "security" for Norton's payment of "interest" on the promissory note. Other provisions of the promissory note are set forth later. 1272 On February 26, 1954, Gibraltar opened on its books a "secured account" in the name of Norton, with a debit entry of $105,000 described as a "secured loan", secured by the $100,000 Treasury bonds which were held "Long". The debit entry reflected Gibraltar's receipt of Norton's note. *134 The note provided inter alia that Norton had pledged the $100,000 Treasury bonds with Gibraltar as security for the "loan" of $105,000, and that Gibraltar had the right to borrow, re-hypothecate, use or transfer the bonds for any purpose, to use the bonds 1273 "to cover delivery of any securities of similar kind which may have been sold to others" by Gibraltar, and to use them "for its own account". Norton had a right to pay the note before the maturity date, upon 30 days notice, and upon the payment of a premium of 1 1/2 percent per year on the principal amount of the note from the prepayment date to the original maturity date. The "prepayment privilege" could not be exercised after March 15, 1961. Or Norton could pay the entire amount of the note on its due date, September 15, 1961, and obtain return of the "pledged" bonds. However, this provision in the printed form of the note was not of significance because the "pledged" bonds matured on September 15, 1961, and were to be redeemed at par, for $100,000, whereas the principal amount of the note was $105,000. The note also gave Norton the right to have the market value of the "pledged" bonds applied toward the payment of the *135 note, but that right could be exercised no sooner than 30 days prior to the due date of the note in 1961 and no later than 10 days before the due date. This provision, too, had little significance under all of the circumstances. The note provided that interest received on the pledged collateral shall be applied to the principal of the note but that no refund would be made of any interest on the promissory note resulting from the reduction of the principal. The installment payments of "interest" on the note to Gibraltar to be paid by Norton were $4,222.22 on February 26, 1954, and 15 payments of $1,055.56 from January 15, 1955, through July 15, 1958, quarterly, and $1,055.49 on October 15, 1958. The sum of the payments was $21,111.11. The note provided that Gibraltar would pay Norton $17,359.46, "reserve" which Gibraltar purportedly "withheld" from the principal amount of the note, which was to be paid in equal installments on the dates when Norton's payments of "interest" became due, provided Norton paid the installments of "interest". Norton and Gibraltar made the reciprocal payments to each other pursuant to the provisions in the note. They exchanged checks with each other *136 on or about the same date. Gibraltar mailed notices to Norton stating that the payment of an installment of "interest" would be due, as provided in the note. Norton wrote checks payable to Gibraltar for each installment of "interest." Gibraltar, in turn, mailed its checks to Norton in amounts representing Gibraltar's "release" of parts of the "reserve". During the period February 26, 1954, to October 15, 1958, Norton's checks to Gibraltar totaled $21,111.11; and Gibraltar's checks to Norton totaled the amount of the reserve, $17,359.46. In effect, Gibraltar repaid to Norton the above sum, and Norton paid Gibraltar from his own funds the net sum of $3,751.65, the difference. The following schedule set forth for 1954-1958 the respective amounts of Norton's payments to Gibraltar, and Gibraltar's payments to Norton: PAYMENTS OF NORTON (N) TO GIBRALTAR (G); PAYMENTS OF GIBRALTAR TO NORTON; AND NET SUM PAID BY NORTON 1954
Check Dates
Net Paid by Norton
2/26/54
N to G…$4,222.22
2/26/54
G to N… 3,471.89
Net paid by N
$ 750.33
1955
1/12/55
N to G…1,055.56
1/11/55
G to N… 867.97
Net paid by N
187.59
4/12/55
N to G…1,055.56
4/14/55
G to N… 867.97
Net paid by N
187.59
7/13/55
N to G…1,055.56
7/15/55
G to N… 867.97
Net paid by N
187.59
10/12/55
N to G…1,055.56
10/13/55
G to N… 867.97
Net paid by N
187.59
Summary - 1955
Total paid Norton to Gibraltar
$ 4,222.24
Total paid Gibraltar to Norton 3,471.88
Net paid Norton to Gibraltar
$ 750.36
1956
1/ 9/56
N to G…$1,055.56
1/ 9/56
G to N… 867.97
Net paid by N
$ 187.59
3/31/56
N to G…1,055.56
4/20/56
G to N… 867.97
Net paid by N
187.59
7/10/56
N to G…1,055.56
7/12/56
G to N… 867.97
Net paid by N
187.59
10/16/56
N to G…1,055.56
10/18/56
G to N… 867.97
Net paid by N
187.59
Summary - 1956
Total paid Norton to Gibraltar
$ 4,222.24
Total paid Gibraltar to Norton 3,471.88
Net paid Norton to Gibraltar
$ 750.36
1957
1/15/57
N to G…$1,055.56
1/16/57
G to N… 867.97
Net paid by N
$ 187.59
4/ 9/57
N to G…1,055.56
4/10/57
G to N… 867.97
Net paid by N
187.59
7/ 9/57
N to G…1,055.56
7/ 9/57
G to N… 867.97
Net paid by N
187.59
10/15/57
N to G…1,055.56
10/18/57
G to N… 867.97
Net paid by N
187.59
Summary - 1957
Total paid Norton to Gibraltar
$ 4,222.24
Total paid Gibraltar to Norton 3,471.88
Net paid Norton to Gibraltar
$ 750.36
1958
1/14/58
N to G…$1,055.56
1/16/58
G to N… 867.97
Net paid by N
$ 187.59
4/ 8/58
N to G…1,055.56
4/ 9/58
G to N… 867.97
Net paid by N
187.59
7/ 8/58
N to G…1,055.56
7/10/58
G to N… 867.97
Net paid by N
187.59
10/14/58
N to G…1,055.49
10/15/58
G to N… 867.97
Net paid by N
187.52
Adjustment G to N….05
(.05)
Summary - 1958
Total paid Norton to Gibraltar
$ 4,222.17
Total paid Gibraltar to Norton 3,471.93
Net paid Norton to Gibraltar
$ 750.24
Summary - 1954-1958
Total paid Norton to Gibraltar
$21,111.11
Total paid Gibraltar to Norton 17,359.46
Net paid by Norton, own funds
$ 3,751.65
*137 1274 5. Norton took deductions for "interest" on his income tax returns for the years 1954-1958 in the sum of his payments to Gibraltar under transaction B, as set forth above, namely: 1954, $4,222.22; 1955, $4,222.24; 1956, $4,222.24; 1957, $4,222.24; 1958, $4,222.17; total deductions, $21,111.11. 6. Although the Treasury bonds had been sold to Childs & Co. on February 26, 1954, Gibraltar credited the principal amount of Norton's note with amounts for interest on the bonds for 1954 and 1955 since the bonds had been "purchased" with the interest coupons for those years attached. For some unexplained or unclear reason, the credit for the coupon interest for 1954 was $2,332.18 instead of $2,750. (This is not explained by the fact that the bond interest accrued to February 25, 1954, date of "purchase" from Faroll, was $828.04.) The credit for 1955 was $2,750. The total credits of $5,082.18 reduced the principal amount of Norton's note from $105,000 to $99,917.82. 7. For March 15, and September 15, 1954, Gibraltar's credit to Norton's account for "interest" on the Treasury bonds was $2,332.18 (not $2,750). Since accrued bond interest of $828.04 was part of the charge for the *138 bonds, Norton reported on his tax return for 1954, in income, the net amount of bond "interest" of $1,504.14 ($2,332.18 less $828.04). On his return for 1955, he reported in income bond interest for that year in the full amount of $2,750. The bonds did not have coupons attached for the years following 1955. The total amount of income from "interest" on the bonds which was reported on Norton's tax returns was, therefore, $4,254.14. 8. On September 15, 1961, the maturity date of the Treasury bonds, Gibraltar credited $100,000 to Norton's account and canceled his note. Since the debit balance was $99,917.82, there was a credit balance "owing" to Norton of the difference, $82.18, which Gibraltar paid to Norton. Gibraltar sent Norton its slip confirming its "purchase" of the bonds "from" him for $100,000. Gibraltar did not pay $100,000 in cash to Norton; the "purchase" by Gibraltar was represented by the credit to the account on Gibraltar's books. Norton reported on his 1961 tax return a capital gain from the transaction of $13,187.50: 1275 9/15/61
Sale
$100,000.00
2/25/61
Purchase 86,812.50
Capital gain
$ 13,187.50
9. The following schedule shows *139 and explains the debits and credits in Norton's account for the transaction: Debits
2/26/54
"Cost" of $100,000 bonds
$ 86,812.50
2/26/54
Accrued bond interest 828.04
$ 87,640.54
2/26/54
Gibraltar's "Reserve" per note of N 17,359.46
2/26/54
Amount of Norton's note to G
$105,000.00
1954-1958
"Interest" charged on Norton's note 21,111.11
Total charges
$126,111.11
9/15/61
Pd. by Gibraltar to Norton 82.18
$126,193.29
Credits
1954
Bond interest credited to note
$ 2,332.18
1955
Bond interest credited to note
2,750.00
1954-1958
Net note "interest" pd. by Norton
3,751.65
1954-1958
Paid by Gibraltar to Norton
17,359.46
9/15/61
Gibraltar's "purchase" of bonds 100,000.00
$126,193.29
10. Apart from anticipated tax savings and benefits, the Treasury bonds transaction could not and did not result in a true economic gain and benefit to Norton and, instead, it resulted in an economic loss to him of $3,669.47, as follows: *10 Net Economic Loss
Debit: "Interest" charged by Gibraltar on note
$21,111.11
Credits: Purported "capital gain"
$13,187.50
Credits for bond "interest" 4,254.14
17,441.64
Norton's net economic loss
$ 3,669.47
*140 The purported "capital gain" was unreal, was a sham, and was a component part of the sham transaction. 11. * The transaction was of benefit to Gibraltar to the extent of $3,669.47, the difference between Norton's payments of "interest" to Gibraltar of $21,111.11, and Gibraltar's payments to Norton of $17,441.64 as the so-called "reserve" of $17,359.46 plus the payment of $82.18 to close the account on its books as of September 15, 1961. 12. The transaction in the Treasury bonds lacked substance and commercial reality; it was nothing more than a paper and book-keeping transaction; and it was a sham transaction devised to obtain tax deductions and benefits. Apart from expected tax benefits, no economic benefit and no actual profit and gain could be realized from the transaction. Rather, apart from expected tax benefits, the transaction resulted in an economic loss to Norton of $3,669.47. Also, he incurred and paid a net expense, his out-of-pocket expense, of $3,669.47, as follows: Net amount of payments to Gibraltar per note
$3,751.65
Less payment 9/15/61 rec'd from Gibraltar 82.18
Net out-of-pocket expense
$3,669.47
*141 1276 Since the transaction was a sham, Norton did not realize any income or capital gain therefrom. Respondent agreed at the trial of these cases that if his determinations are sustained, there shall be eliminated from Norton's taxable income for 1954 and 1955, under the Rule 50 computations, the purported "interest" on the bonds which he included in income on his returns. As the year 1961 is not before the Court, we do not have jurisdiction in these cases over any adjustment for the purported "capital gain" in that year. 13. The transaction was in the form of one from which Norton could not realize a gain because the principal amount of his note to Gibraltar included the figure of $17,359.46, the so-called "reserve", which made the principal amount of Gibraltar's charge $105,000. The due date of the note was the same as the maturity date of the bonds which then would yield only their face amount of $100,000. In addition, Norton was required to make the purported "interest" payments on the note. However, the Treasury bonds allegedly involved were non-interest bonds during the years 1956-1961 (coupons detached). The following illustrates the built-in barrier to Norton's realization *142 of profit from the transaction as it was set up: Upon the maturity of the note to Gibraltar on September 15, 1961, Norton was to be "obligated" to pay Gibraltar for the "cost" of the bonds, $87,640.54, plus the additional charge for the so-called reserve of $17,359.46, or $105,000. But he was to "receive" "interest" on the bonds of only $4,254.14, which was $13,105.32 less than the charge of $17,359.46 for the "reserve" which he had to repay to Gibraltar. In addition, he was to make payments to Gibraltar as "interest" on his note in the net sum of $3,751.65 which, when added to $13,105.32, increased the net amount of the charges to him upon the maturity of his note to $16,856.97. The "charge" to Norton for the Treasury bonds in 1954 was $86,812.50, and at the time of the due date of his note to Gibraltar he could expect to receive from a "sale" of the bonds no more than their face amount of $100,000. Although the redemption value of the bonds was $13,187.50 more than the "cost" of $86,812.50, such "gain" would be $3,669.47 less than the extra charges to him of $16,856.97, explained above. There was, therefore, a built-in loss in the transaction of $3,669.47, unless the bonds could *143 have been "sold" for as much as $103,669.47, the break-even figure. There is no evidence that the parties intended that the transaction could or might be closed prior to September 15, 1961. In fact, there was a premium charge of 1 1/2 percent if the note were to be "prepaid" before March 15, 1961. The transaction was not entered into for profit, and a profit could not have been reasonably expected, apart from anticipated tax deductions and benefits. 14. On the basis of a stipulation of the parties agreeing to the incorporation into the record of these cases of the testimony of Professor John P. Shelton in the cases of Jerome B. Rosenthal, Docket Nos. 67848, 77923, et al., the following list of bid prices for Treasury bonds due September 15, 1961, during the period March 31, 1954, to September 1, 1961, is included herein, since it appears that the parties so intended by their stipulation. The fractions in the list of bid prices have the same denominator, 32; thus, 103-26 means 103-26/32. Since the Treasury bonds matured September 15, 1961, the market prices tended to approach 100 as the time before the maturity date became shorter: UNITED STATES TREASURY BONDS 2 3/4% DUE 9/15/61 - *144 WITH COUPONS ATTACHED - LOW BID PRICES Year
Date
Low Bid Price
1954
Mar. 31
103-26
Apr. 1
103-26
May 26
102-30
June 2
103-2
July 27
103-26
Aug. 9
103-18
Sept. 28
103-11
Oct. 25
103-0
Nov. 29
102-19
Dec. 28
102-7
1955
Jan. 17
101-7
Feb. 28
100-25
Mar. 1
100-23
Apr. 26
100-22
May 6
100-19
June 27
99-31
July 29
99-4
Aug. 1
98-29
Sept. 1
99-2
Oct. 5
99-21
Nov. 21
99-10
Dec. 22
99-1
1956
Jan. 3
98-31
Feb. 23
99-28
Mar. 28
98-22
Apr. 16
97-26
May 9
98-7
June 26
98-28
July 31
97-30
Aug. 21
96-24
Sept. 5
96-15
Oct. 29
96-28
Nov. 27
96-4
Dec. 17
95-24
1957
Jan. 2
96-9
Feb. 18
97-8
Mar. 7
97-6
Apr. 30
96-22
May 27
96-2
June 21
95-12
July 22
95-2
Aug. 12
95-4
Sept. 25
95-10
Oct. 31
95-0
Nov. 1
95-6
Dec. 2
98-16
1958
Jan. 6
99-24
Feb. 3
99-30
Mar. 11
100-22
Apr. 2
101-6
May 1
101-22
June 27
101-8
July 29
100-14
Aug. 29
98-0
Sept. 29
97-20
Oct. 1
97-14
Nov. 3
97-30
Dec. 22
97-14
1959
Jan. 19
96-24
Feb. 2
97-2
Mar. 9
97-0
Apr. 21
96-30
May 13
96-26
June 4
96-12
July 28
96-6
Aug. 31
95-28
Sept. 15
95-22
Oct. 2
95-30
Nov. 30
96-10
Dec. 3
95-30
1960
Jan. 6
96-6
Feb. 19
96-24
Mar. 1
97-16
Apr. 12
97-30
May 19
97-28
June 1
98-8
July 8
99-10
Aug. 16
99-24
Sept. 12
99-23
Oct. 10
99-25
Nov. 21
99-25
Dec. 1
99-27
1961
Jan. 9
100-0
Feb. 28
99-30
Mar. 1
99-30
Apr. 3
100-0
May 24
100-1
June 2
100-0
July 31
100-1
Aug. 8
100-0
Sept. 1
100-0
*145 1277 Transaction C: $100,000 U.S. Treasury Bonds The facts about the second transaction in Treasury bonds are the same as the facts in Transaction "B" except for small differences in figures. Gibraltar made the sale of the bonds, closing date March 1, 1954, to C. J. Devine & Co. instead of to Childs & Co. as in Transaction B, Norton executed a promissory note in the principal amount of $105,000 payable to Gibraltar on September 15, 1961, which was the maturity date of the bonds, and the transaction was closed on September 15, 1961, by a purported "purchase" of the bonds by Gibraltar at par for $100,000 which was credited to Norton's account. In this transaction, Norton sustained a net economic loss of $3,794.30. The detailed facts are as follows: 1. On Friday, February 26, 1954, Joseph Faroll & Co., New York City, issued its sale invoice for $100,000 U.S. Treasury 2 3/4 percent bonds due September 15, 1961, with the interest coupon for March 15, 1956, and subsequent coupons detached. The settlement date was Monday, March 1, 1954. The sale price of the bonds was 86 - 30/32 $86,937.50; the accrued bond interest was $850.83; and the total charge was $87,788.33. The sale slip *146 was addressed to Samuel P. Norton. The ledger card of Faroll, for an account in the name of Norton, showed a debit on March 1, 1954, of $87,788.33, and a credit on the same date in the same amount with the notation "Irving Trust Co." On the same ledger card there are debit and credit entries on February 26, 1954, for the purchase of the other lot of $100,000 of Treasury bonds (Transaction B) for $87,640.54, with the same notation, "Irving Trust". Pursuant to instructions of Gibraltar to Irving Trust dated February 26, 1954, Irving received the bonds from and paid to Faroll $87,788.33. Irving charged Gibraltar's account on its books for the payment to Faroll, plus a charge of $2.50, a total of $87,790.83. The bonds were not delivered to Norton or to Gibraltar; they were delivered to Irving and Irving sent its debit advice to Gibraltar. On the debit advice, dated March 1, 1954, there was the instruction, "Redeliver vs Payment. Our charge covers receipt and delivery of Bds." On February 26, 1954, Gibraltar sold the $100,000 of bonds to C. J. Devine & Co., New York City, at 103 - 10/32, and instructed Irving to deliver them to Devine against payment. Irving followed the instructions. *147 Irving's credit advice to Gibraltar showed a credit to Gibraltar's account on March 2, 1954, for delivery of the bonds to Devine, in the total amount of $104,170.93, which represented a sale price of $103,320.10, plus accrued interest of $850.83. The debit and credit entries to Gibraltar's account on Irving's books for this transaction of a purchase from Faroll and a sale to Devine provided a credit balance or profit in Gibraltar's favor of $16,380.10; 1278 3/2/54
Credit at 103 - 10/32, recd. from Devine
$104,170.93
3/1/54
Debit at 86 - 30/32, Paid to Faroll 87,790.83
Credit balance, profit to Gibraltar
$ 16,380.10
The mechanics employed included a letter signed by Norton, dated February 26, 1954, instructing Faroll to deliver the bonds to "Gibraltar" on March 1, 1954, against payment of $87,788.33; and a letter of the same date signed by Norton to Gibraltar instructing it to receive the bonds on March 1 from Faroll and to pay Faroll the above amount. Also, Gibraltar issued a confirmation slip of its own to Norton dated March 1 stating that Gibraltar had "Received" for Norton's account the $100,000 of bonds against payment of $87,788.33. 2. In *148 fact, Gibraltar did not physically receive the bonds, and it did not pay Faroll $87,788.33. Gibraltar did not make a true and real "short sale" of the bonds. In fact, the bonds paid for themselves by the sale to Devine which was almost at the same time as the purchase from Faroll. The sale to Devine nullified the "purchase" from Faroll as a "purchase" of securities, as an investment, for Norton's account. The bonds came "In" and went "Out" through the securities clearance department of Irving Trust, the clearance agent for Gibraltar. In that "In" and "Out" transaction on February 26, Gibraltar did not use its own funds, and it did not borrow funds, but it only used its account with Irving, Gibraltar did not loan $87,788.33 to Norton, and it did not purchase $100,000 of Treasury bonds for Norton's account other than for one or two days pending the sale and redelivery of the bonds to Devine. Gibraltar's purchase from Faroll and sale to Devine of $100,000 of Treasury bonds was a separate, complete, and closed transaction beginning on Friday, February 26, 1954, and ending with the delivery to Devine on Monday, March 1, or Tuesday, March 2, 1954. (In 1954, February had 28 days, and February *149 28 was Sunday.) Gibraltar's order to sell the bonds was made at or about the same time as the order to purchase the bonds. The bonds were sold. Norton did not "pledge" the bonds to Gibraltar, except on paper. Gibraltar did not receive the payment of any coupon interest on the bonds. 3. The Treasury bonds were 2 3/4 percent bonds due September 15, 1961, on which interest was payable, if paid, on March 15 and September 15; $1,375 on each date; and $2,750 a year. In the transaction with Faroll, the bonds had attached the interest coupons for 1954 and 1955, and the coupons were detached for the years 1956-1961. In Gibraltar's transaction with Norton, Gibraltar treated the transaction as one involving a "purchase" of the bonds for Norton at 86 - 30/32, $86,937.50, with bond interest accrued, $850.83, for a total charge of $87,788.33. Subsequently on its books, Gibraltar gave Norton a credit of $2,332.18 as the "interest" on the bonds for 1954 (which figure is not explained); and a credit of $2,750 as the "interest" on the bonds for 1955, a total of $5,082.18 for "interest" on the bonds. 4. With respect to the transaction between Gibraltar and Norton, the following steps were taken: *150 Norton executed a promissory note (on a printed form of Gibraltar) dated March 1, 1954, payable to Gibraltar on September 15, 1961, which was the maturity date of the bonds, in the principal amount of $105,000, bearing 2 5/8 percent interest, secured by the "pledge" of the $100,000 Treasury bonds. The principal amount of the promissory note was the sum of a socalled cash "reserve", withheld by Gibraltar, of $17,211.67, to be paid by Gibraltar to Norton and $87,788.33, the charge for the bonds according to Faroll's statement. None of the $87,788.33 was paid by Gibraltar to Norton, and Norton did not in fact borrow any amount from Gibraltar. Gibraltar did not pay $87,788.33 of its own funds to anyone. The note stated that Gibraltar withheld $17,211.67 as a "reserve", as "security" for Norton's payment of "interest" on the promissory note. Other provisions of the note are set forth later. On March 1, 1954, Gibraltar opened on its books a "secured account" in the name of Norton with debit entry of $105,000 described as a "secured loan" secured by the $100,000 Treasury bonds which were said to be held "Long". The debit entry reflected Gibraltar's receipt of Norton's note. The note provided *151 inter alia that Norton had pledged the $100,000 Treasury bonds with Gibraltar as security for the "loan" of $105,000, and that Gibraltar had the right to borrow, re-hypothecate, use or transfer the bonds for any purpose, to use the bonds "to cover delivery of any securities of similar kind which may have been sold to others" by Gibraltar, and to use them "for its own account". Norton had a right to pay the note before the maturity date, upon 30 days 1279 notice, and upon the payment of a premium of 1 1/2 percent per year on the principal amount of the note from the prepayment date to the original maturity date. The "prepayment privilege" could not be exercised after March 15, 1961. Or Norton could pay the entire amount of the note on its due date, September 15, 1961, and obtain return of the "pledged"bonds. However, this provision in the printed form of the note was not of significance because the "pledged" bonds matured on September 15, 1961, and were to be redeemed at par, for $100,000, whereas the principal amount of the note was $105,000. The note also gave Norton the right to have the market value of the "pledged" bonds applied toward the payment of the note, but that right *152 could be exercised no sooner than 30 days prior to the due date of the note in 1961 and no later than 10 days before the due date. This provision, too, had little significance under all of the circumstances. The note provided that interest received on the pledged collateral shall be applied to the principal of the note but that no refund would be made of any interest on the promissory note resulting from the reduction of the principal. The installment payments of "interest" on the note to Gibraltar to be paid by Norton were stated on the note to be $4,217.63 on March 1, 1954, and 15 payments of $1,054.41 from January 15, 1955, to July 15, 1958, quarterly, and $1,054.37 on October 15, 1958. The sum of the "interest" payments was $21,088.15. However, the note provided that Gibraltar would pay $17,211.67 in equal installments to Norton on the dates when Norton was to pay the installments of "interest" to Gibraltar, upon the condition that the payments were made by Norton. Therefore, the net amount to be paid by Norton as "interest" was in fact $3,876.48. Norton and Gibraltar made the reciprocal payments to each other periodically pursuant to the note, and they exchanged checks on *153 or about the same date. Gibraltar mailed notices to Norton stating that a payment of an installment of "interest" would be due as provided on the note. Norton wrote checks payable to Gibraltar for each installment of "interest". Gibraltar, in turn, mailed its checks to Norton in amounts representing "release" of parts of the "reserve". During the period March 1, 1954, to October 15, 1958, Norton's checks to Gibraltar totaled $21,088.15, and Gibraltar's checks to Norton totaled $17,211.67, the amount of the "reserve". In effect, Gibraltar repaid to Norton $17,211.67 of Norton's payments to Gibraltar, and Norton's payments from his own funds totaled $3,876.48, the difference. Norton's note to Gibraltar was to become due on September 15, 1961, but the provision for the payment of "interest" on the note did not extend to the due date of the note. Rather no "interest" payments on the note were to be paid after October 15, 1958. The following schedules set forth for 1954-1958 the respective payments of Norton to Gibraltar and of Gibraltar to Norton: PAYMENTS OF NORTON (N) TO GIBRALTAR (G); PAYMENTS OF GIBRALTAR TO NORTON; AND NET SUM PAID BY NORTON 1954
Check Dates
Net Paid byNorton
3/ 1/54
N to G
$4,217.63
3/ 1/54
G to N 3,442.33
Net paid by N
$ 775.30
1955
1/12/55
N to G
$1,054.41
1/11/55
G to N 860.58
Net paid by N
$193.83
4/12/55
N to G
1,054.41
4/14/55
G to N 860.58
Net paid by N
193.83
7/13/55
N to G
1,054.41
7/15/55
G to N 860.58
Net paid by N
193.83
10/12/55
N to G
1,054.41
10/13/55
G to N 860.58
Net paid by N
193.83
Summary - 1955
Total paid Norton to Gi- braltar
$4,217.64
Total paid Gibraltar to Norton 3,442.32
Net paid Norton to Gi- braltar
$ 775.32
1956
1/ 9/56
N to G
$1,054.41
1/ 9/56
G to N 860.58
Net paid by N
$ 193.83
3/31/56
N to G
1,054.41
4/20/56
G to N 860.58
Net paid by N
193.83
7/10/56
N to G
1,054.41
7/22/56
G to N 860.58
Net paid by N
193.83
10/16/56
N to G
1,054.41
10/18/56
G to N 860.58
Net paid by N
193.83
Summary - 1956
Total paid Norton to Gi- braltar
$4,217.64
Total paid Gibraltar to Norton 3,442.32
Net paid Norton to Gibraltar
$ 775.32
1957
1/15/57
N to G
$1,054.41
1/16/57
G to N 860.58
Net paid by N
$ 193.83
4/ 9/57
N to G
1,054.41
4/10/57
G to N 860.58
Net paid by N
193.83
7/ 9/57
N to G
1,054.41
7/ 9/57
G to N 860.58
Net paid by N
193.83
10/ 8/57
N to G
1,054.41
10/11/57
G to N 860.58
Net paid by N
193.83
Summary - 1957
Total paid Norton to Gi- braltar
$4,217.64
Total paid Gibraltar to Norton 3,442.32
Net paid Norton to Gi- braltar
$ 775.32
1958
1/14/58
N to G
$1,054.41
1/16/58
G to N 860.58
Net paid by N
$ 193.83
4/ 8/58
N to G
1,054.41
4/ 9/58
G to N 860.58
Net paid by N
193.83
7/ 8/58
N to G
1,054.41
7/10/58
G to N 860.56
Net paid by N
193.85
10/14/58
N to G
1,054.37
10/15/58
G to N 860.56
Net paid by N 193.81
$ 775.32
Summary - 1958
Total paid Norton to Gibraltar
$4,217.60
Total paid Gibraltar to Norton 3,442.28
Net paid Norton to Gi- braltar
$ 775.32
Summary - 1954-1958
Total paid Norton to Gi- braltar
$21,088.15
Total paid Gibraltar to Norton
* 17,211.67
Net paid by Norton own funds
$ 3,876.48
*154 5. Norton took deductions for "interest" on his income tax returns for the years 1954-1958 in the sum of his payments to Gibraltar under Transaction C, as set forth above, namely: 1954, $4,217.63; 1955, $4,217.64; 1956, $4,217.64; 1957, $4,217.64; 1958, $4,217.60; total deductions, $21,088.15. 6. Although the Treasury bonds had been sold by Gibraltar on February 26, 1954, Gibraltar treated that step as a "borrowing" of the bonds, and Gibraltar credited the accrued bond interest to Norton's account, as the bond interest became due, during the period February 26, 1954, to September 15, 1955. Because the Treasury bonds were "purchased" with March 15, 1956, and subsequent coupons detached, Norton's account was not credited with accrued bond interest after September 15, 1955. Norton reported the accrued interest on the bonds as income on his income *155 tax returns for the years 1954 and 1955. As of February 26, 1954, the accrued interest on the bonds was $850.83. Since this amount was part of the total charge for the bonds, Norton did not report this amount of bond interest in his 1954 income. The accrued interest on the bonds in 1954 was $2,332.18, which amount, less $850.83, was $1,481.35. Gibraltar credited the principal amount of Norton's note with the bond interest, for 1954, $2,332.18, and with the bond interest for 1955, $2,750, total credits $5,082.18. The credits reduced the principal amount of the note from $105,000 to $99,917.82. The bond "interest" reported in income was $1,481.35 for 1954, and $2,750 for 1955, total $4,231.35. 7. On September 15, 1961, the maturity date of the bonds, Gibraltar credited $100,000 to Norton's account, the redemption value, and canceled his note. Gibraltar treated this step as a "purchase" by itself of the bonds from Norton, and sent Norton a slip to confirm the "purchase" dated September 14, closing date September 15, 1961. The principal amount of Norton's note had been reduced from $105,000 to $99,917.82. Therefore, the credit of $100,000 left a credit balance in the account of $82.18 *156 due to Norton. On October 4, 1961, Gibraltar sent its check to Norton in that amount which closed the account. Gibraltar did not pay $100,000 in cash to Norton; the "purchase" of the bonds by Gibraltar was represented 1281 by the credit to the account on Gibraltar's books. On his return for 1961, Norton reported a capital gain from the "sale" of the bonds of $13,187.50, of which 50 percent was taken into account in reporting income from capital gains: 9/15/61
Sale of bonds
$100,000.00
2/25/54
Cost 86,937.50
Capital gain
$ 13,062.50
8. The following schedule shows and explains the debits and credits in Norton's account for the transaction: Debits
2/26/54
"Cost" of $100,000 bonds
$ 86,937.50
2/26/54
Accrued bond interest 850.83
$ 87,788.33
3/ 1/54
Gibraltar's "reserve" per note 17,211.67
Amount of Norton's note to G
$105,000.00
"Interest" charged on Nor- ton's note 21,088.15
Total charges $126,088.15
Credits
1954
Bond "interest" credited to note
$ 2,332.18
1955
Bond "interest" credited to note
2,750.00
1954-1958
Paid by Gibraltar to Norton
17,211.67
1954-1958
Net "interest" paid by Norton, note
3,876.48
9/15/61
Gibraltar's "purchase" of bonds 100,000.00
Total credits
$126,170.33
9/15/61
Less paid by Gibraltar to Norton 82.18 $126,088.15
*157 9. Apart from anticipated tax deductions and benefits, the transaction could not and did not result in a real economic gain and benefit to Norton and, instead, it resulted in an economic loss to him of $3,794.30, as follows: Net Economic Loss
Debit:
"Interest" charged by Gi- braltar on note
$21,088.15
Credits
Purported capital gain
$13,062.50
Bond interest in- come 4,231.35
17,293.85
Norton's net economic loss
$ 3,794.30
The purported "capital gain" was unreal, was a sham, and was a component part of the sham transaction. 10. * Gibraltar benefitted from the transaction to the extent of $3,794.30, the difference between Norton's "interest" payments to Gibraltar, $3,876.48 less the payment by Gibraltar to Norton of $82.18. The seeming profit to Gibraltar of $16,380.10 (the credit balance in its favor on Irving's books; see par. 1 on page 52, supra) may not have been a "profit" to Gibraltar if it had repurchased the detached coupons for delivering the Treasury bonds to Devine on February 26, 1954. 11. The transaction *158 in the Treasury bonds lacked substance and commercial reality; it was nothing more than a paper and bookkeeping transaction; and it was a sham transaction devised to obtain tax deductions and benefits. Apart from expected tax benefits, no economic benefit and no actual profit and gain could be realized from the transaction. Rather, apart from expected tax benefits, the transaction resulted in an economic loss to Norton of $3,794.30. Also, he incurred and paid a net expense, out-of-pocket expense, of $3,794.30, as follows. Net amount of payments to Gibraltar
$3,876.48
Less receipt from Gibraltar 10/4/61 82.18
$3,794.30
Since the transaction was a sham, Norton did not realize any income or capital gain. Respondent has agreed that if his determinations are sustained, there shall be eliminated from Norton's taxable income for 1954 and 1955, under Rule 50 computations, the purported "interest" on the bonds which he included in income on his returns. As the year 1961 is not before the Court, we do not have jurisdiction in these cases over an adjustment to eliminate the reported capital gain in that year. 12. The transaction was in the form of one from which Norton *159 could not realize a gain because the principal amount of his note to Gibraltar included the figure of $17,211.67, the so-called "reserve", which made the principal amount of Gibraltar's charge $105,000. The due date of the note was the same as the maturity date of the bonds which then would yield only their face amount of $100,000. In addition, Norton was required to make the purported "interest" payments on the note. However, the Treasury bonds allegedly involved were non-interest bonds during the years 1956-1961 (coupons detached). The following illustrates the built-in barrier to Norton's realization of profit from the transaction as it was set up: 1282 Upon the maturity of the note to Gibraltar on September 15, 1961, Norton was to be "obligated" to pay Gibraltar for the "cost" of the bonds, $86,937.50, plus the additional charge for the so-called reserve of $17,211.67, or $105,000. But he was to "receive" "interest" on the bonds of only $4,231.35, which was $12,980.32 less than the charge of $17,211.67 for the "reserve" which he had to repay to Gibraltar. In addition, he was to make payments to Gibraltar as "interest" on his note in the net sum of $3,876.48 which, when added *160 to $12,980.32, increased the net amount of the charges to him upon the maturity of his note to $16,856.80. The "charge" to Norton for the Treasury bonds in 1954 was $86,937.50, and at the time of the due date of his note to Gibraltar he could expect to receive from a "sale" of the bonds no more than their face amount of $100,000. Although the redemption value of the bonds was $13,062.50 more than the "cost" of $86,937.50, such "gain" would be $3,794.30 less than the extra charges to him of $16,856.80, explained above. There was, therefore, a built-in loss in the transaction of $3,794.30, unless the bonds could have been "sold" for as much as $103,794.30, the break-even figure. There is no evidence that the parties intended that the transaction could or might be closed prior to September 15, 1961. In fact, there was a premium charge of 1 1/2 percent if the note were to be "prepaid" before March 15, 1961. The transaction was not entered into for profit, and a profit could not have been reasonably expected, apart from anticipated tax deductions and benefits. 13. On the basis of a stipulation of the parties, the list of the bid prices for the Treasury bonds from March 31, 1954, to *161 September 1, 1961, is included herein. (See page 50, Transaction B.) Transaction D: $500,000 U.S. Treasury Notes 1. On December 23, 1955, a purchase was made from Faroll of $500,000 U.S. Treasury notes, due April 1, 1960, bearing interest at 1 1/2 percent. The Treasury notes will be referred to as bonds for convenience. The interest on the bonds was payable semi-annually on April 1 and October 1, $3,750 on each date, $7,500 annually. The purchase price of the bonds was at 95-12/32, $476,875, plus a commission of $156.25, a total of $477,031.275. Faroll's total charge, including accrued interest of $1,700.82, was $478,732.07, as follows: Purchase price, 95-12/32
$476,875.00
Broker's commission 156.25
Cost
$477,031.25
Bond interest accrued to 12/23/55 1,700.82
Total charge
$478,732.07 The transaction date and the settlement date were December 23, 1955. Norton made a payment of $3,732.07 to Faroll by check dated December 23, 1955, which was deposited to Faroll's account with the Farmers and Merchants Bank in Los Angeles, Calif., leaving a balance due of $475,000. 2. Faroll "delivered" the bonds "against payment" to Irving Trust, Gibraltar's clearance *162 agent. Irving debited Gibraltar's account in the amount of $475,000 for the bonds, plus its fee of $12.50, or $475,012.50. 3. Gibraltar "sold" the bonds on the same day, December 23, 1955, to a dealer in New York, Arthur Ehlenberger & Co., for $478,369.57, which was $362.50 less than Faroll's charge on the same day. Gibraltar instructed Irving to immediately "redeliver" the bonds to Ehlenberger's clearance agent, Chemical Bank, "against payment" of $478,369.57. Irving did so, and credited Gibraltar's account on its books with the above amount. The debits and credits by Irving to Gibraltar's account were, therefore: Credit
$478,369.57
Debit 475,012.50
Credit balance in Gibraltar's favor
$ 3,357.07
Except for the temporary use, on December 23 of Gibraltar's credit with Irving, no money was borrowed for making the "purchase" and the "sale" of the bonds on the same day. The sale offset the "purchase". Norton signed two letters dated December 23; one to Faroll and one to Gibraltar, instructing Faroll to deliver the bonds to Gibraltar "against payment" of $475,000, and noting that $3,732.07 was being deposited to Faroll's account at Farmers and Merchants Bank; *163 the other, instructing Gibraltar to receive the bonds from Faroll "against payment" of $475,000. The letters were part of the mechanics. 4. Gibraltar did not "borrow" $475,000, and did not "loan" that amount to Norton, or for his account. 5. Under date of December 23, 1955, Gibraltar opened on its books in the name of Norton, a "Special Loan Account" in which a debit entry was made of $475,000, with the explanation that Gibraltar had "Bought or Received" $500,000 Treasury notes due April 1, 1960, which bonds were held "Long". This charge to Norton's 1283 account reflected Gibraltar's receipt of Norton's note in the amount of $475,000, payable to Gibraltar. 6. Norton executed a printed note of Gibraltar dated December 23, 1955, in the amount of $475,000, payable to Gibraltar on April 1, 1960, bearing 2 3/8 percent interest, payable in installments on the dates and in the amounts typed on the note. This note was security for the purported "loan" by Gibraltar to Norton of the above amount, and it was stated on the note that the note was secured by the pledge to Gibraltar of the $500,000 U.S. Treasury notes. The provisions of the note included the following: That Gibraltar *164 had the right to borrow, re-hypothecate, use, or transfer the pledged bonds for any purpose whatsoever, and to use the pledged bonds "to cover delivery of any securities of similar kind which may have been sold to others by the Gibraltar Financial Corporation, as principal and for its own account." The note provides further that at the option of Gibraltar, the pledged bonds or collateral "of like kind" can be turned over to the signer of the note upon the payment of the principal of the note, together with interest due. The note provides that the bond interest due on the pledged bonds shall be applied to the principal amount of the note; and that the signer of the note shall not be entitled to a refund of any interest paid arising from the reduction of the principal. The note did not have a provision for renewal. It was stated on the note of December 23, 1955, that the 2 3/8 percent interest was to be paid in installments of specified amounts on the dates and in the amounts typed on the note, namely, $16,867.41 on December 23, 1955, a total of that amount in 1955; $2,049.18 on April 1, 1956, and $3,750 on October 1, 1956, a total of $5,799.18 in 1956; $3,750 on April 1 and October 1, 1957, a *165 total of $7,500 in 1957; $3,750 on April 1 and October 1, 1958, a total of $7,500 in 1958; $3,750 on April 1 and October 1, 1959, a total of $7,500 in 1959; and $3,750 on April 1, 1960, the maturity date of the bonds and the note. The sum of all the periodic payments of "interest" on the note, as typed on the note, was $48,916.59. The note did not provide for any "reserve" withheld to secure the "interest" payments. 7. On December 23, 1955, Norton received a payment of $25,000 from Gibraltar, which as will be explained hereinafter was made to appear as a "loan" from CHK to Norton; on December 23, 1955, Norton executed a second promissory note in favor of the CHK Company, a partnership consisting of B. Gerald Cantor, Irving Hoffstein, and Burt Kleiner located in Beverly Hills. The promissory note in favor of CHK was for $25,000 payable on April 1, 1960, with interest at 4 3/4 percent from December 23, 1955, to April 1, 1960, a period of five years. The "interest" for the entire duration of the note amounted to $5,149.11 and was payable in advance on December 23, 1955. The note for $25,000 was secured by Norton's pledge of the collateral given to secure the note between Norton and *166 Gibraltar, for $475,000, CHK receiving a second lien on the collateral which was subordinate to Gibraltar's rights with respect to the $500,000 Treasury bonds pledged under the larger note. CHK paid Norton $25,000 by check dated December 23, 1955. On that date, Norton paid CHK the prepayment of "interest" of $5,149.11, as provided in the note executed in favor of the latter. On December 23, 1955, CHK purportedly "borrowed" $25,000 from Gibraltar, executing a note and pledge agreement in favor of Gibraltar, which note was payable on April 1, 1960, with interest at 4 1/4 percent from December 23, 1955, to April 1, 1960, a period of five years. Under the note executed by B. Gerald Cantor for CHK in favor of Gibraltar, the interest for the entire period of the note, amounting to $4,607.14, was payable in advance on December 23. Gibraltar paid CHK $25,000 by check on December 23, and CHK prepaid the "interest" of $4,607.14 to Gibraltar on that date. Under the note given by CHK in favor of Gibraltar, CHK pledged all of its rights under the note and pledge agreement between itself and Norton to Gibraltar to secure the "loan" of $25,000 to CHK on December 23. In reality, the "prepaid interest" *167 of $5,149.11, paid by Norton to CHK, went to Gibraltar in the form of CHK's payment of $4,607.14 as its prepayment of "interest" to Gibraltar. The rate of "interest" on Norton's note to CHK was 4 3/4 percent, but it was 4 1/4 percent on the note of CHK to Gibraltar. CHK kept the difference beween the two amounts, $541.97, presumably as a fee for its services. In substance, Norton was "charged" $500,000 by virtue of his execution of the two notes, for $475,000 to Gibraltar, and $25,000 to CHK. In substance, the $25,000 1284 served the same function as the "reserve" of cash to be paid by Gibraltar to Norton, which was the mechanics adopted in Transactions A, B, and C, supra, except that in this instance the "reserve" of $25,000 was paid to Norton through CHK and it was paid at the beginning of the transaction on December 23, 1955. According to the note to Gibraltar, Norton's first payment of "interest" was due on December 23, 1955, in the amount of $16,867.41. Norton paid that amount to Gibraltar. In substance, there was simply an exchange of checks covering that amount as the receipt of the $25,000 (from CHK) covered Norton's payment of $16,867.41 to Gibraltar on the same date. *168 The receipt of $25,000 also covered Norton's payment of $3,732.07 to Faroll and most of Norton's payment of $5,149.11 to CHK as "prepaid interest", except $748.59. In substance, therefore, Norton used only $748.59 of his own funds in making payments of the above-described, three items on December 23, 1955, as follows: 12/23/55
Received by Norton, CHK
$25,000.00
12/23/55
Paid by Norton:
(a) To Faroll
$ 3,732.07
(b) To CHK
5,149.11
(c) To Gibraltar 16,867.41
Net paid by Norton own funds
748.59
$25,748.59
$25,748.59
The mechanics of this part of the transaction also involved a "round robin" from Gibraltar and back to Gibraltar. Gibraltar transferred $25,000 to CHK, but Gibraltar received $16,867.41 "interest" from Norton; $4,607.14 "interest" from CHK. Also Norton's payment of $3,732.07 to Faroll had the effect of reducing Irving's charge to Gibraltar's account by that amount in the step when Irving received the Treasury bonds from Faroll "against payment". Gibraltar's account with Irving, in that step, was charged only $475,000 (plus the fee of $12.50) rather than all of Faroll's charge of $478,732.07. Gibraltar realized the *169 following benefits: 12/23/55
Gibraltar pd. CHK - Norton
$25,000.00
12/23/55
Gibraltar received:
(a) Credit from Faroll-Irving
$ 3,732.07
(b) Cash "interest" from CHK
4,607.14
(c) Cash "interest" from Norton
16,867.14
Excess from Norton, net
206.62
$25,206.62
$25,206.62
As shown above, with respect to the step in this transaction involving $25,000, Norton's out-of-pocket expense was $748.59 (see schedule above). The recipients of that expense of Norton were CHK which received, evidently as a fee, $541.97, and Gibraltar which received $206.62 (see schedule above). The total of those figures is $748.59. 8. With respect to the provisions of Norton's note to Gibraltar relating to any possible prepayment of the principal amount of $475,000 prior to the maturity date of April 1, 1960, the following are relevant: The note was a printed form of Gibraltar. Norton purportedly had "pledged" with Gibraltar the $500,000 U.S. Treasury notes (bonds) dur April 1, 1960, which had been sold to Ehlenberger & Co. on December 23, 1955. It was stated in the note that the signer of the note, Norton, had the right to receive Treasury notes in like kind *170 from Gibraltar "upon full payment of the principal and interest [on the note] at maturity." There was no specific provision for prepayment of the note prior to its due date in 1960. However, there was a provision that Norton had the right, upon giving written notice, to apply the market value of the securities, "pledged" pursuant to the note, "to the payment of this note", but that right could be exercised, if desired, only in 1960; that is to say, "no less than 10 days nor more than 30 days prior to the maturity date of this note." Accordingly, the provisions of the note did not permit Norton to pay the principal amount of the note before April 1, 1960; or if he had desired to close the transaction by exercising the option to have the market value of the "pledged" securities applied to the payment of the note, he could not have exercised that right any earlier than about March 1, 1960, 30 days prior to April 1, 1960. 1285 In this instance, the purportedly "pledged" securities were of such type that the right to apply the "market value" of the securities "to the payment of the note" was of little or no practical significance because the Treasury notes referred to matured on *171 April 1, 1960, were to be redeemed at their face value, and ordinarily under such circumstances the market price of that kind of security tends to approach par, or 100, as the time preceding the redemption date approaches and comes close to the redemption date. In form and according to Norton's notes to CHK and to Gibraltar, $500,000 was to be paid, and if Norton received 500,000 by way of application of market value, or credit, or in part in cash, that amount would just cover the sum of the principal amount of the two notes and there would be just an even break. The note also provided that if "upon application of any credit * * * there is a surplus over and above the liability of the undersigned hereunder, then * * * Gibraltar * * * shall pay such surplus to the undersigned." Also, the note was binding upon the legal representatives and assigns of the signer of the note for the benefit of Gibraltar. In the separate note to CHK for $25,000, which incorporated a "loan" agreement between Norton and CHK, which also referred to Norton's note to Gibraltar, there was no provision allowing Norton to pay that note before its maturity date, April 1, 1960. 9. Under the note of Norton to *172 Gibraltar, Gibraltar could have applied "interest" "received" on the allegedly "pledged" Treasury notes to the reduction of the principal amount of the note, but Gibraltar did not do that. Of course, the $500,000 of Treasury notes had been sold on December 23, 1955, to Ehlenberger & Co., and that sale had nullified the purchase of the securities on the same day from Faroll & Co. Gibraltar did not hold those securities and it did not receive any interest on them. The interest on the Treasury notes would have been payable on April 1 and October 1 of each year, $3,750 on each date, $7,500 annually. On Norton's note to Gibraltar, the purported "interest" on the note was payable by Norton on the first of April and October of each year beginning with the second payment due on April 1, 1956. The procedure followed by Norton and Gibraltar, respectively, beginning on April 1, 1956, involved an exchange of checks. Norton sent his check to Gibraltar, and Gibraltar sent its check to Norton, so that in effect Norton did not make any payment out of his own funds. Gibraltar's checks were purportedly for the accrued interest on the "pledged" Treasury notes, $3,750 biannually. The first payment *173 to Gibraltar of the purported "interest" on the note, $16,867.41, has been explained and accounted for above. Norton's receipt of $25,000 from Gibraltar, through CHK, covered Norton's first payment. The second payment of the purported "interest" on the note was stated to be $2,049.18. Norton sent Gibraltar a check for that amount, due April 1, 1956. However, on April 1, 1956, Gibraltar sent Norton a check for $3,750, as "interest" accrued on the Treasury notes, which was $1,700.82 more than Norton's payment. Therefore, Norton did not have any expense in connection with that payment to Gibraltar. As explained above, Norton had out-of-pocket expense of $748.59 in connection with his payments on December 23, 1955, and in connection with his receipt of $25,000. When Gibraltar paid Norton $3,750 on April 1, 1956, Norton's "surplus" of $1,700.82 over and above his payment to Gibraltar of $2,049.18, served to offset that out-of-pocket expense, and he still had a "surplus" of $952.23, as follows: 12/23/55
Norton's expense
$ 748.59
4/ 1/56
Norton paid Gibraltar 2,049.18
$2,797.77
4/ 1/56
Gibraltar paid Norton 3,750.00
Surplus to Norton
$ 952.23
The *174 remaining payments of the so-called "interest" on Norton's note to Gibraltar, beginning on October 1, 1956, were $3,750, on October 1, 1956, and on April 1 and October 1 of 1957, 1958, and 1959, and on April 1, 1960. That is to say, the note called for eight payments of $3,750 by Norton. He gave his checks to Gibraltar in those amounts. At about the same dates, Gibraltar gave its checks to Norton for $3,750, each, as the purported "interest" on the Treasury notes. In those exchanges of checks, Norton received back what he had paid to Gibraltar and he did not have any out-of-pocket expense. As stated hereinbefore, Norton's payments to Gibraltar of the so-called note "interest" aggregated, per the note, $48,916.59. Taking into account the payment to Norton of $25,000 by CHK on December 23, 1955, and all of Gibraltar's payments and a credit to 1286 him of "interest" on the purportedly "pledged" Treasury notes, Gibraltar paid and credited Norton as "interest" $1,700.82 more than Norton paid Gibraltar as "interest" on his note, and Norton did not have any out-of-pocket expense with respect to what he paid Gibraltar as "interest", as follows:
Pd. by Gibraltar to Norton
Pd. by Norton to Gibraltar
Excess Pd. by Gibraltar to N
12/23/55
$16,867.41 (CHK)
$16,867.41
4/ 1/56
3,750.00
2,049.18
$1,700.82
10/ 1/56
3,750.00
3,750.00
4/ 1/57
3,750.00
3,750.00
10/ 1/57
3,750.00
3,750.00
4/ 1/58
3,750.00
3,750.00
10/ 1/58
3,750.00
3,750.00
4/ 1/59
3,750.00
3,750.00
10/ 1/59
3,750.00
3,750.00
4/ 1/60 3,750.00
3,750.00
$50,617.41
$48,916.59
$1,700.82
*175 Upon making all of the payments to Gibraltar of the purported "interest" on his note, and other payments, Norton's out-of-pocket expense of $748.59 was reimbursed by Gibraltar's payments and a credit of "interest" on the Treasury notes, and in addition Norton received from Gibraltar the net amount of $952.23 which was his "gain": 1955-1960
Net payment by Gibraltar to Norton
$1,700.82
12/23/55
Norton's out-of-pocket expense 748.59
1955-1960
Norton's net gain
$ 952.23
9. On his tax returns for 1955-1960 (1960 is not before us), Norton deducted as "interest" paid on his note to Gibraltar $16,867.41 for 1955; $5,799.18 for 1956; and $7,500 for each of the years 1957, 1958, and 1959, and $3,750 for 1960. The total of the deductions for the years 1955-1960 was $48,916.59. In addition, for 1955 he deducted as a payment of "interest" the $5,149.11 paid to CHK. Therefore, his deductions for purported "interest" in this transaction totaled $54,065.70. Since 1960 is not involved here, the deductions for "interest" which are in issue here were those taken in the returns for 1955-1959 which aggregated $50,315.70 (excluding $3,750 "paid" April 1, 1960). 10. In his *176 returns for 1956-1959, the years involved here, Norton reported in taxable income, the payments received from Gibraltar as "interest" on the Treasury notes. For 1955, no interest on the Treasury notes was reported. For 1956, Norton included in income as Treasury notes "interest" the net amount of $5,799.18, which was the $7,500 received from Gibraltar less $1,700.82, the interest accrued to December 23, 1955, the date of the purported "purchase" of the bonds. The $1,700.82 was part of Farroll's charge for the securities and was part of "cost". Norton included in income as "interest" on the Treasury notes $7,500 for each of the years 1957, 1958, and 1959. The total amount so reported was $28,299.18. He reported $3,750 in income in his return for 1960, bringing the total to $32,049.18. However, 1960 is not involved here. 11. On March 31, 1960, Gibraltar issued a confirmation slip to Norton confirming a "purchase" "from him" of $500,000 Treasury notes, 1 1/2 percent due April 1, 1960, at 100, the redemption value of the Treasury notes, with the closing date April 1, 1960. The confirmation slip noted $3,750 as the accrued interest on the notes to April 1, 1960, and that the total proceeds *177 of Gibraltar's purported "purchase" were $503,750.00. On its books in the account in Norton's name, Gibraltar entered a credit to his account in the above amount. Gibraltar then marked Norton's note of $475,000 paid and canceled the note. Gibraltar did not purchase any U.S. Treasury notes due on April 1, 1960, from Norton or anyone else. On December 23, 1955, in an "In" and "Out" transaction Gibraltar had purchased and sold $500,000 of Treasury-April 1, 1960, notes. It did not hold any for Norton. Gibraltar's confirmation slip, addressed to Norton, of March 31, 1960, merely provided the basis for the credit entry in Norton's account on its books. 12. The step involving Norton's note to CHK, and the latter's payment of $25,000 to Norton on December 23, 1955, was an integral part of Gibraltar's transaction with Norton purportedly involving $500,000 of Treasury notes. Since the $25,000 was advanced by Gibraltar, as another type of a 1287 "reserve" in connection with a note, the "charges" to Norton of $475,000 and $25,000 in the form of his two notes represented, in substance, one charge of $500,000. Gibraltar's purported "purchase" "from Norton" of $500,000 Treasury notes, and *178 its credit to him of $500,000 in his account, represented, in substance, a credit which covered both notes, and in closing the transaction as of April 1, 1960, Gibraltar in fact reversed the procedure with respect to CHK and the $25,000 and gave Norton a check for $25,000 which Norton paid to CHK and, in turn, CHK paid to Gibraltar in repayment of Gibraltar's advance of $25,000 to CHK. Again, the procedure was a "round robin" of $25,000 from Gibraltar which came back forthwith to Gibraltar, and Norton and CHK were the conduits for that transfer "around" and back to Gibraltar. The mechanics adopted consisted of bookkeeping entries as follows: As of March 31, 1960, there was a debit balance due Gibraltar in Norton's account of $475,000, the principal amount of his note. There also was a charge (debit) to Norton of the last installment of "interest" on his note of $3,750, making the total debits $478,750. On April 1, 1960, Gibraltar credited $503,750 to the account. The credit of $3,750, representing the purportedly accrued "interest" due April 1, 1960, on the "Treasury notes" might have offset the debit in the same amount for "interest" on Norton's note to Gibraltar but instead Norton *179 sent Gibraltar a check for $3,750 on March 31. On May 12, 1960, the account was closed by Gibraltar's payment of $28,750 to Norton. That payment represented a payment to Norton of $25,000, the difference between the credit of $500,000 and $475,000, and $3,750 for the April 1, 1960, "interest" on the Treasury notes. Norton reported that $3,750 as income in his 1960 tax return. The charges and credits to the account on Gibraltar's books in 1960 were, therefore, as follows: Charges:
Due on note of Norton
$475,000
"Interest" due 4/1/60 on note of N 3,750 $478,750
Credits:
Paid by Norton, note "interest"
$ 3,750
Treasury notes bought by Gibraltar
500,000
"Interest" 4/1/60 Treasury notes
3,750
$507,500
Less Gibraltar paid Norton 28,750 $478,750 On May 13, 1960, Norton paid $25,000 to CHK. CHK had given its note to Gibraltar for $25,000 on December 23, 1955, which was payable April 1, 1960. CHK paid $25,000 to Gibraltar. 13. On his 1960 tax return, Norton reported the "sale" of the Treasury notes and a capital gain of $22,968.75: 3/31/60
"Sale" of Treasury notes
$500,000.00
12/23/55
"Cost" of Treasury notes 477,031.25
Capital gain
$ 22,968.75
*180 The "cost" used by Norton was Faroll's charge of $476,875 plus its commission of $156.25. Norton did not in fact and substance realize a capital gain of $22,968.75. 14. It is our finding that the item of $25,000 was an advance of cash to Norton by Gibraltar which used CHK as a conduit, and that in determining the economic and actual result of the transaction with Gibraltar, the advance of $25,000 is not to be treated as a separate and independent transaction between Norton and CHK. Rather, the $25,000 was in fact and substance a cash advance by Gibraltar to Norton, and it was an integral part of the entire transaction between Norton and Gibraltar. CHK, a partnership, was within the complex of Cantor, Fitzgerald, and Gibraltar. CHK was utilized in the Norton transaction as one of the several steps taken to give a certain appearance and form. It follows from this finding that in fact Gibraltar paid and made available to Norton $58,750, the sum of the $25,000, and of the purported "interest" on the purportedly "pledged" Treasury notes, $33,750. That sum exceeded by $952.23 Norton's cash payments to Gibraltar, to CHK, and to Faroll (which Norton paid for Gibraltar) totaling $57,797.77, *181 as follows: Paid by Gibraltar to Norton:
"Interest" on Treasury notes
$33,750.00
Cash "reserve" 25,000.00
$58,750.00
Paid by Norton:
"Interest" pd. to Gibraltar
$48,916.59
"Interest" pd. to CHK
5,149.11
Paid to Faroll for Gibraltar 3,732.07
57,797.77
Net cash received by Norton from Gibraltar
$ 952.23
Apart from expected tax deductions and tax benefits, Norton's net economic gain from this transaction was $952.23: 1288 (a) Treasury notes interest reported in income
$32,049.18
Capital gain reported 22,968.75
$55,017.93
Less:
(b) "Interest" charged, Gibraltar
$48,916.59
"Interest" charged, CHK 5,149.11
54,065.70
Norton's net economic gain
$ 952.23
The following schedule shows in summary form the charges and the credits to Norton's account in this transaction: Charges to Norton's Account
Charged to Norton for Treasury notes
$478,732.07
Charged to Norton per CHK note 25,000.00
$503,732.07
Charged for "interest", Norton's note 1
48,916.59
Charged for "interest", Norton's note 2 5,149.11
Total charges to Norton
$557,797.77
Credits to Norton's Account Paid by Gibraltar to Norton, "interest"
$ 33,750.00
Paid by Gibraltar to Norton
25,000.00
Credit for Gibraltar's "purchase" 500,000.00
Total paid & credited by Gibraltar
$558,750.00
Less: Excess of credits over charges 952.23
$557,797.77
*182 15. Ultimate findings: The Treasury notes were to mature on April 1, 1960, when they were to be redeemed at their face amount of $500,000. The payment to Faroll on December 23, 1955, of $3,732.07 reduced the "charge" for the Treasury notes to $475,000. The note of Norton to Gibraltar, $475,000, was to become due, also, on April 1, 1960. The amount of the cash advanced to Norton on December 23, 1955, by Gibraltar through CHK was predetermined on the basis of the difference between the "charge" for the Treasury notes, $475,000, and the redemption value of the Treasury notes, $500,000. That difference being $25,000, the amount of the cash which was advanced indirectly by Gibraltar to Norton on December 23, 1955, was $25,000. As of December 23, 1955, the charges to Norton were known; i.e., the respective amounts of "interest" set forth in the note to Gibraltar and in the note to CHK which Norton signed, and the amount of cash to be paid to Faroll for Gibraltar's benefit. As of December 23, 1955, it also was known that Gibraltar would credit $500,000 to Norton's account on its books as of about April 1, 1960, the due date of his notes to Gibraltar and CHK, because the maturity date *183 of the Treasury bonds which purportedly were involved was the same date, April 1, 1960. As of December 23, 1955, it was predetermined that Norton would realize a gain from the transaction of $952.23. That gain was allowed by Gibraltar to Norton as a predetermined gain. In the "In" and "Out" transaction on December 23, 1955, in Treasury notes, arranged by Gibraltar through the securities clearance department of Irving Trust, there appeared to be a "gain" to Gibraltar in its account with Irving of $3,357.07 (see page 66, supra). However, since Gibraltar provided, indirectly, the cash for Norton's payment of $3,732.07 to Faroll on December 23, 1955, the "In" and "Out" transaction through Irving Trust, clearance agent, cost Gibraltar $375, as follows: 12/23/55
Faroll's charge for the Treasury notes
$478,732.07
12/23/55
Proceds of sale to Ehlenberger 478,369.57
12/23/55
Cost to Gibraltar
$ 362.50
12/23/55
Clearance fee charged by Irving 12.50
Total cost to Gibraltar
$ 375.00
16. The respondent conceded that if his determinations disallowing "interest" deductions are sustained, then there shall be excluded from income, under the Rule 50 computations, *184 the amount reported in each year 1956-1959 as interest received on the Treasury notes. As the year 1960 is not before the Court in these cases, this concession cannot be given effect with respect to the capital gain reported for 1960. 17. The balance sheets of Gibraltar reflect cash in banks on December 1 of the years 1953-1957, as follows: Dec. 1
1953
$23,913.88
1954
41,811.89
1955
53,158.47
1956
24,401.12
1957
32,475.00
On the basis of a stipulation of the parties referring to testimony of Professor John F. Shelton in the cases of Jerome B. Rosenthal, Docket Nos. 67848, 77923, et al., the following list of the bid prices of Treasury notes due April 1, 1960, is included herein, since it appears that the parties so intended by their stipulation. The following is a list of the bid prices on the market, for U.S. Treasury notes 1289 due April 1, 1960, during the period December 30, 1955, to March 4, 1960. In the list, prices are stated with fractions having a denominator of "32", but the denominator is omitted. Since the Treasury notes were due on April 1, 1960, and were redeemable at par, the bid prices tended to approach 100 as the time before the *185 due date became shorter: *10 UNITED STATES TREASURY NOTES 1 1/2% - DUE 4/1/60 - LOW BID PRICES
Year
Date
Low Bid Price
1955
Dec. 30
95-8
1956
Jan. 6
95-4
Feb. 3
95-24
Mar. 16
95-6
Apr. 20
94-10
May 11
94-22
June 1
94-30
July 27
94-20
Aug. 31
93-20
Sept. 7
93-16
Oct. 5
94
Nov. 30
93-8
Dec. 7
93
1957
Jan. 4
93-20
Feb. 1
94-20
Mar. 1
94-12
Apr. 26
94-20
May 24
94-18
June 21
94-4
July 19
94
Aug. 16
94
Sept. 6
94-16
Oct. 4
94-20
Nov. 1
95
Dec. 6
97
1958
Jan. 3
97-24
Feb. 7
98-12
Mar. 7
99
Apr. 3
99-4
May 2
99-16
June 27
99-28
July 25
99-18
Aug. 29
97-28
Sept. 5
97-20
Oct. 3
97-20
Nov. 7
97-28
Dec. 19
98-2
1959
Jan. 23
98
Feb. 6
98
Mar. 13
98-4
Apr. 17
98-16
May 22
98-18
June 12
98-14
July 2
98-22
Aug. 7
98-24
Sept. 4
98-16
Oct. 2
98-20
Nov. 13
98-26
Dec. 4
98-30
1960
Jan. 8
99-8
Feb. 5
99-16
Mar. 4
99-18
Summary of the Securities Transactions In the four transactions, Norton was "charged" "interest" on his notes by Gibraltar (including CHK) totaling $228,199.01, *186 and Norton took deductions for "interest" on his tax returns 1953-1960, inclusive, in that total sum. However, Gibraltar paid cash and gave credits to Norton during the four transactions in the total net amount of $213,841.07 (most of it in cash), which offset Norton's cash payments of "interest". Therefore, although Norton's deductions on his returns totaled $228,199.01, his actual cash payments to Gibraltar (including CHK), were in the net sum of only $14,357.94. The following schedule gives the summary and shows the figures: Norton's Deducted"Interest" to G
N. Rec'd Cash &Credits from G
Norton's NetExpense
A
$131,934.05
$ 90,388.90
$ 7,764.22
B
21,111.11
17,359.46
3,751.65
C
21,088.15
17,293.85 3,794.30
($15,310.17)
D 54,065.70
55,017.93
* 952.23
$228,199.01
$213,841.07
($14,357.94)
Norton gave checks to Gibraltar totaling $228,199.01. In fact, Gibraltar refunded $213,841.07 thereof, mostly by its cash payments (the credits were for relatively small amounts). In A, B, and C, Norton's net *187 payments of "interest" to Gibraltar totaled $15,310.17, which was part of his out-of-pocket expense in the three transactions which purportedly involved, but in fact did not involve securities in the face amount 1290 of $1,200,000. In D, purportedly involving $500,000 of securities, even though Gibraltar (and CHK) "charged" Norton "interest" totaling $54,065.70, Norton did not have any expense because Gibraltar (and CHK) paid him in cash $55,017.93 which exceeded his payments of $54,065.70 by $952.23. In Transaction D, Gibraltar made cash payments of $33,750 to Norton in the guise of "interest earned" by the U.S. Treasury notes, plus the net amount of $21,267.93, or $55,017.93. Gibraltar advanced $25,000 to Norton through CHK on December 23, 1955, but Norton used $3,732.07 thereof to make a payment to Faroll & Co., which was for the benefit of Gibraltar and reduced by that much the payment of Irving Trust to Faroll for Gibraltar's account in the "In and Out" transaction in the U.S. Treasury notes, so that in fact Norton received in that step only the net amount of $21,267.93. It is our ultimate finding that each one of the four transactions was merely a paper transaction, was *188 a sham, and cannot be recognized for tax purposes. Petitioner reported as taxable income payments which he received from Gibraltar in the guise of "interest" earned by the Government securities purportedly involved. Respondent has conceded that if we make the above findings, then there shall be eliminated from taxable income the purported "interest" which was reported. He has conceded, also, that the purported capital gain which was reported shall be eliminated from taxable income. Those adjustments will be made under Rule 50. There was not any "interest" on the Government securities because there were not any securities. Gibraltar's payments to petitioner, which were in the guise of "interest" on the securities, were refunds of Norton's payments. No income was involved except in one instance. It was in Transaction D. In that transaction, Gibraltar's payments to Norton exceeded his payments to Gibraltar by $952.23. That amount came out of Gibraltar's funds. The overpayment occurred in 1956. However, strictly speaking the computation would have to be made at the end of the transaction, at the time of the closing thereof on Gibraltar's books, in 1960. Since the taxable year is not *189 before us in these cases, we do not have jurisdiction to effectively make a finding that in the running account between Gibraltar and Norton, Norton realized taxable income in 1960 of $952.23. Gibraltar certainly did not make a gift of that amount to Norton. If 1960 were before us in these cases, we could make the finding that this item was income in 1960. Our observation about this detail is academic. Moreover, it appears from petitioner's brief that the year 1960 is closed. It must suffice, therefore, simply to mention and explain this item. The following schedule lists the amounts which Norton reported in income on his returns for 1953-1959, inclusive, as "interest", on Government securities, received from Gibraltar. In fact, those payments by Gibraltar represented refunds to Norton of part of his payments of "note interest" to Gibraltar. *10 "Interest" Income Reported on Returns
Year
A
B
C
D
Total
1953
$10,888.89
$ 10,888.89
1954
17,500.00
$1,504.14
$ 1,481.35
20,485.49
1955
17,500.00
2,750.00
2,750.00
23,000.00
1956
17,500.00
$ 5,799.18
23,299.18
1957
16,284.72
7,500.00
23,784.72
1958
7,500.00
7,500.00
1959
7,500.00
7,500.00
Total
$79,673.61
$4,254.14
$4,231.35
$28,299.18
$116,458.28 *101960
(Not involved in these cases) $ 3,750.00
$32,049.18
*190 In the four transactions, Norton's out-of-pocket expense was $15,834.42, as shown hereinbefore, as follows: Transaction
Net Out-of-PocketExpense of Norton
A
$ 9,322.88
B
3,669.47
C 3,794.30
Total
$16,786.65 1291 Transaction
Net Out-of-PocketExpenses of Norton
D Less excess rec'd from Gibraltar $ 952.23
Net expense
$15,834.42 Issue 2: Docket No. 67854, 1953 Income of BRNM Law Partnership Rosenthal and Samuel P. Norton were members of a law partnership located in Beverly Hills, Calif., having four members, Brand, Rosenthal, Norton, and Miller, hereinafter called the partnership. There were disputes among the members which led to litigation and delayed the dissolution of the partnership. However, on February 23, 1953, the conduct of the business of the partnership was terminated. Rosenthal and Norton formed their own separate law partnership, but they undertook to watch the winding up of the affairs of the old partnership. One of the problems involved the collection of fees owing to the partnership for services performed before February 23, 1953, which was the cut-off date after which the business of that particular partnership *191 ended except the procedure of collecting fees and ending the business and the litigation. A special bank account was opened by Rosenthal and Norton at Union Bank and Trust Co., apparently located in Beverly Hills, soon after February 23, 1953, for the purpose of holding, receiving, and preserving funds of the partnership. Deposits were made in this bank account of moneys collected after February 23 of money owed to the partnership. The bank account was opened by Rosenthal and Norton as a kind of custodian and trust account in which the four former law partners had an interest; it was called "Rosenthal and Norton Special Account". They transferred all of the remaining funds from the law partnership bank account at the Union Bank to the new special account. The law partnership had its own accounting records. A new accounting record was set up by Rosenthal and Norton for the BRNM partnership in connection with the termination of the business as of February 23, and in connection with the new special bank account at the Union Bank. Entries were made in the new accounting record of collections, receipts, and disbursements after February 23. The new book-keeping record also was called *192 "Rosenthal and Norton Special Account". One purpose of the new bookkeeping record and special bank account was to keep a record of collections of the billings of the BRNM partnership, and of the payments of the unpaid expenses of the old firm. Another purpose was to make an accounting record to be used in the litigation among the partners; and to preserve the assets; and to prevent improper withdrawals of partnership funds. One of the issues among the partners related to the amounts of income to which each partner was entitled. As of February 23, 1953, the interest of each partner was as follows: Rosenthal 35 percent; Norton 25 percent; Brand 25 percent; and Miller 15 percent. The partnership kept its accounts and reported income on a cash basis for a fiscal year beginning November 1 and ending October 31. A partnership tax return for BRNM was filed for the fiscal year ended October 31, 1953. The net income of the partnership which was reported on the return was $72,011.63. There is no dispute about that figure as the net income involved. One of the problems in this case is whether all of the net income of $72,011.63 was earned prior to February 23, 1953, or whether part was *193 attributable to the period February 24 to October 31, 1953. The respondent made determinations whereby he adjusted the dollar amounts, respectively, of the shares of Rosenthal and Norton in the partnership net income of $72,011.63. The dispute in this case involves respondent's determination of the dollar amount of Norton's share of $72,011.63, the income from the law partnership which was includable in his income for his taxable year 1953. The same question is presented in a separate case, of Jerome B. Rosenthal. In the partnership tax return filed for the period ended October 31, 1953, the dollar amounts of the distributive shares of the four partners were reported as follows: Rosenthal
35%
$ 25,222.29
Norton
25%
17,989.44
Brand
25%
17,989.44
Miller
15% 10,810.46
Total
$72,011.63
In the income tax return of Norton for 1953, he included the above amount, $17,989.44, as his distributive share of the 1953 income of the law partnership, BRNM. In making his determinations which are in issue here (which also involve Jerome B. Rosenthal in a separate case pending in this Court) the respondent adopted the position that of the total sum of partnership *194 1292 earnings, $72,011.63, $36,215.16 was attributable to the period November 1, 1952, to February 23, 1953, and that the balance of $35,796.47 was attributable to the remaining period February 24 to October 31, 1953; and that with respect to the second period no part of the allocated amount of $35,796.47 represented shares of Brand and Miller, but rather all of that part represented shares of Rosenthal and Norton in equal amounts. On the above theory respondent determined that the earnings of $72,011.63 were allocable between the two periods before and after February 23, 1953, and among the four individual taxpayers as follows: 11/1/52 to 2/23/53
2/24/53 to 10/31/53
Total
Rosenthal
$11,458.86
$17,898.24
$29,357.10
Norton
9,967.80
17,898.23
27,866.03
Brand
9,217.13
0
9,217.13
Miller 5,571.37
0
5,571.37
$36,215.16
$35,796.47
$72,011.63
Respondent's reallocations resulted in increasing the dollar amount of the partnership income reported by Rosenthal and Norton in their separate and respective income tax returns for 1953 as is shown in the following schedule, so that respondent increased the dollar amount shares of the partnership *195 income attributable to Rosenthal and Norton, respectively, by $4,134.81 and $9,876.59. Respondent's allocations had the effect of reducing the dollar amount shares of the partnership income of Brand and Miller, respectively, by $8,772.31 and $5,239.09: Share of
Share R.
Increase
Income Reported
Determined
& Decrease
Rosenthal
$25,222.29
$29,357.10
$ 4,134.81
Norton
17,989.44
27,866.03
9,876.59
Brand
17,989.44
9,217.13
(8,772.31)
Miller
10,810.46
5,571.37
(5,239.09)
The law partnership of BRNM concluded its business operations on February 23, 1953, but thereafter until the dispute among the four partners was settled, the partnership was in a period of winding up its affairs, collecting bills due, and paying obligations. Those matters were handled by Rosenthal and Norton, but they were not engaged in continuing and carrying on the old partnership business. There was only one period to be accounted for, the fiscal period of the BRNM partnership, November 1, 1952, to October 31, 1953. The respondent's theory was incorrect in determining that two periods were involved for tax purposes, such as November 1, 1952, to February 23, 1953, and *196 February 24 to October 31, 1953. On the other hand, Rosenthal and Norton formed a new and different law partnership after February 23, 1953. The business and earnings of their new partnership were not the business and earnings of the BRNM partnership. The earnings and receipts of the new partnership were accounted for in books and records started for the new partnership by Rosenthal and Norton. The earnings and receipts of the BRNM partnership collected after February 23, 1953, were deposited in the special account at the Union Bank and recorded in the special set of books started to record the receipts and disbursements during the winding up period. No part of Rosenthal and Norton's earnings from their new partnership were deposited to the special account at the Union Bank or reflected in the books of the special account. Robert Brent, an independent Certified Public Accountant, who had been employed by Rosenthal and Norton as an accountant for several years prior to the trial of this case, testified about the accounting records of the BRNM partnership and the Rosenthal and Norton special account and about what those records reflected. The books and records of the old partnership *197 were kept and reflected entries recorded until the partnership was terminated on February 23, 1953, after which date no entries were made in that set of books. The special account set up by Rosenthal and Norton reflected entries recorded during the winding up period from February 24, 1953, to October 31, 1953. Brent analyzed the two sets of books and records to determine which fees and income were received by the old partnership prior to February 23, 1293 and which fees were collected and deposited in the special bank account by Rosenthal and Norton after February 23, 1953. He also analyzed the books to determine whether the fees and income collected and deposited in the special account after February 23, 1953, were earned or attributable to the services performed by the BRNM partnership prior to February 23. In his analysis, Brent referred to a trial balance sheet (Exhibit 55) to summarize his findings from his review and analysis of the partnership's books and the books of the special account. The trial balance sheet was a report on the earnings of the BRNM partnership for the fiscal year ended October 31, 1953, which showed net income of $72,011.63. Brent checked the amounts *198 in the trial balance with the balances reflected in the accounts in the ledger of the BRNM partnership and in the ledger of the special account. Of the net income of $72,011.63 of the BRNM partnership for the fiscal year 1953, fees and income received and disbursements made by the old partnership prior to February 24, 1953, accounted for the net amount $47,222.24. The balance, $24,789.39, was accounted for by receipts and disbursements after February 23, 1953, while Rosenthal and Norton were winding up the accounts of the old partnership, which were deposited to and paid from the special account, and were recorded in the books of the special account by Rosenthal and Norton. The net amount of $24,789.39 resulted from gross receipts of approximately $36,000 and disbursements of about $11,200, as reflected in the books of the special account. There were entries in the legal income and other income accounts in the ledger of the Rosenthal and Norton Special Account which indicated that amounts collected after February 23 and deposited to the special account were attributable to the period prior to February 23, such as notations describing the income or fee recorded, as "Hedy Lamar - *199 Legal thru 2-23-53"; "Lewis Jaffa - Legal thru 2-23-53"; and "Soriano V. Colby, Legal in full to 2-24-53". Brent also checked the entries in the ledger accounts of the special account with the cash receipts and disbursements journal from which the entries to the ledger accounts were posted. For every entry in the ledger accounts recording income or fees deposited to the special account, he found a notation in the corresponding entry in the journal that the fees were earned prior to February 23, 1953. In addition, Brent checked the income and fees recorded in the ledger accounts with billings which were made in 1952 by the BRNM partnership, and in several instances he found that the amount of the entry in the ledger account for fees and income collected after February 23, 1953, corresponded exactly with the amount of the billings to clients dated in 1952. All of the net income, $72,011.63, reported in the BRNM partnership return was earned by the old partnership prior to February 23, 1953. Only the sum of $24,789.39, out of $72,011.63, represented a net sum of items collected after February 23, which were deposited to and paid from the special account at the Union Bank after February *200 23 and were reflected in the books of the special account. Rosenthal's distributive share of the net income of the 1953 partnership income was $25,222.29, as reported in the BRNM partnership tax return and in his own return for 1953. Samuel P. Norton's distributive share of partnership net income was $17,989.44, which was correctly reported in his income tax return for 1953, and in the BRNM partnership return for 1953. The respondent made incorrect determinations in increasing the dollar amount shares, and the percentage shares, of Rosenthal and Norton in the income of the BRNM partnership for fiscal year 1953 so as to add to their reported shares $4,134.81 and $9,876.59, respectively, and each one is not taxable for such additional amounts, respectively. Rosenthal and Norton did not carry on the business of the BRNM partnership after February 23, 1953; they only managed the winding up of that law business. They formed a new and different law partnership of their own after February 23, 1953. None of the $72,011.63, the earnings of the old partnership represented or included earnings of the new and separate partnership of Rosenthal and Norton, organized by them after February 23, 1953. *201 Ultimate Findings of Fact Issue 1: Transactions in Government Securities 1. Claimed "Interest" Deductions: The following findings relate to each one of the four purported transactions in Government securities. 1294 Each transaction was a paper transaction, and was a sham. In each transaction: No securities were purchased by or for Norton or for his account; none were held for his account; and no interest on any of the securities which purportedly were involved was received by Gibraltar or Norton. The closing of Norton's four accounts on Gibraltar's books consisted of only bookkeeping entries. The bookkeeping entries did not reflect any bona fide sale of any securities which had been held for his account under a pledge with Gibraltar. No securities, held for Norton's account, were "pledged" with Gibraltar. There were no bona fide and real "short sales" of any securities "held" for Norton and "pledged" with Gibraltar. The transactions of Cantor-Fitzgerald and of Gibraltar with the securities dealers, Childs & Co., Faroll & Co., Ehlenberger & Co., Strauss & Co., and Devine & Co., involved sales of securities on or close to the same dates when the same securities had been purchased *202 from or through a dealer. The sales closed each transaction, in an "In and Out" securities transaction, almost simultaneously with the purchase thereby canceling each purchase and, also, providing the funds with which to make payments for the purchases. The transactions were not in reality or in fact "short sales" of securities bought and held by or for Norton. The "In and Out" transaction in a security in each instance, which was handled by the respective clearance agents of Cantor-Fitzgerald, Gibraltar, Strauss & Co., and others did not involve the borrowing of funds, or the lending of funds, and no indebtedness of Norton was created thereby or resulted therefrom. The promissory notes executed by Norton, payable to Gibraltar, did not relate to and did not involve any securities, and they did not relate to the particular securities which were involved in the almost simultaneous "In and Out" purchases from and sales to securities dealers. No securities were pledged with Gibraltar as collateral for any of the promissory notes executed by Norton payable to Gibraltar, and in one instance payable to the CHK partnership (Transaction D). The promissory notes executed by Norton were merely *203 part of each paper and sham transaction. Each transaction attributed to Norton and to an account on Gibraltar's books in Norton's name was not in reality and substance what it appeared to be in form. In reality, in the respective transactions herein designated as A,B,C, and D, no real Federal Land Bank bonds, U.S. Treasury bonds, and U.S. Tteasury notes were involved; none were actually delivered to Norton or to Gibraltar for his benefit; no payment was actually made to a securities dealer for securities by Norton or by Cantor, Fitzgerald or Gibraltar on Norton's behalf. With respect to a payment on December 23, 1955, to Faroll in Transaction D of $3,732.07, by Norton, the payment was in fact made by Gibraltar, uning CHK and Norton as its conduits, and Gibraltar on the same day in effect and substance regained all of that disbursement except $375 through the immediate sale of the Treasury notes to Ehlenberger & Co. and the credit of $3,357.07 to Gibraltar's clearance account on the books of Irving Trust, the small difference of $375 being an expense of Gibraltar in that "In and Out" purchase and sale of Treasury notes on December 23, 1955. No funds of Gibraltar or Cantor-Fitzgerald *204 were actually advanced or received in each of the purported "short sales" of securities; only bookkeeping entries, debits and credits, were involved in the respective accounts on the books of the respective clearance agents and Gibraltar and Cantor-Fitzgerald. In each transaction, A,B,C, and D, no funds were actually advanced or paid by Gibraltar, or Cantor-Fitzgerald, to Norton, or to any one, a dealer or otherwise, on his behalf, under any one of the purported loans to Norton. Gibraltar did not purchase any Land Bank bonds, Treasury bonds, or Treasury notes to "replace" any of those securities which were involved in the "In and Out" transactions with securities dealers at the beginning of each one of the purported transactions with Norton, - A,B,C, and D. Gibraltar did not have sufficient cash on hand to loan Norton the amount set forth in each note executed by Norton, i.e., $1,052,000, $105,000, $105,000, and $475,000, on or about the date of each note, or during any time material hereto. Gibraltar did not borrow on behalf of Norton all or part of $1,052,000, or $105,000, or $105,000, or $475,000 on or about the date of each note signed by Norton, or at any time material hereto. *205 Gibraltar did not loan $1,052,000, or $999,500, or $105,000, or $105,000 or $475,000 to Norton in the respective, purported transactions, - A,B,C, and D. 1295 No securities were actually delivered by Gibraltar in a sale to close each transaction on its books in the name of Norton. Instead, each account on its books in the name of Norton, in transactions A,B,C, and D was closed by debits and credits to balance the account. With respect to each promissory note executed by Norton at the beginning of Transactions A,B, and C, and with respect to the reference in the notes to a "reserve" "retained" by Gibraltar in the respective amounts of $90,388.90, $17,359.46, and $17,211.67, there was not in fact any "reserve" retained by Gibraltar of its own funds, and Gibraltar did not pay from its own funds any of those amounts. Instead, those amounts represented, in substance and in fact, the sum of Gibraltar's refunds and repayments to Norton of his own periodic payments to Gibraltar in the guise of payments of "interest" on his promissory notes. In Transaction "D", the item of $25,000 advanced to Norton through CHK at the beginning of the transaction on December 23, 1955, served the same *206 function as a "reserve" and the $25,000 covered Norton's first payment of "interest" of $16,867.41 to Gibraltar under his note for $475,000; Norton's payment of "interest" of $5,149.11 to CHK; and Norton's payment of $3,732.07 to Faroll, except $748.59 which was covered by Gibraltar's payment of Treasury note "interest" of $3,750 on April 1, 1956, so that by a financial round robin, the $25,000 was returned to Gibraltar and Norton's out-of-pocket expenses were reduced by $25,000. In fact and in substance, Gibraltar did not pay and Norton did not receive any real and actual interest on Land Bank bonds, Treasury bonds, or Treasury notes; and the amounts paid in cash to Norton, under the respective transactions in the guise of "interest" earned by a Government security were in fact repayments to Norton of his own funds which he had paid to Gibraltar as "interest" on his promissory notes; and Gibraltar's credits on its books to Norton's respective accounts of purported "interest" on a Government security were merely bookkeeping entries. In substance and in fact Norton was not indebted to Gibraltar for the amount on the face of each note he executed, payable to Gibraltar, and payable *207 to CHK ($25,000 in Transaction D) in each transaction; and his periodic payments under each note, in the guise of a payment of "interest", were not payments of interest on indebtedness, or payments for the use or forbearance of money. In each transaction and under each promissory note, including the note for $25,000 to CHK, Norton did not in fact pay Gibraltar the entire amount designated as "interest" by the terms of each note due to the fact that Gibraltar made refunds to Norton of substantial amounts of Norton's payments, which Gibraltar refunded in the guise of payments from the so-called "reserves" and in the guise of payments of "interest"accrued on the Government securities that purportedly had been, but had not been, "pledged" by Norton with Gibraltar. Thus, Norton's actual payments to Gibraltar, under his promissory notes, in the guise of payments of "interest" thereon, amounted to only the net amounts of $7,764.22 in A; $3,751.65 in B; $3,876.48 in C; and zero in D. Each transaction was lacking in economic benefit to Norton apart from some anticipated tax benefits. The principal purpose of each transaction was the creation of deductions for tax purposes. Each transaction *208 was lacking in substance and bona fides apart from tax purposes. In each transaction, which was a paper transaction, Norton did not receive any income from the Government securities purportedly involved, and he did not realize any capital gain. 2. Alternative Claims for Deductions: Petitioners' alternative claim for deduction of out-of-pocket expense, or net economic loss, can relate, in these cases, only to Transaction A and to the taxable year 1957, in the amount of $9,322.88. Apart from anticipated tax benefits, there was no reasonably expected profit or economic gain to be realized from the transaction which purportedly involved a "loan" of $1,052,000 and Gibraltar's charges of $97,777.51 on the original note of Norton, and $34,156.49 on the second, or renewal, note, a total charge of $131,934. The transaction was not one which was entered into for profit, and Norton's out-of-pocket expense of $9,322.88 was not a loss from a transaction entered into for profit. No loss deduction is allowable for such expense. The transaction did not represent in any respect a unilateral contract giving Norton an option to purchase $1,000,000 Land Bank bonds, and there was no intention of any *209 of the parties involved that such option was given to Norton to be exercised, if he so desired, independently and apart from the general arrangements. Gibraltar did not have its own funds with which to make 1296 a loan at any time material to Norton of funds for the actual purchase of the bonds, and Gibraltar did not intend to obtain an actual loan of such funds from any outside source for such purpose. Since the entire transaction for the purported purchase of $1,000,000 of bonds was only a paper transaction and a sham, without substance and reality, the element of an "option" to purchase the bonds cannot be implied or read into the transaction. Therefore, the out-of-pocket expense of $9,322.88 was not a loss attributable to a failure to exercise an option to buy or sell property. Apart from anticipated tax benefits, a profit could not have been reasonably expected from the transaction as it was arranged, purportedly involving $1,000,000 of Land Bank bonds; it was not a transaction entered into for profit; it was a paper transaction and a sham; no bonds were actually held for or purchased for or by Norton; and no bonds were held for the production of income. Therefore, the expense *210 of $9,322.88 was not an ordinary and necessary expense paid and incurred for the management, conservation, or maintenance of property held for the production of income. Issue 2: Income of BRNM Law Partnership Norton's taxable income for 1953 from the BRNM law partnership, and his distributable share thereof, was $17,989.44, and no more. Issue 3: Addition to 1954 Tax In each individual tax return of each petitioner for 1954, Docket Nos. 74913 and 74914, there was a substantial underestimation of the estimated tax for 1954. Therefore, each petitioner is liable for the addition to the 1954 tax under section 294(d)(2), 1939 Code. Opinion Preliminary Matters 1. Petitioner makes contentions regarding certain procedural matters such as the statutory notices of deficiences, and the basis for respondent's assessments of interest on deficiencies. The argument is directed toward relief which petitioner believed might have been given by this Court prior to the trial of these cases. The relief requested could not have been given prior to the trial of these cases because this Court does not have jurisdiction over the remedy which petitioner wanted to invoke. See Mertens, Law of *211 Federal Income Taxation, Vol. 9, Chap. 50, par. 50.18, pp. 50-52, and cases cited in the footnotes, relating to the jurisdiction of this Court. For example, this Court has no jurisdiction to consider questions concerning the amount of interest on an overpayment of tax to which a taxpayer may be entitled, where this Court has determined that there was an overpayment in tax; see and compare G.E. Fuller, 20 T.C. 308 (1953), affd. 213 F. 2d 102(C.A. 10, 1954); and Estate of Mary Redding Shedd, 37 T.C. 394, 399 (1961), affd. 320 F. 2d 638 (C.A. 9, 1963); and, conversely, this Court does not have any jurisdiction to determine on what basis the respondent shall assess interest on a tax deficiency and whether adjustments can be made back to, or to start from some particular date. The jurisdiction of this Court is fixed by statute; it arises from the statutory notice of deficiency itself. We have jurisdiction to make determinations about issues arising from the determinations set forth in the deficiency notice, and about properly raised issues in the pleadings. In that regard, with some variations, this Court's jurisdiction is fixed by *212 the determinations in the deficiency notice. Contrary to petitioner's contention, we cannot direct the respondent to issue a revised or a different deficiency notice. The issuance of a deficiency notice is an administrative matter of the Internal Revenue Service over which this Court does not have any jurisdiction. The petitioner states that he was faced with a dilemma at the time the deficiency notices were issued of whether to exercise his choice of paying the deficiencies and suing the respondent for refunds in a United States District Court, or to file petitions in this Court. He states on brief that if at that time the respondent had been willing to concede that "income" from Government securities, reported in petitioner's tax returns, was not taxable income, as he conceded at the time of the trial of these cases, then the amounts of the deficiencies would have been lower, and in that event he would have been financially able to pay the deficiencies, and he would have filed a suit for refunds in a United States District Court rather than file petitions in this Court. Petitioner argues that this Court should have issued an order, soon after the petitions were filed here, requiring *213 the respondent to eliminate the "interest" on 1297 Government securities from taxable income, which petitioner reported in his returns, rather than follow his policy of "protecting the revenues" by taking an inconsistent position about income from and deductions under the transactions in issue. The petitioner filed a motion requesting an order to that effect. The motion was filed about four years before the trial of these cases. It was denied because this Court lacks jurisdiction to direct the respondent to issue new and different deficiency notices. Moreover, it must be clear to petitioner that this Court cannot take jurisdiction in one matter, such as issuing such order relating to deficiency notices (even if it had the jurisdiction to do so) and then relinquish its jurisdiction to enable a taxpayer to file a suit in a United States District Court. Petitioner should recognize that this Court cannot take jurisdiction, and then dismiss the cases without entering a judgment relating to the deficiencies. If we took jurisdiction we could dismiss the cases, but we could do that only pursuant to an order relating to the deficiencies. However, petitioner originally did not want this *214 Court to dismiss these cases under an order sustaining the deficiencies which he wished to contest, only in another court. Consideration has been given to these contentions of the petitioner, and to related matters, which need not be discussed, but we can not give the requested special relief, apart from the issues presented. In the matter of the date from which the respondent may be willing to compute interest on deficiencies under the decisions of the Court in these cases, we do not have any jurisdiction. Gussie P. Chapman, 14 T.C. 943, 947 (1950), affd. per curiam 191 F. 2d 816 (C.A. 9, 1951), certiorari denied 343 U.S. 905 (1952). It may be possible that the respondent's administrative procedures are such as to provide some administrative relief to the petitioner, especially in view of respondent's concession at the time of the trial of these cases that items reported as "income" from the Government securities involved here were not taxable income, were not income realized by petitioner, and were only part of the sham transactions which cannot be recognized for tax purposes and, therefore, are to be eliminated from taxable income. The petitioner *215 took a consistent position in his tax returns in reporting "income" from the various Government bonds and notes, even though he actually did not realize such "income", and in taking the claimed deductions for payments of "interest", under his view that the transactions with Gibraltar should be recognized for tax purposes. Now, under this Court's rulings and respondent's concessions, the amounts of the tax deficiencies will be adjusted and reduced under our Rule 50. In the assessment and collection procedures of the respondent, he may be able to exercise some discretion with respect to his assessment of interest on the deficiencies. This point relates to a revision of the amounts of the deficiencies as of the dates of the deficiency notices so as to recompute the deficiencies to reflect the elimination from taxable income of "income" from the Government securities. This matter will be involved in respondent's computations of interest on the deficiencies. But on these general matters, this Court is unable to grant certain relief requested by the petitioner because of lack of jurisdiction. This Court could not have "certified" these cases to a United States District Court for trial *216 and decision. See and compare Krakoff v. United States, - F. 2d - (C.A. 6, 1970, September 14, 1970). Petitioner does not cite any statute, case, or rule as authority for his argument. A taxpayer, under relevant federal statutes, is given an election to make a choice of a federal court in a federal tax case, either the United States Court of Claims, a United States District Court having jurisdiction over the parties, or the United States Tax Court. But when he has made his election, as petitioner did in filing petitions in this Court, then the tribunal selected cannot certify the case to another court which would have had jurisdiction if in the first instance the taxpayer had elected to invoke that court's jurisdiction. The United States Tax Court is not an administrative agency; it is not a division of either the United States Treasury Department or of the Internal Revenue Service; it is a special court created by the Congress as an independent tribunal. These matters are so well established as not to require tedious citations of statutes, cases, and rules. 2. The petitioner argues at length that he was entitled to rely upon the form of the transactions as construted and represented *217 to him by Cantor, Fitzgerald and Gibraltar, and that he was not required or obliged to ascertain (by independent "investigation", inquiry, or any other method) whether in fact securities had been purchased for his account and held for his account; whether in fact Gibraltar had 1298 made a real and bona fide loan of the money stated on each one of the promissory notes which he executed, or had borrowed money from an outside source on his behalf; and whether in reality Gibraltar had received actual, accrued interest on securities allegedly purchased for his account, as was represented to him in the payments of funds to him in the guise of bond and note interest and credited to his account. Petitioner asserts that in his personal accounting for his assets and liabilities he treated on his books each transaction as one in which he had acquired the securities allegedly involved and also had incurred actual indebtedness. Petitioner strongly argues that evidence about the internal procedures of Cantor, Fitzgerald and Gibraltar, described as evidence of "third party" transactions, was inadmissible and that this Court erred in allowing the receipt into evidence of exhibits and testimony *218 covering those "third party", or internal procedures, of Gibraltar, especially, and of other participants including clearance agents and dealers. His argument is that the only admissible and relevant evidence consists of the dealers' slips addressed to him, showing the purported purchases and sales of the allegedly involved securities, the promissory notes which he executed, and the book accounts in his name on Gibraltar's books. He points out that each promissory note was a full recourse, unqualified promissory note. He asserts that he did not have any arrangement with Gibraltar "concerning the continued ownership or disposition of the" Land Bank bonds and U.S. Treasury bonds and notes, "and that the ultimate disposition thereof was solely within the control of Petitioners." He asserts further that loans "to purchase or carry United States Government securities are exempt from margin requirements of the Federal Reserve Board." Petitioner filed in these cases briefs extending into several "volumes", and he has laboriously and extensively discussed and argued his position and theories, and cited a substantial number of cases, including Niederkrome v. Commissioner, 266 F. 2d 238, *219 (C.A. 9, 1959). Oregon and C.R. and Company v. Grubissich, 206 F. 577, (C.A. 9, 1913); and United States v. Feinberg, 140 F. 2d 592, (C.A. 2, 1944). Petitioner argues that all of the promissory notes executed by him in favor of Gibraltar (and CHK) were in fact and in law promissory notes, and that they "created", in each instance, "a valid, legal and effective indebtedness from Petitioners to Gibraltar." Petitioner cites provisions of the California Civil Code, sections 3082, 3086, and 3105, and of the New York Negotiable Instruments Law, paragraphs 20, 22, 23, 24, 25. Petitioner refers to a serious observation and questions of this Court during the trial of these cases with respect to the bona fides of his financial competence to incur actual indebtedness of $1,000,000 (and more) to pay for $1,000,000 of securities, as a "snide" inference about his competence to undertake an indebtedness in that large amount. Petitioner's briefs extend over approximately 550 pages. His arguments, contentions, citations of cases, statutes, and various authorities have been carefully considered. If those contentions, arguments, and references to *220 authorities presented new points, and relevant matters, which have not previously been considered by this Court and other courts, as is evident from the written opinions of this Court and other courts in the long list of cases involving the same or similar issues as are in these cases (but not from any improper exercise of judicial notice, see B. F. Edwards, 39 B.T.A. 735, 738,739), we would indeed set forth and discuss fully all of petitioner's arguments. No useful purpose would be served in so doing. Petitioner has undertaken, on brief, to advise the Court about rules of judicial procedure, which he has described as "Caveats", among them the rules against the improper taking of judicial notice "of findings of fact in other cases", and of "records in a case involving different parties"; and the general rule that "assertions [of counsel] in opening statements, in arguments, or in briefs are not evidence * * * and cannot be taken to supply evidence which is lacking." We would like to assume that this Court is not in need of such "instructions", or perhaps "warnings" and advice, but in view of petitioner's extensive list of "caveats" in his reply brief, pages 283-284, it *221 may be well to note that his advice to this Court has also been taken into account. In B. F. Edwards, 39 B.T.A. 735, 738, supra, this Court (Judge Opper) reviewed some of the rules about the taking of judicial notice in general and in specific matters. Referring to proceedings in this Court it was stated that (p. 738) "the facts of a particular situation, the subject of private, 1299 rather than public knowledge, even though in some manner referred to in documents in the files of the Board [Board of Tax Appeals, the former name of this Court], may not be similarly treated. * * * Such material, if not part of the present record, would be beyond the scrutiny of the court on appeal." [5]
*222 The petitioner, in his "caveats" or, as defined in a dictionary, in his "legal warning to a judicial officer", does not specify any particular matter; does not relate or tie his "warnings" to this Court to any specific case previously decided by this Court; or to any part of the record in these cases; or to any part of the transcript of the trial of these cases; and he does not, in his list of general "caveats" state explicitly or in detail anything about the record in these cases which was subjectively in his mind when he gratuitously set forth his list of general rules in his reply brief. In that situation, we are unable to deal with or discuss any specific matter in these cases, or within the issues to be decided. However, in view of the substantial number of cases decided by this Court in which were present the issue whether payments made by a taxpayer were "interest on indebtedness" and therefore were deductible as payments of interest, it may serve a useful purpose and indicate this Court's notice of petitioner's caveats to state that in the consideration of the issues in these cases "judicial notice" has not been taken of the records or of the judicial findings of the facts *223 in other comparable cases decided by this Court. It appears to be judicious to set forth in the margin all of petitioner's warnings to the Court. [6]
*224 We return to petitioner's contention that he was entitled to rely on the form of each transaction with Gibraltar, and that he was no obliged to ascertain the facts involving the inner procedures of C-F and Gibraltar. We understand that petitioner means that he was uninformed about Gibraltar's procedures in each of the transactions. We believe that was the situation and we can assume that Norton was fooled by C-F and Gibraltar. It should be noted that there is no suggestion or inference in the respondent's 1300 disallowance of the claimed "interest"deductions, or in respondent's contentions on brief, that the petitioner, Norton, engaged in some type of fraudulent scheme or was aware of Gibraltar's and Cantor-Fitzgerald's devices and mechanics. The transactions in issue here did not represent a unique and unusual type of transaction and device, as is explained hereinafter. It may be assumed that Norton was unaware of and uninformed about the mechanics and devices employed by C-F and Gibraltar, and that he was a victim of their devices and manipulations. The "sham" transactions were the sham transactions of Gibraltar and Cantor, Fitzgerald, and the inference is not made that Norton *225 knowingly engaged in sham transactions. If we may cite and refer to a few of the decided cases upon which respondent relies (without seeming to indulge in any proscribed taking of "judicial notice"), we refer to the following cases: Goodstein v. Commiss ioner, 267 F. 2d 127, affirming 30 T.C. 1178; Lewis v. Commissioner, 328 F. 2d 634; Lynch v. Commissioner, 273 F. 2d 867; Broome v. United States, 170 F. Supp. 613; and Rubin v. United States, 304 F. 2d 766. Each of the cited cases involved transactions similar to the four transactions in issue here, which were arranged by Livingstone & Company and M. Eli Livingstone, a Boston broker and dealer in securities. Gibraltar and Cantor-Fitzgerald dealt in what came to be known as "Livingstone" transactions. In general, upon the particular facts and the evidence in each particular case (of course), it has been held by various courts, and in the above-cited cases, that where a Livingstone-type transaction is established by the evidence to be a sham transaction, it cannot be recognized for tax purposes. The taxpayer in these cases was one of many who were induced *226 to enter into a Livingstone-type of transaction. But Norton did not invent or devise that kind of transaction and it can be assumed that at the time he entered into the four transactions with Gibraltar, in issue here, he was not aware of Gibraltar's mechanics and devices. So much for the explanation. The question is whether evidence about Gibraltar's and C-F's intra mural mechanicss and devices are admissible. In our opinion such evidence is admissible. The petitioner seeks the allowance of a deduction for payments he made to Gibraltar under section 23(b), 1939 Code, and section 163(a), 1954 Code, allowing a deduction for "all interest paid or accrued * * * on indebtedness". Deductions are a matter of legislative grace and the taxpayer has the burden of establishing by competent proof that what he paid out was "interest on indebtedness". He must prove that the payment for which he seeks a deduction comes within the statute. It is of no avail that at the time the taxpayer entered into a particular transaction he did not know that the other party to the transaction (Gibraltar here) would not make a bona fide loan of money to him, or would not actually borrow money on his behalf, or *227 would not actually purchase securities for his account, and, on the other hand, would arrange only a paper transaction which would be a sham, which could not and would not be recognized for income tax purposes, and that there would not be a real indebtedness and that money paid in the guise of interest would not in fact be a payment of interest on indebtedness within the meaning of the statute. The taxpayer here has not denied that he intended to treat his payments to Gibraltar as deductible items of "interest" on his tax returns. It must be recognized that there is a rule for tax purposes resembling the rule of caveat emptor with respect to anticipated tax deductions; the taxpayer must beware lest his undertakings in fact fail to meet the requirements of the transaction. If we were to approve petitioner's contention that his claim for an interest deduction under the applicable statute does not involve or depend upon what was or was not done by the party with which he dealt, Gibraltar, with respect to the creation of an actual, real, and bona fide "indebtedness", the condition in and the requirement of the statutory provision, namely, that there must be a bona fide indebtedness and *228 that the taxpayer's payment must be for the use or forbearance of money, would be undermined and defeated. We are obliged, therefore, to reject petitioner's contention that it is immaterial and irrelevant to his claim and cause, whether Gibraltar actually loaned money to him and actually purchased securities for him, and that evidence about what Gibraltar did or did not do is immaterial and inadmissible. Petitioner's reliance upon Niederkrome, Grubissich, and Feinberg, supra, is misplaced. Petitioner stipulated with the respondent that the facts about Gibraltar's procedures and 1301 mechanics are true, the so-called "third party" facts. He objected to the admissibility of them on the grounds of relevancy and materiality. The above-cited cases are not applicable here. The issue in those cases was whether the evidence offered came within the ambit of the Business Records Act, 28 USCA 1732. The evidence offered in those cases was clearly hearsay and not admissible unless it was admissible under an exception under that Act. In Feinberg, the evidence was held to be admissible, while in Niederkrome and Grubissich the records were held to be inadmissible. Upon *229 their facts the cited cases are distinguishable and are not in point here. The so-called "third party" evidence to which petitioner objects, relating to the procedures and mechanics of C-F and of Gibraltar are relevant and material in determining the objective facts of the four transactions between petitioner and Gibraltar which are in issue. The Grubissich and Niederkrome cases were decided by the Court of Appeals for the Ninth Circuit. Subsequently, the same Court of Appeals decided MacRae v. Commissioner, 294 F. 2d 56, where it approved the view stated in Lynch v. Commissioner, 273 F. 2d 867, 872, with respect to the objective facts about a transaction resembling those in issue here, that "a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers", unless the statute itself turns on intent. In Perry A. Nichols, 37 T.C. 772, 789, this Court (Judge Raum) stated: "No matter what petitioners' intent may have been upon entering the transaction, the transaction itself remains a sham that cannot give rise to valid interest deductions." In Lynch, supra, the petitioners *230 also contended that they were innocent about "the round-robin nature" of Livingstone's dealings, but their ignorance of the objective realities was of no avail. Here, as was the case in Perry A. Nichols, supra, the "objective realities" were that petitioner did not purchase in any of the four transactions the Government securities purportedly involved, he did not borrow money from Gibraltar (or CHK in Transaction D), and he did not pay true interest on indebtedness in any of the transactions. "Therefore, regardless of what petitioners may have intended or believed or expected, there can be no interest deductions under the statute. The 'good faith' of petitioners is irrelevant." In Goodstein v. Commissioner, supra, p. 131, the court observed about the facts there that no indebtedness existed from the taxpayer to Seaboard, and that "Despite the transitory possession by the Guaranty Trust Company of the Treasury notes for Livingstone's account who was acting as the taxpayer's agent, there was never in substance either a purchase of the notes by the taxpayer or borrowing of the purchase funds from Seaboard." The court next observed that although the transactions *231 seemed to have created a "legal relationship between the taxpayer and Seaboard", "it was not one of borrower and lender", but was "the exchange of promises of future performances between the taxpayer and Seaboard." In these cases, upon their particular facts, the same observations are made, substituting for Seaboard, The Gibraltar Financial Corporation, and Irving Trust for Guaranty Trust. Accordingly, petitioner's contention about his execution of promissory notes must be considered against the background of the entirety of each transaction with Gibraltar. Although the form of his promissory notes was in conformity with the legal form of such notes, nevertheless the net results of his transactions with Gibraltar were only "the exchange of promises of future performances" between himself and Gibraltar, and in substance the transactions did not create the relationship of borrower and lender. Further reference to and discussion of petitioner's lengthy arguments about procedural matters will not serve the purpose of considering and deciding the many and ultimate questions. Issue 1: Four Transactions in Government Securities: Deductions for Payments of Alleged Interest; or, in the *232 Alternative, for Loss A. Deductions Claimed as Interest: The main question under this issue is whether there was, in the instance of each one of four transactions in Government securities, a real and bona fide indebtedness of Norton to Gibraltar, and of Norton to CHK Company, also, in Transaction D, evidenced by promissory notes, so that payments made by Norton pursuant to the notes during the 7 years 1953-1959, as "interest" on the purported "loans", constituted interest paid on indebtedness within the meaning of section 23(b), 1939 Code, and section 163(a), 1954 1302 Code. [7] The "interest" deductions taken on the tax returns were disallowed by the respondent upon his determinations that the payments were not "interest paid on indebtedness" within the provisions of the applicable Code sections, and that they are not deductible under any other Code provisions. There are additional questions under alternative grounds for claimed deductions. *233 It is an established rule of law that "interest on indebtedness," as used in the statute, means "compensation for the use or forbearance of money", Deputy v. Du Pont, 308 U.S. 488, 498 (1939). It has been defined, also, as "the amount which one has contracted to pay for the use of borrowed money." Old Colony R.R. Co. v. Commissioner, 284 U.S. 552, 560 (1932). The term "indebtedness", as used in the statute, has been defined as "an unconditional and legally enforceable obligation for the payment of money." Autenreith v. Commissioner, 115 F. 2d 856, 858 (C.A. 3, 1940); Commissioner v. Park, 113 F. 2d 352, 354 (C.A. 3, 1940); Gilman v. Commissioner, 53 F. 2d 47, 50 (C.A. 8, 1931). Upon due consideration of all of the evidence, our conclusion and findings are that Norton did not "contract to pay for the use or forbearance of money." The use of money was never a right of Norton in all of the transactions and arrangements, and no loans were made to him. The elaborate transactions can best be described as shams within the rule of Goodstein v. Commissioner, 267 F. 2d 127 (C.A. 1, 1959), affirming 30 T.C. 1178; *234 Lynch v. Commissioner, 273 F. 2d 867 (C.A. 2, 1959), affirming 31 T.C. 990; Knetsch v. United States, 364 U.S. 361 (1960); and Kapel Goldstein, 44 T.C. 284 (1965), affd. 364 F. 2d 734 (C.A. 2, 1966). These cases, on their facts, are indistinguishable in principle from the substantial number of cases which have held that payments of purported "interest" on alleged "loans" were not interest on indebtedness and, therefore, were not deductible. Knetsch v. United States, supra; Sammy Cahn, 41 T.C. 858 (1964), affd. 358 F. 2d 492 (C.A. 9, 1966); Williams v. Commissioner, 323 F. 2d 656 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; Amor F. Pierce, 37 T.C. 1039 (1962), affd. 311 F. 2d 894 (C.A. 9, 1962); Danny Kaye, 33 T.C. 511 (1959), affd. 287 F. 2d 40 (C.A. 9, 1961); Gordon MacRae, 34 T.C. 20 (1960), remanded on another issue, 294 F. 2d 56 (C.A. 9, 1961), certiorari denied 368 U.S. 955; Goodstein v. Commissioner, supra; Sonnabend v. Commissioner, 267 F. 2d 319 *235 (C.A. 1, 1959), affirming a Memorandum Opinion of this Court; Lifschultz v. Commissioner, 393 F. 2d 232 (C.A. 2, 1968), affirming a Memorandum Opinion of this Court; Benenson v. United States, 385 F. 2d 26 (C.A. 2, 1967); Max Barnett, 44 T.C. 261 (1965), affd. 364 F. 2d 742 (C.A. 2, 1966), certiorari denied 385 U.S. 1005; Kapel Goldstein, supra; Minchin v. Commissioner, 335 F. 2d 30 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; Jockmus v. United States, 335 F. 2d 23 (C.A. 2, 1964); Becker v. Commissioner, 277 F. 2d 146 (C.A. 2, 1960), modifying a Memorandum Opinion of this Court; Lynch v. Commissioner, supra; Leslie Julian, 31 T.C. 998 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959); Carl E. Weller, 31 T.C. 33 (1958), affd. 270 F. 2d 294 (C.A. 3, 1959), certiorari denied 364 U.S. 908; W. Stuart Emmons, 31 T.C. 26 (1958), affd. 270 F. 2d 294 (C.A. 3, 1959); Joseph H. Bridges, 39 T.C. 1064 (1963), affd. 325 F. 2d 180 (C.A. 4, *236 1963); Perry A. Nichols, 37 T.C. 772 (1962), affd. 314 F. 2d 337 (C.A. 5, 1963); United States v. Roderick, 290 F. 2d 823 (C.A. 5, 1961); Gheen v. Commissioner, 331 F. 2d 470 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court; Knowles Electronics, Inc. v. United States, 365 F. 2d 43 (C.A. 7, 1966); Lewis 1303 v. Commissioner, 328 F. 2d 634 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court, certiorari denied 379 U.S. 821; Dooley v. Commissioner, 332 F. 2d 463 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court; Rubin v. United States, 304 F. 2d 766 (C.A. 7, 1962); Rothschild v. United States, 407 F. 2d 404 (Ct. Cl. 1969); Brown v. United States, 396 F. 2d 459 (Ct. Cl. 1968); Oritt v. United States, 357 F. 2d 692 (Ct. Cl. 1966); Broome v. United States, 170 F.Supp. 613 (Ct. Cl. 1959); Carl Shapiro, 40 T.C. 34 (1963); A. A. Helwig, 37 T.C. 34 1046 (1962); William R. Lovett, 37 T.C. 317 (1961); Morris R. DeWoskin, 35 T.C. 356 (1960). *237 Except for immaterial variances as to names, amounts, the securities, and the forms of the transactions, the cases under consideration come within the reasoning of the cases cited above and the holdings that certain transactions were a sham. In Knetsch, supra, it was held that amounts claimed as "interest" could not be deducted where the transaction which gave rise to the claimed deduction was a sham. See Morris R. DeWoskin, supra; Gordon MacRae, supra; Rubin v. United States, supra. In these cases considerable attention was given to form, and petitioners rely heavily upon the form of each step taken. However, we do not find any difference in the substance of the transactions in Land Bank bonds, and Treasury bonds and notes in these cases upon making comparisons with the cases cited above. The findings, conclusions, and decisions in the cited cases were arrived at because the substance of each of the respective transactions in issue in each of those cases differed from its form. In these cases, the divergence of substance from form is as great or greater than in the cited cases. We find no significant difference between the facts of these *238 cases and those of Gordon MacRae, supra, after carefully and fully considering the evidence here, and all of petitioners' assertions, contentions, and arguments in their lengthy briefs. All of the cases cited by petitioners have been considered. L. Lee Stanton, 34 T.C. 1, is distinguishable from these cases. In Stanton the Commissioner conceded that the transactions in issue were bona fide and real, and that they created genuine indebtedness. He has not made any of those concessions in these cases. In Stanton this Court concluded that the taxpayer undertook to run the risk of the rise and fall of the market. We cannot make that conclusion here. See Max Barnett, supra, p. 281. It is recognized here, as was done in Knetsch v. United States, supra, affirming, 348 F. 2d 932 (Ct. Cls.) that one of the principles stated in Gregory v. Helvering, 293 U.S. 465, is that a taxpayer has a right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, if he employs "means which the law permits", and that rule has been considered in these cases. However, the related rule is equally well settled that *239 in instances of the type such as is in issue here "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, supra. That rule of law requires that we first look beyond the form in which the transaction in question was cast. Under the statute involved here, the petitioners may prevail "only if the payments in question were in fact and in substance interest i. e., consideration paid for the use and forbearance of money. Cf. Deputy v. Du Pont, 308 U.S. 488." See Gordon MacRae, supra, p. 26. The statutory provisions involved here, sections 23 (b), 1939 Code, and 163(a), 1954 Code, pertain to a type of allowable deduction. Deductions are matters of legislative grace, and to obtain the benefit of a statute permitting a deduction of a specified type, the taxpayer must prove and establish that his claimed deduction comes within the provisions and specifications of the statute. As has been restated recently in Brown, et al. v. United States, - F. 2d - (May 15, 1970, Ct. Cls.), where a taxpayer "attempts to use the tax system to obtain a benefit or advantage where *240 the only possibility of any real benefit or advantage comes through the tax mechanism itself", and where "there would be no substantial benefit or advantage through the transaction alone, apart from the operation of the particular tax mechanism employed by the taxpayer," the courts should examine carefully such attempts. "Such attempts may not always be rejected per se, but we think that a universal precondition of acceptance for tax purposes is that the taxpayer 'turn square corners' and fulfill every 1304 legislative requirement of tax law, correctly construed." Knetsch v. United States, supra, is not favorable to petitioners' claims in these cases but to the contrary supports the respondent's determinations. See Rubin v. United States, supra, p. 770, where the court noted that Knetsch is not inconsistent with the cases cited by the Government. Cases cited by the petitioners, such as the following, are distinguishable from these cases because in them the courts found the transactions to be in substance what they appeared to be in form and to have commercial reality: Maysteel Products, Inc. v. Commissioner, 287 F. 2d 429, reversing 33 T.C. 1021; *241 and Fabreeka Products Co. v. Commissioner, 294 F. 2d 876, reversing 34 T.C. 290. See Max Barnett, supra, p. 281, where the same observation was made. On the authority of the decisions of the cases cited above (in the long list set forth at the beginning), the general question is decided for the respondent. In view of the assertions and contentions of the petitioners in their lengthy briefs, it is advisable to discuss the facts, and the substance of the transactions in question, which purported to involve Federal Land Bank bonds and Treasury bonds and notes. Further discussion is necessary because of the diametrically opposite views, of the substance of the purported transactions, of the petitioners and the respondent, respectively, particularly because the petitioners contend that the form and the various steps of each transaction were in substance what they appeared to be in form. The ultimate question and the subsidiary questions are questions of fact. In parts of the petitioners' assertions on brief, there are several examples of their failure, whether or not deliberate and obtuse, to recognize important facts and distinctions; and *242 there is a tendency, whether or not intentional, to obfuscate the real facts underlying some of the steps employed in the transaction. Moreover, our task in clearly making the findings has been an exceedingly tedious and time-consuming undertaking because the seemingly simple structure of the transaction and of the provisions in the promissory notes given to Gibraltar were far from simple and uncomplicated. It should be made clear that the many schedules set forth in the findings are the result of this Court's diligent and careful analysis of the relationship of one step to another, and of the necessary comparisons of steps followed by Gibraltar with steps followed by petitioners, particularly with respect to the steps followed by Gibraltar in making payments to Norton, with which, of course, he was entirely cognizant. The obligation of this Court to look through form in order to ascertain substance, so that the realities and substance of the steps employed as well as of the entire transaction would emerge, has not been an easy task to execute. The design and structure of the underlying plan of each transaction, including the promissory note to Gibraltar which in the principal *243 amount included a so-called "reserve", were in many ways ingenious in their employment of the form of certain commercial and financial procedures. Descriptive labels were used, such as "short sale" which were not real at all in substance. There were no "short" sales of bonds and notes, and to describe what was done as a "short sale" was an artifice and subterfuge in itself. In order to understand the ingenuity of the general plan and of the separate steps employed in each one of the four transactions, there must be an understanding of the evidence and of its significance which reflects understanding of the mechanics and procedures of those who are engaged in executing securities transactions. The fact that Cantor, Fitzgerald (C-F) and Gibraltar were closely related, although separate entities, that both were dealers in securities, and that each one had as its clearance agent in New York, the Chemical Bank and the Irving Trust Company, respectively, which in their other and major activities are actually engaged in the procedures of clearance agents in real securities transactions, created a trompe l'oeil which at first might fool the eye. There was a great deal of eye-foolery in the *244 steps which were employed in each transaction, so that what was nothing at all appeared to have substance and to be a customary procedure in the business of buying and selling securities, of "delivering" them "against payment", and of "borrowing" securities to make a "short sale" of them. The transactions on their face had the appearance of the use and employment of money in substantial amounts, but relatively little money was employed. Real transactions in the buying and selling of securities involve much paperwork 1305 and many bookkeeping entries. In the transactions in dispute, and in the steps employed, only the paperwork and the bookkeeping entries were real, not the purported use and borrowing of money, and not the purported acquisition of Land Bank bonds and Treasury bonds and notes. That the whole device and framework of each transaction were ingenious is demonstrated by the lengthy Findings of Fact and the many illustrative schedules of figures in the findings, which have been derived from the evidence as the result of a lengthy and tedious examination and analysis of the evidence by this Court which counsel for the respective parties were not industrious enough to *245 supply, but Norton and respondent supplied some schedules. This Court, having worked out the findings, with the schedules, might find it sufficient to dispose of the questions involved simply by referring to the findings as dispositive of the ultimate question for decision, with the observation that petitioners' assertions and contentions are wholly lacking in merit. But it appears to be advisable to discuss and comment on some of the mechanics used in the transactions, so that the "eye-catching trompe l'oeil", or the deceptions, will not persist. Furthermore, since the petitioners have engaged in the exercise on brief of attempting to distinguish these cases from the decided cases in which the transactions which were not recognized for tax purposes were almost the same or closely similar to the transactions in dispute here, we must laboriously repeat here the analyses in the typical authorities which are controlling, even though in doing so we are obliged to largely quote from them. With respect to the matter of the burden of proof, our conclusion is that the petitioner, Norton, had the burden of proof with respect to all of the questions, including those involving the claimed *246 deductions for the payments of alleged "interest" pursuant to Norton's promissory notes. Max Barnett, 44 T.C. 261, 276 (1965), affd., 364 F. 2d 742 (C.A. 2, 1966); and Rule 32, Rules of Practice of this Court. Respondent introduced a considerable amount of evidence, much of it over petitioner's objection. To the extent that a burden of proof shifted to him, he satisfied his burden of proof. Petitioner's view of his burden of proof was that the evidence should be limited so as to exclude evidence about the mechanics employed by Gibraltar and its associates in the four transactions, and about what Gibraltar did or did not do, all of which he contends was irrelevant. We do not agree with his contentions. The objective facts are relevant to the determination whether there was a bona fide and real indebtedness of petitioner, in substance, in connection with every note he signed and in every transaction including the purported "loan" of $25,000 by CHK in Transaction D. If Petitioner was "taken in" or misled by those with whom he dealt, including Gibraltar, that fact and factor are of no avail to him with respect to whether the provisions of he interest-deduction *247 sections of the Codes were satisfied. In order for each one of his payments to Gibraltar and CHK to be deductible as "interest on indebtedness", there had to be an indebtedness; a use of money actually loaned to him, and his beliefs and subjective intentions are not controlling with respect to the statutory provisions involved, as has been stated by this Court and other courts in many similar cases. Norton's ignorance (which he asserts was the case) of the actual steps taken (or not taken) by C-F, Gibraltar, and CHK, and of the mechanics and paper procedures employed by each one of them is of no avail. Deductions for the payments in issue are deductible in each year only if they were in fact and substance interest on an existing indebtedness. Sections 23(b), 1939 Code, and 163(a), 1954 Code, do not by their terms permit as a condition for the allowable deduction for "interest paid on indebtedness" the taxpayer's intent, belief, good faith, good intentions, or subjective considerations. A matter as real as taxation does not depend upon the varying subjective beliefs and intentions of individual taxpayers, but, instead, taxation and the right to deductions depend upon the objective realities *248 of the transaction. Lynch, supra, p. 872; Perry A. Nichols, supra, p. 789; MacRae, supra, 294 F. 2d 56, 59; W. Stuart Emmons, supra, 31 T.C. 26, 31. No matter what Norton's intentions were upon entering into each transaction, the question is whether in substance there were real indebtedness and evidence with respect thereto is relevant, material, and admissible. The following relates to Transaction A, but in general it also is descriptive of Gibraltar's mechanics in B.C. and D. The evidence shows that on February 11, 1953, C-F and Gibraltar did not borrow $961,611.11 in connection with an order to purchase $1,000,000 Land Bank bonds, the total "charge" on Childs' sale slip. Practically simultaneously, Gibraltar placed a sell-order with Childs to sell $1,000,000 1306 of the same bonds; Childs executed the sellorder at the market price of 95 1/2; and the sell-order neutralized the buy-order. The "purchase price" of bonds covered by C-F's order to buy was "paid" through the mechanics of Gibraltar's simultaneous order to "sell". The mechanics meant that the bonds paid for themselves in a simultaneous "In" and "Out" mechanics *249 on the same day. The "In" and "Out" transactions were in effect paper transactions carried out by the respective bookkeeping entries of Loeb, Rhoades & Co. and Irving Trust in the respective accounts of C-F and Gibraltar. C-F's account with Rhoades was charged $961,611.11, and by virtue of a credit to Rhoades from Irving of the same amount the item was closed with respect to C-F. Irving charged Gibraltar's account $961,611.11 for its credit to Rhoades in that amount, and credited Gibraltar's account with the "selling" price reported by Childs in the same amount. No funds were borrowed on February 11, 1953. Government bonds can be "transferred" between dealers and clearance agents by debits and credits to their respective accounts pursuant to order slips of the clearance agents "to deliver against payment", or "to receive against payment". The evidence does not show any more than the paper aspects consisting of order slips. It is immaterial which way the "In" and the "Out" mechanics were carried out because whether or not there was a "movement" of the Land Bank bonds, there were and there had to be the paper and bookkeeping procedures, consisting of the orders to deliver or receive *250 "against payment", and the respective "pairs" of debits and credits in C-F's running account with Rhoades and Gibraltar's running account with Irving. No money was required. Customary mechanics of the securities market were utilized by C-F and Gibraltar in purporting to make a short sale; the mechanics were available to them. However, in a real short sale, the cost of the security is paid by or for the person who makes the purchase of the Government security. In an actual transaction the person who makes the purchase of a Government security ordinarily does not make a simultaneous sale thereof. There is no evidence that anyone put out $961,611.11 in cash for Norton on February 11, 1953; neither C-F nor Gibraltar did so. C-F and Gibraltar were in a position as dealers to utilize the above-described mechanics on behalf of Norton to "purchase" $1,000,000 of bonds without using any money. There was no "forbearance" or "use" of borrowed money. There was no borrowing of money from a bank secured by a physical pledge of securities as collateral. Compare Max Barnett, supra, p. 265; Lifschultz v. Commissioner, supra, 393 F. 2d 232, 233; and similar cases where bank *251 loans were actually involved in transactions similar to this one. In the mechanics utilized here, there was no formal "bank" loan by Rhoades or Irving, the clearance agents, but if so it was only for a few hours on February 11. In a real "short" sale some one owns the security and has paid for it, or has the indicia of ownership so as to be able to loan the security to some one who wants to make a real short sale. See J. George Gold, supra, 41 T.C. 419, 427. However, it is not necessary to be technical. Perhaps in form there was a "short" sale, but in substance there was not. The bonds simply went "In" and "Out" of the respective accounts of C-F and Gibraltar with their respective clearance agents. In Gordon MacRae, supra, pp. 26-27, this Court, taking notice of normal business transactions (p. 26), dealt with form versus substance by observing (p. 27): The steps taken, each in itself a legitimate commercial operation, were here each mirror images, and add up to zero. The various purchases and sales, each real without the other, neutralize each other and fairly shout to the world the essential nullity of what was done. No purchase and no sale is essentially *252 identical with what was done here, i.e., identical and virtually simultaneous purchases and sales. The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely. The exactly same observation applies here. In Goodstein v. Commissioner, supra, p. 131, the court concluded (as quoted in MacRae, p. 27) that "there was never in substance either a purchase of the notes by the taxpayer or borrowing of the purchase funds from Seaboard." The exact same conclusion is made here. See Rubin, supra, p. 770; Perry A. Nichols, supra, p. 788; and DeWoskin, pp. 358-359. The purported "sale" of the bonds on September 5, 1957, was no more than an attempt to give the series of lifeless steps an aura of vitality. No bonds attributable to Norton or a real transaction for him were "sold". He did not realize any actual capital gain. 1307 We have made lengthy findings of fact with respect to each transaction, and have prepared from the evidence many schedules showing in summary form what transpired as between petitioner, C-F, and Gibralter (and CHK in Transaction *253 D) in the matter of their exchanges of checks and Gibralter's credits in Norton's accounts on its books. Gibralter and C-F devised and provided the "transaction" in each instance, and the steps and mechanics which they (chiefly Gibralter) followed. Each one of the transactions was cast in forms resembling the "Livingstone" kind of transaction. The petitioner, Norton, did not participate in the development or creation of each transaction and respondent does not contend that he did. There are no allegations of fraudulent intent on the part of Norton. He complied with the requests of his "financial" advisers. Perhaps he was, in a sense, a dupe and a gull and was "taken in" by his advisers. Each transaction, A,B, and C, involved an expense to Norton which in fact was Gibralter's fee for providing the arrangements, the paper transactions, and the expected tax benefit. In Transaction D there was more paid to him than he paid to Gibralter. In every instance, his execution of a promissory note to Gibralter (and to CHK in D) was only a basic part of the plan. Each transaction must be considered in its entirety, and when so considered, it is abundantly clear that regardess of the legality of *254 each note and of the relationship between Norton and the "payee" thereby represented, the notes in themselves did not create "indebtedness" within the meaning of section 23(b), 1939 Code, and section 163(a), 1954 Code, which can be recognized for income tax purposes. The significance of each promissory note cannot, for tax purposes, be determined in a compartment isolated from all of the steps followed by Gibralter and its related constituents. There was not in substance and reality and existing indebtedness of Norton and the designation in each note of his periodic payments as "interest" did not make them, for tax purposes, "interest on indebtedness". The book accounts and the debits and credits therein on Gibralter's books, although evidence of the facts which they purportedly recorded, are not conclusive of the question for decision, whether the payments were in reality payments of interest for the use and forbearance of money, - interest on indebtedness. Doyle v. Mitchell Bros. Co., 247 U.S. 179; Eli D. Goodstein, supra, p. 1190, and cases cited. Upon the record and all of the evidence in these cases, the execution of each promissory note was but one component part *255 of each paper transaction, of each sham transaction, and each note was not evidence of a bona fide and real indebtedness of Norton. Within the framework of each entire transaction evolved and carried out by Gibraltar and its associated entities, each note of Norton was only a device to give the appearance of a loan to Norton and of the "pledging" of "purchased" securities as collateral for a "loan", as well as the appearance of the accrual and receipt of "interest" on the "pledged" Government bonds and notes. The appearance of the accrual of "interest" on the purportedly "purchased" securities in fact was another device for the making of cash payments to Norton, and the entries of credits to his book accounts. In reality the cash payments of Gibraltar (and of CHK in D) were simply refunds to Norton of his payments to Gibraltar (and CHK). It is immaterial that Norton was evidently "fooled" by Gibraltar and C-F and did not know about the devices and mechanics which they employed and devised. Since each transaction of Gibraltar (and C-F and CHK) was lacking in substance and was an artifice, and since no real borrowing and lending took place, no effect for income tax purposes can be given *256 to Norton's promissory notes and to the periodic payments designated as "interest" in the notes. Our Findings of Fact and the ultimate findings therein which are made in these cases, clearly set forth the "round robin" which took place in each transaction. The facts here, being closely similar to the facts in the cases cited hereinafter, from which the conclusions resulted in the cited cases, it is not necessary to restate here the reasoning in the cited cases. Broome v. United States, supra: J. George Gold, supra, p. 427; Eli D. Goodstein, supra; Lynch, supra; MacRae, supra; Perry A. Nichols, supra; W. Stuart Emmons, supra; Max Barnett, supra; Lewis, supra; Rubin, supra; and Rothschild, supra. We again note, as was done by this Court in MacRae, 34 T.C. 20, 26, supra, that even though each step taken by Gibraltar, including the utilization of "In and Out" securities orders with securities dealers, and the employment of clearance agents, and the taking of promissory notes from Norton, and the bookkeeping debits and credits on Gibraltar's books, - was *257 similar or the same as is followed in a legitimate business and 1308 commercial transaction, those steps were, in these transactions, A,B,C, and D, merely "mirror images" of the real thing, and they added up to zero in substance and reality. The several steps, each real, without the other steps, neutralized one another and resulted in nullities. Each transaction, A,B,C, and D, was ingenious, complicated, involved, and had the appearance of a commercial transaction, but nevertheless in substance each transaction had no purpose other than the erection of the facade for the tax deductions here in issue. In Transaction D, Norton received from Gibraltar more than he paid to Gibraltar (and CHK), and on Gibraltar's books it showed a gain. As was held in Rubin v. United States, supra, p. 770-771, we do not believe that the fact that Norton made a profit in Transaction D distinguishes that transaction from the others or from the now well-established rule that no recognition to such transaction can be given for federal income tax purposes. That Norton got a profit in D was only "incidental to the chimerical character of the transaction." It is held that each transaction, *258 A,B,C, and D, was merely a paper transaction; that in each one there was no substance and reality; there was no real indebtedness; the payments to Gibraltar were not interest on indebtedness; and the claimed "interest" deductions are denied. Also, it is held that Norton is not taxable on "income" reported as "interest" on Government bonds and notes for the taxable years before us, or on the capital gain reported in Transaction A. Adjustments eliminating such reported income for the years before us will be made by the respondent and petitioner under Rule 50. B. Alternative Claims for Deduction of Expense: Petitioners raised an issue in the alternative in their amended petitions to the effect that in the event that respondent's determinations are sustained, disallowing deductions taken for "interest" on Norton's promissory notes, then they should be "permitted to deduct" the so-called "economic loss." In the amendment to the petitions, there is no reference to any section of the Internal Revenue Code dealing with allowable deductions under which petitioners claim deductions on alternative grounds. Petitioners did not present in their briefs any specific argument directed toward any *259 alternative ground for claiming deductions involving their "economic loss." It is our understanding that in the amendment to the petitions, the petitioners meant to make a claim for a deduction of the out-of-pocket expense of Norton in all of the transactions with Gibraltar, and that the words "economic loss" mean expense of or loss from a transaction with Gibraltar. On brief Norton asserted, without any elaboration, that he "could have realized an economic gain in all four transactions," and that he "anticipated" other benefits besides tax reduction. He also made the assertion that when the Rule 50 computations are made by the parties (this Court's Rule 50), to be filed with the Court for the Court's order or judgment stating the revised amounts of the deficiencies, a "credit" shall be allowed for his out-of-pocket expenses. It is our understanding that the petitioner, Norton, has not abandoned (in his briefs) the claim made in the amendment to the petitions for the allowance of a deduction, or deductions, of his "loss" or out-of-pocket expenses on some alternative ground. Therefore, the alternative claim is given consideration according to our understanding of petitioner's lengthy *260 briefs, even though both the petitioners and the Court would have been aided by petitioner's specific arguments, tied to a particular section of the Internal Revenue Code, as is customary and is ordinarily required in this Court. At this point, although it is not in sequence, it should be noted that petitioners' briefs reveal that in several respects, the petitioner, Norton, is not sufficiently and well enough acquainted with the procedures of this Court and with the technical aspects of this Court's jurisdiction to deal with several matters. Since this Court is located in Washington, D.C., does not have any division located in any state or region (comparable to a United States District Court for a region or state), and has a nation-wide jurisdiction which is fixed by statute, it is understandable that many attorneys (whose practice is not of a specialized kind with more or less frequent trials in this Court, sitting in a local area) do not become adequately acquainted with the statutory limitations on this Court's jurisdiction, and with this Court's Rules of Practice. It is not prejudicial in any way to the cause of the petitioner, Norton, that he is not well acquainted with such *261 matters, and we are inclined to provide to him as much assistance and relief as 1309 properly can be done. For example: The statutory notices of deficiencies giving rise to these cases do not involve the taxable years 1960 and 1961. Therefore, this Court does not have jurisdiction to make any determinations or adjustment relating to petitioners' income tax liability for 1960 and 1961, and we do not have the authority to issue any order relating to either a deficiency in or overpayment of tax for 1960 and 1961. And, with respect to our Rule, designated "Rule 50," which is related to our order called the "decision" of income tax liability, this Court cannot make or direct the respondent to make any "adjustment for overpayment of tax for 1960," and for 1961. On brief, the petitioners have made requests to that effect. In these cases, we cannot give such assistance to the petitioners. As far as the record shows, the years 1960 and 1961 are closed unless the petitioner duly filed with the respondent claims for refunds of overpaid taxes, if any. This Court has no jurisdiction over or connection with the administrative procedures of the Commissioner of Internal Revenue. It is not a division *262 of the United States Treasury or of the Internal Revenue Service. Undoubtedly the petitioner, an able counsellor and attorney, is aware of these matters. They are respectfully noted, nevertheless, in view of many points mentioned in the lengthy briefs of the petitioners. Attention has been given to references in the briefs to what are described as "Penultimate Caveats." This Court is acquainted with them. No useful purpose would be served by discussing them. In many respects, the references to certain "caveats" are argumentative, general, and are not related to the issues presented for decision by the pleadings. In this regard, it should be stated that these cases stand on their own facts, and the questions presented for decision have been considered and decided on the basis of the evidence in these cases. For example, judicial notice has not been taken "or records in a case involving different parties," or of "findings of fact in other cases". We turn now to petitioners' alternative claim for a deduction for Norton's out-of-pocket expenses. In the deficiency notices, giving this Court jurisdiction in these cases, the Commissioner determined deficiencies in income tax for each *263 of the taxable years 1953-1959, inclusive. Transaction A was the only one of the four transactions which was concluded within the years 1953-1959. Transactions B and C were concluded in 1961, and D in 1960. In the matter of the allowability of deductions taken on the tax returns for the years 1953-1959 as deductions of interest paid on indebtedness, it has been necessary to consider the facts about all of Transactions B,C, and D, to the end, even though those transactions were not concluded until after 1959. But with respect to a deduction for out-of-pocket expense, as a loss or an expense, or as a deductible item on any available statutory ground, such deduction may be taken only for the year in which the expense was ascertained and fixed, which is the year in which the transaction was concluded. The petitioners did not make a clear pleading of their alternative claim for deduction of the loss or out-of-pocket expense of Norton. His alternative claim for such deduction had to be made in terms of his out-of-pocket expense in each transaction, the total amount thereof, the taxable year for which the deduction is claimed, and the section of the Internal Revenue Code relied upon in *264 claiming the deduction. The amended petition in each one of these cases did not include a proper pleading to raise an issue about the deductibility of such expense. See Rule 7, this Court's Rules of Practice, for statements of the requirements for a proper pleading, which is an allegation of "error" of the Commissioner. The aborted pleading was defective because of the absence of a statement in the amendment to each petition of the taxable year for which a deduction, in the alternative, is claimed, the amount of the claimed deduction; the facts, and the statute under which the deduction is claimed. If proper pleadings had been filed, the petitioners would have had to refer to the specific transaction (not to all of them as a unit) involving the expense, and to the amount thereof for which a deduction is claimed. That was not done. We could rule that because the matter was not properly pleaded, no alternative claim and issue is before us for decision. However, it is believed that petitioners' claim was understood by the respondent, and we will consider the matter. Respondent has covered it in his brief. Petitioners' alternative claim for a deduction relates, and can relate, only to *265 the out-of-pocket expense in Transaction A, Land Bank bonds. That expense was $9,322.88. The only year for which deduction thereof can be claimed is 1957 in which year the transaction was completed. 1310 Petitioners appear to have intended to claim a deduction in that amount as either: (a) a loss from a transaction entered into for profit, under section 165(c)(2), 1954 Code; or (b) as a loss attributable to Norton's failure to exercise "a privilege or option to buy or sell property," under section 1234; or as an ordinary and necessary expense paid for the management, conservation, or maintenance of property held for the production of income," under section 212(2). Upon consideration of the evidence and facts, it is held that a deduction of $9,322.88, for 1957, is not allowable under section 165(c)(2), or section 1234, or section 212(2). In view of the generality and defects of the pleading raising this issue, we are unable to interpret the pleading in the amendment to the petition in Docket No. 91362 as referring to any other section of the 1954 Code, if any other section thereof is available for a claimed deduction. If any other Code section might be available for petitioners' *266 claim, petitioners should have (and were required by our Rules to) specifically referred to it in their pleading. The reasons for the above conclusion are: It appears that petitioner claims, in the alternative, a deduction for his out-of-pocket expense for the year in which a transaction was concluded. Only Transaction A was concluded in a year before us, 1957. The years 1960 and 1961 are not before us and over them we do not have any jurisdiction. The question is, therefore, whether Norton's out-of-pocket expense in A, of $9,322.88, is deductible as a loss from a transaction entered into for profit, under section 165(c)(2); or as an ordinary and necessary expense for the management, conservation, or maintenance of property held for the production of income, under section 212(2); or, under section 1234, as a loss attributable to failure to exercise "a privilege or option to buy or sell property". Upon due consideration, the deduction of the expense of $9,322.88 cannot be allowed under any one of the above-cited provisions of the Code. We have concluded that Transaction A was a paper transaction, a sham. The facts show that there was no reasonable expectation of gain therefrom, *267 apart from tax benefits, or of an economic benefit to Norton, and that the possibility of a profit was illusory. The amount of the purported "indebtedness" was "loaded" by a figure of $90,388.90 for a purported "reserve" to be paid to Norton, over and above the charge for the theoretical "purchase" of the Land Bank bonds, up-charging Norton $1,052,000. The bonds were to be redeemed at 100 on October 1, 1957, and Norton's second note became due on October 1, 1957. There was no real possibility of the realization of a gain or economic benefit, apart from tax benefits, to Norton from the transaction. It has been settled that a loss deduction for such out-of-pocket expense is not allowable under section 165(c)(2), under such facts as are present here. Lewis v. Commissoner, supra, p. 639; MacRae v. Commissioner, supra, pp. 59-60. A paper or sham transaction cannot be regarded as one entered into for profit within the meaning of section 165(c)(2). Cf. Knetsch v. United States, supra.
It would appear that perhaps petitioner seeks a deduction for this expense under section 212(2) although he has not argued the matter on brief but seems to have left the matter *268 to this Court's discretion and consideration. The point was considered by the Court of Claims in Knetsch v. United States,, 348 F. 2d 932, 939 (1965), the second Knetsch case. There the court noted that a deduction under section 212(2) depends upon whether the expenditure arises "in connection with the taxpayer's profit-seeking activities. United States v. Gilmore, 372 U.S. 39, * * *.", and the court held that such deduction could not be allowed. Here, the same conclusion must be reached. Norton's "profit" motives in Transaction A were not the profit-seeking activities contemplated by the terms of section 165(c)(2), and the same is true with respect to section 212. It is held that petitioner is not entitled to a deduction of the out-of-pocket expense under section 212. Finally, is petitioner entitled to a deduction for the expense under section 1234. Petitioner has not presented any argument on brief with respect to this matter. Our conclusion is that for the purpose of the applicability of sections 1234 and 165(c)(2) (which also must be satisfied), Transaction A was not entered into for profit apart from expected tax benefits. The transaction could yield *269 an economic gain to Norton only if he succeeded from it in receiving the claimed deductions for "interest". Transaction A lacked substance and was a sham. Petitioner was required to show that he intended or expected to realize a profit from 1311 it apart from tax savings but he failed to do so. A deduction under section 1234 is not allowable. See Lewis v. Commissioner, supra, p. 640; Brown v. Commissioner, supra, pp. 464-467; DeWoskin, supra, pp. 363-364. The circumstances and the provisions in the notes of Norton in Transaction A were such that Norton did not have the right to terminate the transaction at any time, pay the note, and get the Land Bank bonds. The renewal, or second, note contained the provision that Norton would be required to give Gibraltar notice of an intention to "sell" the "pledged" bonds at a time very close to October 1, 1957, the maturity date of both his note and of the Land Bank bonds, i. e., not less than 10 days and not more than 30 days prior to the maturity date of his note, October 1, 1957. This factor distinguishes this case from Becker, supra, 277 F. 2d 146, and from some observations in MacRae v. Commissioner, supra, *270 on this point. The expense is not deductible under section 1234. It should be noted that the petitioner, Beatrice Norton, deceased, petitioner's wife, had nothing whatsoever to do with her husband's transactions with Gibraltar in A,B,C, and D, and that she was a petitioner in these cases only due to the filing of joint or individual returns for her as a spouse. Professor John P. Shelton, an economist, testified about various matters including the possibility of the realization of gain from the Land Bank bonds transaction. The parties have referred in their briefs to his testimony; it has been considered. The "hypothetical question" give by counsel to Shelton omitted some critical facts in these cases, and was confused in other respects. Shelton's testimony, though considered, does not establish that a true economic gain could have been realized, apart from expected tax benefits, and it was not helpful to petitioner in any respect. Shelton admitted (Tr. p. 992) that his opinions about possible gains included expected tax benefits. Issue 2: Docket No. 67854, 1953 Income of BRNM Law Partnership The determination to be made is the dollar amount of the earnings of BRNM law partnership *271 prior to February 23, 1953, when the operations of that partnership business were concluded. The respondent determined that only $36,215.16, out of $72,011.63, was the amount of the earnings up to February 23. The contention of Rosenthal and Norton is that $72,011.63 was earned by the BRNM partnership prior to February 23 even though that entire amount had not been paid to and collected by the BRNM partnership before February 23, 1953. The respondent's determinations in the statutory deficiency notice included the determinations that of the $72,011.63 net earnings for the fiscal year November 1, 1952, to October 31, 1953, the sum of $35,796.47 was "earned" after February 23, 1953, and that after that date the "partners" were only Rosenthal and Norton, so that one-half of the post-February 23 earnings was the income of Rosenthal, $17,898.24, and one-half was the income of Norton, $17,898.23. The parties are agreed that the net earnings for the 12-month period November 1, 1952, to October 31, 1953, were $72,011.63. The questions to be decided are (1) whether the entire amount of $72,011.63 was earned, although not collected, prior to February 23, 1953; and, if not, what part *272 of the $72,011.63 was earned after February 23 by Rosenthal and Norton as the remaining members of the old BRNM partnership. The questions presented are questions of fact with respect to which Norton, in this case, and Rosenthal, in a separate case now pending before the Court, had the burden of proof. Upon consideration of the evidence, our findings and conclusions are that the entire $72,011.63 represented net income earned prior to the cut-off date, February 23, 1953. It is concluded, further, that in making collections, and receiving payments, of accounts receivable of the old BRNM partnership after February 23, 1953, Rosenthal and Norton were acting only as representatives of the old partnership and as custodians of its funds, on hand and to be collected, and that they were not engaged after February 23, 1953, in conducting a business for themselves as the two remaining partners of the old BRNM partnership. In arriving at the latter conclusion, a distinction has been made between the procedures of Rosenthal and Norton in winding up, after February, the affairs of the BRNM partnership, and their conduct of their own separate business as the 1312 members of their new law *273 partnership, "Rosenthal and Norton". We are satisfied that no part of the $72,011.63 represented net earnings of a new partnership consisting only of Rosenthal and Norton, and that no part of the $72,011.63 represented income earned after February 23. It is concluded that respondent's determinations were not correct. It is held that the entire $72,011.63 was earned by the BRNM partnership before February 23, although part was collected after that date by Rosenthal and Norton, who acted, in effect, as custodians and conservators of the earnings of the old partnership. It is held, further, that the respective shares of Rosenthal and Norton were, respectively, 35 percent, $25,222.29, and 25 percent, $17,989.44, and that respondent erred in increasing Rosenthal's share by $4,134.81 and Norton's share by $9,876.59. Petitioner produced the ledger accounts of the BRNM partnership; the accounting records maintained after February 23 for the special account; a trial balance sheet for the BRNM accounts and the accounting records of the special account; and the testimony of Robert Brent, an independent Certified Public Accountant and an attorney. Brent examined the two sets of accounting *274 records, one made before and the other made after February 23, 1953. He located notations in the accounting records which showed that the legal fees and other items of income which were collected after February 23, 1953, were for services performed prior to that date. The collections of fees after February 23, 1953, were about $36,000, and the disbursements were about $11,220.61, making the net amount of those collections $24,779.39. We are satisfied with Brent's analysis, we accept his testimony as correct, and conclude that the gross and net amount of the collections after the above date were income earned by the old partnership prior to February 23, 1953. Issue 3: Docket Nos. 74913, 74914; Addition to 1954 Tax, Section 294(d)(2), 1939 Code Separate tax returns were filed for 1954 by Norton and his wife. One-half of Norton's income, $68,489.46, and one-half of the deductions, $47,321.92, were reported on each of the separate returns. Included in the deductions were $40,217.56, the total of Norton's payments in 1954 on his "promissory notes" in transactions A,B, and C. The net taxable income reported on Norton's return, Docket No. 74913, was $8,783.77, and the tax reported was *275 $2,226.48. The net taxable income reported on his wife's return, Docket No. 74914, was $9,383.77, and the reported tax was $2,430.48. Respondent disallowed the deduction taken on each return as "interest", of $20,108.78 (one-half deducted on each return). The other adjustment, uncontested, was the denial of a deduction of $1,104.97 on each return. Disallowance of the "interest" deductions accounted for most of the 1954 deficiencies, $10,991.98 for Norton, and $11,159.99 for his wife. The petitioners reported $1,530 as the estimated tax for 1954 of each one, Norton and Mrs. Norton. The respondent's determinations of the correct tax liability for 1954, after denying the deductions for "interest" and another uncontested deduction, were $13,218.46 for Norton, and $13,218.47 for Mrs. Norton. However, under Rule 50 the respondent will eliminate from taxable income for 1954 "interest" on Government bonds "involved" in the disputed transactions which was included in taxable income in the total amount of $21,412.11. One-half thereof, $10,706.05, will be eliminated from income reported on each individual return. That adjustment will reduce the 1954 tax of each petitioner to an amount which *276 will be less than the respondent's determinations of $13,218.46 and $13,590.47, respectively. Nevertheless, it appears that after the tax in each instance is recomputed, it will follow that the estimated tax of $1,530 still will be less than 80 percent of the tax. Section 294(d)(2), 1939 Code, which applies to 1954, (see section 6554(h), 1954 Code), provides that there shall be added to the tax an amount which (under certain facts) is equal to 6 percent of the amount by which such tax so determined exceeds the estimated tax. The addition to the tax is mandatory. DeWitt M. Sherwood, 20 T.C. 733; H. R. Smith, 20 T.C. 663. Petitioners have not shown that respondent erred in applying section 294(d)(2). Subject to the Rule 50 computations, the additions to the 1954 tax are sustained. But if section 294(d)(2) does not apply, upon the making of the recomputations under Rule 50, then there will not be such additions to each tax. Recomputations of the deficiencies are required under Rule 50 of the Court's 1313 rules. For 1953, Docket No. 67854, the conclusion is that respondent erred in increasing Norton's share of the old law partnership income by $9,876.59; *277 and respondent has agreed that there shall be excluded from income the amount reported as "interest" received on the Land Bank bonds, $10,888.89. On the returns for 1954, "interest" from Government bonds was included in income in the total amount of $21,412.11 (one-half being reported on each individual return). However, in the schedule attached to Norton's 1954 individual return, there was not a breakdown of the above amount showing the sources of the bond "interest" reported, such as transactions A,B, and C in these cases. Under Rule 50, the parties will agree upon the total amount of the "interest" on the Government bonds which were involved in the transactions in issue here, which amount is to be excluded from taxable income for 1954. The parties will compute under Rule 50, also, the total amount of the bond "interest" which was included in taxable income on the tax returns for 1955, 1956, 1957, 1958, and 1959 as "interest" on the bonds involved in the transactions in dispute in these cases, as it is not clear whether all of the interest from Government bonds which was reported in the income of each of the taxable years was "derived" from the securities which purportedly were *278 involved in the four transactions in issue in these cases, although it appears that such was the case. The taxable years 1960 and 1961 are not before this Court in these cases. Only transaction A, Federal Land Bank bonds, was "closed" in one of the taxable years involved here. The other three transactions were "closed" in 1960(D), and in 1961(B and C). The respondent has agreed that the purported "capital gain" which was included in the taxable income of Norton on his returns shall be excluded from income. With respect to transaction A, capital gain of $42,937.50 was reported in Norton's return for 1957. The appropriate adjustment thereof will be made under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. The cases consolidated with Docket No. 67854 are: Docket No. 74913, Samuel P. Norton; Docket No. 74914, Estate of Beatrice Norton, Deceased, Samuel P. Norton, Administrator and Docket Nos. 77098, 91362, and 94829, Samuel P. Norton and Estate of Beatrice Norton, Deceased, Samuel P. Norton, Administrator.↩
*. 1955: Payments appear to be 5 cents more than deducted. ↩
**. 1958: Payments appear to be 15 cents less than deducted.↩
2. See Jerome B. Rosenthal and Ruth B. Rosenthal, Tax Court Memorandum Opinion. 1970-332, filed November 30, 1970. ↩
3. See Estate of Martin M. Melcher, deceased, and Doris Day Melcher, Tax Court Memorandum report, T.C. Memo. 1970-237↩, filed August 24, 1970. 4. See Gordon MacRae, 34 T.C. 20 (1960), affirmed and modified 294 F. 2d 56↩ (C.A. 9, 1961).
*. By official Tax Court order, dated 11-20-70 and signed by Judge Harron, these sentences replaced the last sentence of this paragraph.- CCH.↩
*. By offlcial Tax Court order, dated 11-20-70 and signed by Judge Harron, this paragraph was replaced. - CCH.↩
*. Gibraltar's payments to Norton 1954-1958 totaled $17,211.57, but the note of Norton specified as the "reserve" $17,211.67. Gibraltar credited 10 cents to Norton, bringing its payments up to $17,211.67. But this adjustment of 10 cents reduced the net amount of Norton's payments to Gibraltar from $3,876.58 to $3,876.48. See p. 60.↩
*. By official Tax Court order, dated 11-20-70 and signed by Judge Harron, this paragraph was replaced. - CCH.↩
*. In Transaction D Gibraltar paid Norton $952.23 more than Norton paid Gibraltar and he did not have any out-of-pocket expense.↩
5. In Badger Materials, Inc., 40 T.C. 1061, 1063, this Court noted that "we are not at liberty to use the record on the motions originally filed by * * * [other parties] to determine the * * * issue as it relates to the other transferees. Cf. B. F. Edwards, 39 B.T.A. 735 (1939); and Funk v. Commissioner, 163 F. 2d 796 (C.A. 3, 1947). Consequently the last paragraph of our prior opinion is withdrawn * * *." In Funk v. Commissioner, 163 F. 2d 796, 799-802, the Court of Appeals for the Third Circuit discussed problems of judicial notice, with particular reference to the United States Tax Court. As a matter of fact (and this intra mural fact should now be made clear), the Division of this Court which heard and decided the Funk case, 7 T.C. 890↩, did not take judicial notice of the record or the judicially made Findings of Fact in the earlier case of Wilfred J. Funk, decided under a Memorandum Opinion (Judge Hill), Docket No. 111193, and the Government attorney in the Department of Justice, on appeal, was grossly in error in making such ex parte admission. However, for this Court to have undertaken to obtain correction of that misrepresentation and the inference made by the Court of Appeals would have involved a procedure which this Court unfortunately did not see fit to pursue.
6. Penultimate Caveats Judicial notice cannot be taken of records in a case involving different parties. Badger Materials, 40 T.C. 1061. Assertions in opening statements, in arguments, or in briefs are not evidence, and, while helpful where there is sufficient evidence in support of the contentions made, cannot be taken to supply evidence which is lacking. Paul R. Kennedy, T.C. Memo. 1958-139. The Court may take judicial notice of decisional law. However, citations are not evidence. Citations are not proof. Citations do not justify the service of arbitrary, unreasonable and capricious deficiency notices. The Court may not take judicial notice of findings of fact in other cases. Citations may not be used to carry Commissioner's burden of proof. Citations cannot be used to support Commissioner's presumption of correctness. Except in unusual circumstances to avoid unreasonable hardship, a court may not notice the records or judgment in a different case, even tho the other action is pending in or was determined by the same court and was between the same parties, Johnston v. Ota, 43 C.A. 2d 94, 110 P.2d 507. Precedents are the basis of stare decisis not res adjudicata. The Commissioner refused to produce the files of other taxpayers to enable petitioners to establish a course of conduct followed by the Commissioner. Citations are not evidence. Stare decisis is not res judicata. Presumptions are not evidence, but they impose upon the party against whom it operates the burden of proof as to the non-existence of the presumed fact. When taxpayers proved a prima facie case, the burden of going forward with the evidence shifts to the Commissioner. The presumption of correctness is not evidence and may not be given any weight as evidence. Examine the deficiency notices for the grounds of disallowance. The Commissioner is stuck with these as he has pleaded no other grounds. He must affirmatively allege new grounds. Mertens § 50.63.↩
7. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * * (b) INTEREST. - All interest paid or accrued within the taxable year on indebtedness, * * * SEC. 163. INTEREST. (a) GENERAL RULE. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩